# EXHIBIT 2

# EXHIBIT 2



**BENNET OMALU**
P A T H O L O G Y

Phone: 279-345-1300
Fax: 866-402-6875
**bennetomalu@bennetomalu.com**

Autopsy and Anatomic Pathology
Clinical Pathology and Toxicology
Forensic Pathology

Neuropathology
Epidemiology
Medico-Legal Consultations

Roger P. Croteau, Esq.                                               June 6, 2024
Roger P. Croteau & Associates, Ltd.
2810 West Charleston Boulevard, Suite 67
Las Vegas, Nevada 89102

Dear Mr. Croteau,

**Re:    Reiner Sommer, Deceased
         Medico-Legal Report**

**Summary of Education, Training and Experience**

I completed medical school in 1990 at the University of Nigeria, Enugu, Nigeria. Upon
graduating from medical school, I completed a one-year clinical housemanship at the University
of Nigeria Teaching Hospital in the fields of Pediatrics, Internal Medicine, General Surgery,
Obstetrics, and Gynecology. After housemanship, I worked as an emergency room physician at a
university hospital in Nigeria for approximately three years. I sat for and passed my United
States Medical Licensing Examinations [USMLE] while I worked as an emergency room
physician. I came to the United States in 1994 through a World Health Organization scholarship
to become a visiting research scholar for eight months at the Department of Epidemiology,
Graduate School of Public Health, University of Washington, Seattle, Washington.

In 1995, I proceeded to the College of Physicians and Surgeons of Columbia University, New
York, at Harlem Hospital Center, to complete residency training in Anatomic Pathology and
Clinical Pathology. In 1999 I proceeded to the University of Pittsburgh, Pittsburgh, Pennsylvania
to complete residency training in Forensic Pathology and Neuropathology. I hold four board-
certifications in Anatomic Pathology, Clinical Pathology, Forensic Pathology and
Neuropathology. I also hold a Masters in Public Health [MPH] degree in Epidemiology from the
Graduate School of Public Health, University of Pittsburgh, Pittsburgh, Pennsylvania. I also hold
a Masters in Business Administration [MBA] degree from the Tepper School of Business,
Carnegie Mellon University, Pittsburgh, Pennsylvania, one of the leading business schools in the
world. I am a Certified Physician Executive and an Honorary Fellow of the American Association
of Physician Leadership [AAPL]. I also hold a fifth board-certification in Medical Management
from the AAPL. I am currently licensed to practice Medicine and Surgery in the State of
California.

I am currently the President and Medical Director of Bennet Omalu Pathology [BOP], a
California medico-legal consulting firm, and a Clinical Professor at the Department of Medical

Pathology and Laboratory Medicine, University of California, Davis. In my capacity as the Medical Director of BOP, I am a consulting Forensic Pathologist and Neuropathologist to many hospitals in central California and to several counties in northern California. There are less than a few dozen practicing Forensic Pathologists-Neuropathologists in the United States who are board-certified in both Forensic Pathology and Neuropathology.

For over twenty years, I have been involved in over thirteen thousand death and injury investigations in my career as a Forensic Pathologist and Neuropathologist, which began in 1999. I have personally conducted and performed over twelve thousand autopsies and death investigations and examined over thirteen thousand brain tissue specimens. I also perform trauma pattern analysis in both living patients and deceased patients to determine causes and mechanisms of sustenance of injuries and death. I am also involved in the evaluation of living victims of all types of injuries and trauma, including but not limited to victims of assault, traumatic falls, industrial and accidental injuries, medical complications and misadventures, rape, child abuse and sports-related injuries. I have been consulted and retained as an expert witness in one to two thousand cases involving all types of medico-legal cases across all jurisdictions in the United States including federal, state, county and municipal courts and arbitration panels; in both civil and criminal cases, for the plaintiff, defense, district attorneys and public defenders. I have been involved as an expert witness in complex class action and industrial lawsuits involving thousands of individuals and major corporations.

My areas of interest and focus include brain patho-physiology, brain injuries and brain trauma, in both living and deceased patients. I identified Chronic Traumatic Encephalopathy [CTE] in a retired football player when I performed an autopsy and examined the brain of Mike Webster in 2002. Subsequently, I identified CTE in other high-impact, high-contact sports athletes and in military veterans suffering from Post-Traumatic Stress Disorder [PTSD]. Since 2002 CTE has received international attention from the sports industry, sports medicine, and neuroscience. My work has been featured extensively in all media platforms across the world. My work and life were featured in a major Hollywood film, "Concussion" released in December 2015 by Sony Motion Pictures, in which the renowned actor, Will Smith, played me as Dr. Omalu. Several New York Times best-selling books have also been published on my life and work including "The League of Denial" and "Concussion." I have published several books including my memoir, "Truth Doesn't Have a Side," which was published in August 2017. My latest book, "Brain Damage in Contact Sports" was published in February 2018. I have published extensively in the medical and scientific literature, authoring many scientific papers and book chapters.

I have received three honorary PhD degrees from two universities in the United States, and from the Royal College of Surgeons of Ireland in recognition of my work and expertise. I have also received numerous awards from across the world in recognition of my work and expertise in both living and deceased patients. I have received the "Distinguished Service Award" from the American Medical Association [AMA], which is the most prestigious award of the AMA. I have been honored by the United States Congress and I have appeared on multiple occasions before committees of the United States Congress and committees of State Legislatures across the Unites States advising them on matters relating to trauma. In 2019 and 2020 I was appointed to the Traumatic Brain Injury Board of the State of California to advise the State on matters relating to traumatic brain injuries.

Since 1999 I have testified as an expert witness in matters relating to all types of injuries and deaths in over 600 court proceedings across the United States. I have attached a copy of my



curriculum vitae, which enumerates my body of work and experience in greater detail. The cases I have testified in, beginning in 2009, are enumerated at the end of my curriculum vitae.

Pursuant upon your request, I have reviewed the materials sent to me on the case of Reiner Sommer, Deceased.

A list of the materials submitted to me for review, and reviewed by me on this case is attached to this report as Appendix A.

In order to perform and apply a valid differential diagnosis method on this case, including but not limited to causation criteria[1] analysis, central limit theorem analysis and clinico-pathologic correlation analysis, I had to review, document, and analyze the materials sent to me in considerable depth and detail. Such differential diagnosis and review would form the foundation for my case-specific and general causation opinions in this case.

**Brief Summary of Prevailing Forensic Scenario[2,3]**

At the time of his death on October 18, 2021, Reiner Shawn Sommer (Reiner Sommer) was a 50-year-old white male who was born on March 7, 1971. His death certificate states his underlying cause of death to be Toxic Effects of Methamphetamine in the Setting of Police Restraint. The manner of his death was a homicide. Other significant contributory factors to death were Atherosclerotic and Hypertensive Cardiovascular Disease and Obesity.

On October 18, 2021, at approximately 10:30 a.m., Mr. Sommer entered a Walgreens store, made his way to the pharmacy where he submitted prescriptions to be filled. The store manager, Joshua Bever, later found Mr. Sommer in the bathroom, lying on the ground inside the toilet stall. He seemed confused and was incoherent. Mr. Bever called 911 at about 01:08 p.m.

Paramedics of the Clark County Fire Department (CCFD), Todd Garwood and Matthew Pokorny responded. Upon their arrival at the Walgreens store, Mr. Sommer was lying on the bathroom floor, with a water bottle and Emergen-C packets around him. He weighed approximately 300 pounds and was probably six feet tall. He was acting erratic, slapping the floor and his stomach, and acting inappropriately. Once the stall door was unlocked, paramedics attempted to get him to sit up and speak with them but he was uncooperative and would not follow commands. He appeared to be exhibiting an acute psychotic episode with confusion and incoherence. His blood sugar was within normal limits so Todd Garwood suspected he was on drugs.

Mr. Sommer ripped one packet of Emergen-C open and poured it into his mouth dry, drank out of the toilet bowl, and later knocked the toilet off the floor. When AMR arrived, officers of the Las Vegas Metropolitan Police Department (LVMPD) were called at about 01:38 p.m. Todd

---

[1] Hill, AB. The Environment and Disease: Association or Causation? Proc R Soc Med. 1965 May;58(5):295-300. PMID: 14283879; PMCID: PMC1898525. [These are causation criteria that long existed prior to Sir Hill for the purposes of differentia diagnosis. However, he summarized them in a speech that he gave in 1965. Since then, these criteria applied in the method of differential diagnosis became known as the Bradford Hill criteria. However, they existed and were in use prior to Sir Hill's speech].

[2] This section of the report should not be used to establish the facts in this case and is not intended to be used to establish the facts in this case.

[3] There are body camera video clips, which were submitted and reviewed, and in part show the terminal events of the restraint asphyxiation. These video clips confirm the prevailing terminal forensic scenario.



Garwood stated that the initial plan by the paramedics was to sedate Mr. Sommer with Ketamine. Mr. Sommer continued to behave erratically.

At 01:44 p.m. officers of the LVMPD (Sergeants Bagaporo and Blum) arrived and were briefed by CCFD and AMR personnel. When they entered the bathroom, they saw Mr. Sommer lying on the bathroom floor, yelling incoherently, and making noises. Sergeant Blum created a plan to take Mr. Sommer into custody and allow medical personnel to assist him once additional officers arrived. At that time, Officer Garcia had arrived and was inside the restroom when Mr. Sommer moved away from the toilet bowl to the opposite end of the bathroom stall.

Sergeant Blum directed officers to move in and take Mr. Sommer into custody, who by then, was on the floor at a corner of the stall, lying face down with his head in the corner. His arms were underneath his body. Officers conducted a segmenting tactic on him. Sergeant Blum grabbed Mr. Sommer's feet while two other officers restrained his trunk, applying and pressing him down prone on the ground with their extremities and body weight. Two officers climbed on top of him, on his back, kneeling on him, applying their body weight on him, and pressing him down and prone on the ground. Mr. Sommer made grunting and growling noises.

The officers removed Mr. Sommer's arms from underneath his body and placed him in handcuffs, while pressing his body and head down on the floor. At this point Mr. Sommer was noted to become unresponsive and flaccid after about 2-3 minutes of pressing him down prone on the ground. They pulled him out from the bathroom into the main portion of the bathroom where he was rolled onto his side in the recovery position. An officer stated that Mr. Sommer was turning purple. Officers informed the medical team that Mr. Sommer was unresponsive, and they were asked to bring him out into the hallway where they would have more room to work on him. He was eventually pulled into the open portion of the store as they performed life-saving measures. Mr. Sommer was emergently transported to Southern Hills Hospital where he was pronounced deceased by Dr. Aronstein at 01:42 p.m.

Mr. Sommer had a past medical history of a bipolar disorder, hypertension, diabetes mellitus, depression, chronic low back pain, and sciatica. He was a smoker and used Marijuana.

**Autopsy:**
A full autopsy was performed on the body of Reiner Sommer on October 19, 2021, at the Clark County Coroner-Medical Examiner's Office by Dr. Ben Murie, Medical Examiner. Dr. Murie opined that Reiner Sommer, a 50-year-old white male died as a result of the Toxic Effects of Methamphetamine in the Setting of Police Restraint. The manner of his death was determined to be a Homicide. Other significant contributory factors were Atherosclerotic and Hypertensive Cardiovascular Disease and Obesity.

At autopsy, Mr. Sommer weighed 326 pounds and measured 71 inches. His body mass index was 45.5 kg/m².

Dr. Murie enumerated the following pathologic diagnoses:

I.   Toxic effects of Methamphetamine in the setting of police restraint
     a.   Postmortem toxicology positive for Amphetamine and Methamphetamine
II.  Atherosclerotic and hypertensive cardiovascular disease
III. Obesity
IV.  Multifocal abrasions and contusions



V.    Postmortem toxicology, additional:
a.   Positive for THC and Norbuprenorphine

Dr. Murie described injuries associated with medical intervention to include multiple bilateral anterolateral rib fractures, hepatic laceration adjacent to the falciform ligament, and a 600 ml hemoperitoneum, as well as contusions and abrasions of the anterior aspect of the chest

Dr. Murie described the following evidence of trauma:

Head:
1.    There was a 1.5 x 2 cm red-brown abrasion of the nose.
2.    There were scattered red-brown abrasions of the lips measuring from 0.1 cm to 1.8 cm in greatest dimensions.
3.    There was a 0.5 cm red abrasion of the left ear

Torso:
1.    There were multiple purple-brown contusions of the anterior aspect of the chest covering a total surface area of approximately 21-25 cm.
2.    There were scattered red-brown abrasions of the anterior aspect of the chest measuring from 0.1 to 1 cm in greatest dimensions.
3.    There was a 1 x 2 cm purple contusion of the upper right buttock.
4.    There was an 8 x 12 cm area of red-brown abrasions of the left middle back.
5.    There were purple contusions of the right flank that covered a 13 x 15.5 cm surface area.
6.    There was a 4.5 x 7.5 cm blue contusion of the left side of the abdomen.

Extremities:
1.    There was a 1 x 1 cm red-brown abrasion of the dorsum of the right wrist.
2.    There were multiple red-brown abrasions and purple contusions, 2 cm in greatest dimension, of the dorsum of the right hand.
3.    There was a 4 x 4 cm green to purple contusion of the right arm.
4.    There were multiple scattered brown contusions, 1-4.5 cm in greatest dimension, of the right forearm.
5.    There were also multiple red-brown abrasions of the right forearm.
6.    There was a 2.5 x 2.5 cm red-brown abrasion of the right elbow.
7.    There was a 0.5 cm tan-red laceration, centered by a 2 x 2 cm blue contusion of the ventral aspect of the right thumb.
8.    There was a 0.5 cm abrasion of the right middle finger.
9.    There were red abrasions of the right palm that measured 1 cm in greatest dimension.
10.   There was an 11 x 14 cm area of blue-purple contusions of the left arm.
11.   There was a 10 x 3 cm area of red-brown abrasion of the left forearm.
12.   There was a 7 x 12 cm area of purple contusions of the left forearm.
13.   There was a 6 x 6 cm area of purple contusions of the dorsum of the left hand.
14.   There was a 3.5 x 8 cm area of contusions of the right knee.
15.   There was a 4 x 6 cm area of red-brown abrasions of the right leg.
16.   There was a 1.5 x 4 cm area of red-brown abrasions and a 5 x 7 cm area of purple contusions of the left knee.

The brain weighed 1490 grams. The heart weighed 580 grams and the right and left lungs weighed 1240 grams and 850 grams respectively and were red-purple. The liver weighed 2200 grams with mottled red-brown parenchyma. The vessels of the circle of Willis showed mild



atherosclerotic disease. The coronary arteries revealed 50% stenosis of the left main coronary artery by an atherosclerotic plaque. There was 25% stenosis of the left anterior descending and the right coronary arteries by an atherosclerotic plaque. There was dilatation of the four cardiac chambers. The walls of the right ventricle, left ventricle and interventricular septum measured 0.5 cm, 1.5 cm, and 1.8 cm, respectively. The aorta had moderate uncomplicated atherosclerosis. The cut surfaces of the lungs exuded abundant amounts of blood and frothy fluid.

No tissue histologic analysis was performed and no tissue microscopic examination was performed.

Post-mortem plain X-ray imaging revealed orthopedic hardware in the thoracolumbar spine region.

Autopsy heart blood samples and unspecified peripheral blood samples were submitted for toxicologic analyses to the NMS Labs, Horsham, Pennsylvania. The following toxicologic profile was enumerated:

| Compound | Result | Unit | Matrix Source |
|---|---|---|---|
| Amphetamine | 43 | ng/mL | Peripheral Blood |
| Methamphetamine | 180 | ng/mL | Peripheral Blood |
| Norbuprenorphine-free | 0.61 | ng/mL | Peripheral Blood |
| Delta-9 Carboxy THC | 8.0 | ng/mL | Peripheral Blood |

**Medico-Legal Questions**

1. **What were the underlying cause of death, mechanism of death, contributory factor to death and manner of death of Reiner Sommer?**

Medicine is a life science, which is evidence based. The practice of medicine is guided by established standards and generally accepted principles, which certified physicians must adhere to. The specialties and the categories of physicians who are proficiently trained, specialized, and competent in the accurate determination of the cause, mechanism and manner of death are the forensic pathologists, especially for deaths involving all types of trauma and bodily injury. The death of Reiner Sommer involved serious bodily injury.

The College of American Pathologists [CAP] describes the specialty of forensic pathology as follows: "Forensic pathology is the subspecialty of pathology that directs its efforts to the examination of living or dead persons in order to provide an opinion concerning the cause, mechanism, and manner of disease, injury or death; the identification of persons; the significance of biological and physical evidence; the correlation and/or reconstruction of wounds, wound patterns, and sequences; and conducting comprehensive medico-legal death investigations. Forensic pathology applies techniques of pathology to the needs and protection of public health, public safety, quality assurance, education in medicine, research, jurisprudence, and the administration of justice. Its highest goal is the development of strategies to prevent injury, disease, and death."[4]

---

[4] Homepage | College of American Pathologists (cap.org)



The CAP also describes a forensic pathologist as follows: "A forensic pathologist is a pathologist with special training and experience in forensic pathology who is actively engaged in medico-legal autopsies and death investigations. Forensic pathologists shall be board-certified by the American Board of Pathology or American Osteopathic Board of Pathology after appropriate training and passing a rigorous examination, or a non-USA based pathologist with equivalent certification. The practicing forensic pathologist is licensed in one or more states; he/she is skilled in conducting death investigations, interpreting injuries in both fatal and non-fatal cases, performing medico-legal examinations, determining disease/injury causation to an appropriate degree of medical certainty, and determining cause and manner of death."[5]

Trauma pattern recognition, interpretation and analyses are the fundamental methodologies the forensic pathologist adopts in the differential diagnoses of causes and mechanisms of injuries and/or death. Trauma pattern recognition, translation and analysis are commonly applied to forensic differential diagnoses, opinions, and conclusions. It is a generally accepted principle and common knowledge in medicine and forensic pathology, that specific traumatic events generate predictable, reproducible, and specific patterns of injuries, outcomes, and death.

The practice of forensic pathology is guided by very well-established and generally accepted principles, which board-certified forensic pathologists must adhere to while they routinely perform differential diagnoses and determine causes, mechanisms, and manners of death. Objective decisions, conclusions and opinions should be made in all types of trauma case analyses strictly based on objective interpretations of patterns of injuries, prevailing forensic scenarios, and trauma pathophysiology. The prevailing global forensic scenarios, the patterns of trauma and the expected outcomes of trauma exhibited by Reiner Sommer are vividly consistent with fatal and homicidal trauma as prescribed by the well-established and generally accepted patho-physiology of trauma and disease.

The determination of cause and manner of death are guided by and must adhere to very well-established and generally accepted principles and concepts, standards of practice and common knowledge of science and medicine. In order to determine the cause of death of Reiner Sommer accurately and competently, we may have to review these generally accepted principles and concepts, standards of practice and common knowledge. Forensic pathologists cannot determine cause and manner of death at whim outside these principles, concepts, and standards when they perform differential diagnoses to determine causes, mechanisms, and manners of death. Objective decisions, conclusions and opinions should be made in all types of trauma case analyses strictly based on objective interpretations of patterns of injuries and prevailing forensic scenarios, which should be based on these well-established and generally accepted principles and concepts, standards of practice and common knowledge of science and medicine.

There are four components of cause of death, viz: underlying cause of death, contributory factor to death, mechanism of death and manner of death.

<u>What is an underlying cause of death?</u>
The underlying cause of death is defined as the single factor, event, or disease, which instigates or initiates a terminal chain of events that finally culminates in death. It must not be a single disease. An event like compression of the body, a gunshot wound of the head, an assault or a fall

---

[5] Homepage | College of American Pathologists (cap.org)



can be a cause of death, when it initiates the terminal chain of events. The chain of events, which occurs between the underlying cause of death and death itself, encompasses the mechanisms of death. Mechanisms of death are typically not written on the death certificate.

An illustration is when an individual is shot in the spine causing quadriplegia. Assuming the individual survives for fifteen years after he was shot and develops the known sequelae of quadriplegia like recurrent bronchopneumonia, recurrent aspiration pneumonia, recurrent urinary tract infections, and decubitus ulcers, and finally develops an overwhelming sepsis and dies from sepsis. The underlying cause of death will be the event, gunshot wound of the spine. The terminal chain of events and the mechanisms of death would include the recurrent infections and the sepsis, which finally preceded death. Although the immediate causes of death in this instance are natural diseases, the traumatic gunshot wound of the spine precipitated the natural diseases and would supersede the natural diseases. The cause of death on the death certificate may be completed as "Gunshot Wound of the Spine."

When unnatural events or diseases, like falls from any height, compression of the body or fractures, co-occur with natural events or diseases, like cancer or heart disease in the cascade of events that precipitate death, the unnatural events or diseases supersede the natural events or diseases and assume the cause and manner of death.

An illustration is a 60-year-old woman who is dying from end-stage cancer and has only several months to live. She is admitted into a hospice care center for comfort care only. She got up from bed one morning to go to the bathroom, slipped, fell on the ground, and impacted her head on the floor. She sustained subdural hemorrhages inside her skull and died several weeks later from complications of surgery to evacuate the subdural hemorrhage. The cause of death in this instance would be the traumatic brain injury she suffered because it was an unnatural disease or event, although she had suffered advanced cancer for several years and was dying from terminal cancer, which is a natural disease. The manner of death therefore would be an accident.

For a factor or disease to assume the underlying cause of death, there has to be a contiguous chain of events between the initial occurrence of that factor or disease and the occurrence of death, without any significant breach. The interval between the initiating factor and final demise is immaterial and non-contributory to the determination of an underlying cause of death as far as a contiguous chain of events can be established and competently linked to the initiating factor without any significant breach.

When there is a pre-existing lethal chain of events from any factor or disease, and a novel factor or disease arises, either dependent on, or independent of the pre-existing factor or disease, and successfully disrupts and breaches the contiguity of the chain of events of the pre-existing factor or disease, while initiating a novel lethal chain of events, which culminates in death, the novel factor or disease would assume the underlying cause of death.

An illustration is the instance of a 55-year-old obese man with severe coronary atherosclerotic disease, who has had multiple myocardial infarctions and a triple coronary artery by-pass surgery and has developed and is dying from end-stage congestive cardiac failure from ischemic cardiomyopathy. If this same man falls backwards at home while opening a chest of drawers, which falls on top of him, entraps him and compresses his trunk for about 5 minutes before his 26-year-old son finds him and moves the chest of drawers off him. Unfortunately, by this time he was beginning to lose consciousness. The wife calls 911, paramedics arrive and emergently take him to the hospital where he is successfully resuscitated but had suffered asphyxial brain



injury. He is admitted into the intensive care unit where he dies two days later from complications of compression of the trunk and asphyxial brain injury. Although he was suffering and dying from severe and advanced heart disease, the compression of his trunk, which he suffered was a novel and independent factor which instigated a novel chain of events, which successfully interrupted the previously existing chain of events, which culminated in his death. Compression of the trunk would therefore assume the underlying cause of death and determine the manner of death, which in this instance would be an accident. The asphyxial injury of the brain is an unnatural disease and would supersede the natural diseases and assume the cause and manner of death.

For every disease, there are extenuating and aggravating factors, which can either decrease or increase the risk of suffering from or dying from a disease. A contemporaneous or co-morbid disease or factor that increases the risk of a second disease or factor does not denote causation, rather it denotes co-morbidity. Disease or event "A" that is co-morbid with disease or event "B" does not mean disease "A" causes disease "B" and vice versa.

<u>What is a contributory factor to death?</u>
A heading in the death certificate states the following: "Other Conditions Contributing to Death." A contributory factor to death is defined as any factor, disease, or event, which occurs contemporaneously with the underlying cause of death, possesses an independent capacity to cause death, however the lethality of this capacity is inferior to the lethality of that of the underlying cause of death. The contributory factor may accentuate or accelerate the lethality of the underlying cause of death.

An illustration is the instance of a man who suffers from end-stage metastatic lung cancer and sustains a fracture of his humerus when he fell in his living room. He is taken to the hospital, and he undergoes open reduction and internal fixation with intramedullary rods. He unfortunately suffers a post-traumatic fat embolism following his surgery and dies from acute respiratory failure six days after he sustained his fracture. The underlying cause of death would be acute respiratory failure due to traumatic fat embolism due to fracture of the humerus. The contributory factor to death will be the metastatic lung cancer. The manner of death would be an accident. The lethal capacity of the traumatic fat emboli caused by his fractured humerus is far more superior to the lethal capacity of his lung cancer. This is why the fractured bone killed him within six days while he had survived lung cancer for three years. Traumatic fat embolism from a fractured long bone and metastatic lung cancer independently possesses potent lethal capacities, however the lethal capacity of traumatic fat embolism is superior to that of lung cancer; and traumatic fat embolism is an unnatural disease, while lung cancer is a natural disease. Traumatic fat embolism caused by a fracture would therefore become the underlying cause of death and assume the manner of death, which will be an accident. The lung cancer will become the contributory factor to death.

A contributory factor to death may become an underlying cause of death, if and when it instigates a chain of events, which successfully interrupts the pre-existing chain of events of the underlying cause, which has been discussed above. In this instance, the underlying cause of death would become the contributory factor.

<u>What is a manner of death?</u>
The manner of death is a medico-legal terminology, which categorizes the circumstances, which surround death sometimes referred to as "the prevailing terminal forensic scenario." There are two broad categories of manners of deaths:



1.  Natural
2.  Un-natural

Natural deaths are deaths caused by known natural diseases as have been published in the International Classification of Diseases. Un-natural deaths are classified into four manners of death:
1.  Homicide
2.  Suicide
3.  Accident
4.  Undetermined

For this report, only the homicide manner of death will be defined. A death is classified as a medical homicide when a person intentionally, knowingly, recklessly, or negligently causes the death of another human being. A medical homicide may be deemed as a death that occurs, directly or indirectly, as a result of another person's actions.

In the determination of manner of death, whenever an un-natural factor plays a role in the causation and mechanism of death, no matter how infinitesimal, the unnatural factor supersedes the natural factors and assumes the manner of death.

The case of Reiner Sommer

On October 18, 2021, Reiner Sommer was a 50-year-old male who was alive and well. He was not in any imminent death and was not dying from any disease before he encountered the police. He was suffering from the effects of Methamphetamine intoxication. His autopsy confirmed that he suffered from hypertensive cardiovascular disease and coronary atherosclerotic disease. Hypertensive cardiovascular disease and coronary atherosclerotic disease are prevalent in the United States population and were neither expected to kill him nor were killing him on October 18, 2021. 51% of adult men in the United States who are 18 years old and above suffer from hypertension[6]. About 7-10% of adults in the United States who are 20 years old and above suffer from coronary artery disease[7]. About 20.5 million of adults in the United States suffer from coronary artery disease, making it the most common type of heart disease in the United States[8].

Mr. Sommer had a medical history of bipolar disorder. The video clips of the body cameras show him manifesting symptoms of a substance-induced acute psychosis[9,10]. Substance-induced acute psychosis is part of the substance use disorder which involves a brief period of delusion, hallucination, disorganised thoughts and/ or speech following the use of drugs like stimulants including but not limited to Methamphetamine, compared to a baseline state. Just like we have in this case, it is associated with a history of bipolar disorder and schizophrenia. It is a transient state that is not expected to cause death, and effective treatment involves ruling out

[6] Products - Data Briefs - Number 364 - April 2020 (cdc.gov)
[7].https://www.cdc.gov/heartdisease/facts.htm#:~:text=Coronary%20Artery%20Disease,killing%20382%2C820%20people%2
0in%202020.&text=About%2020.1%20million%20adults%20age,have%20CAD%20(about%207.2%25).&text=In%202020%2
C%20about%202%20in,less%20than%2065%20years%20old.
[8] https://www.nhlbi.nih.gov/health/coronary-heart-
disease#:~:text=About%2020.5%20million%20U.S.%20adults,the%20surface%20of%20the%20heart.
[9] Baldaçara L, Ramos A, Castaldelli-Maia JM. Managing drug-induced psychosis. Int Rev Psychiatry. 2023 Aug-Sep;35(5-6):496-502. doi: 10.1080/09540261.2023.2261544. Epub 2024 Feb 1. PMID: 38299647.
[10] Fiorentini A, Cantù F, Crisanti C, Cereda G, Oldani L, Brambilla P. Substance-Induced Psychoses: An Updated Literature Review. Front Psychiatry. 2021 Dec 23;12:694863. doi: 10.3389/fpsyt.2021.694863. PMID: 35002789; PMCID: PMC8732862.



emergencies, investigating underlying causes, and addressing acute intoxication and withdrawal using sedative and antipsychotic drugs like Benzodiazepines and Chlorpromazine. Mr. Sommer's manifestation of substance-induced psychosis on October 18, 2021 was a transient state, and was not expected to kill him, and was not killing him. As the paramedics had noted, Mr. Sommer needed medical treatment and sedation and not violent takedown and physical restraint. In fact, substance induced psychosis is not a rare occurrence; a majority of patients who use drugs like Methamphetamine and Cocaine manifest substance induced psychosis and is very prevalent in this cohort of the population[11].

Reiner Sommer's medical history, which included the disease substance use disorder is not uncommon in the United States. He was not an anomaly. According to the National Center for Drug Abuse Statistics, 50% of people aged 12 and over in the United States population have used illicit drugs in their lifetime[12]. And according to the Substance Abuse and Mental Health Services Administration of the United States Department of Health and Human Services, in 2021, 42.9 million people aged 12 or older [or 15.3 percent of the population] had an illicit drug or alcohol use disorder in the past year[13].

<u>Reiner Sommer did not die as a result of Cardiac or Cardiopulmonary Arrest</u>
Reiner Sommer, a 50-year-old male did not die from cardiac arrest, cardiopulmonary arrest, or cardiac arrhythmia. A very basic and fundamental handbook for the determination of cause of death was published by the CDC in 2003[14] and it was titled "Physicians' Handbook on Medical Certification of Death". Page 13 of this handbook states the following:

> The immediate cause does not mean the mechanism of death or terminal event (for example, cardiac arrest or respiratory arrest). The mechanism of death (for example, cardiac or respiratory arrest) should not be reported as the immediate cause of death as it is a statement not specifically related to the disease process, and it merely attests to the fact of death. Therefore, the mechanism of death provides no additional information on the cause of death.

Page 32 of the same book states the following:

---

[11] Smith MJ, Thirthalli J, Abdallah AB, Murray RM, Cottler LB. Prevalence of psychotic symptoms in substance users: a comparison across substances. Compr Psychiatry. 2009 May-Jun;50(3):245-50. doi: 10.1016/j.comppsych.2008.07.009. Epub 2008 Sep 23. PMID: 19374969; PMCID: PMC2743957.
[12] https://drugabusestatistics.org/
[13] https://www.samhsa.gov/data/sites/default/files/reports/rpt39443/2021NSDUHFFRRev010323.pdf
[14] Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics. Physicians' Handbook on Medical Certification of Death. 2003 Revision. Hyattsville, Maryland. DHHS Publication No. [PHS] 2003-1108.



**When processes such as the following are reported, additional information about the etiology should be reported:**

| | | | |
|---|---|---|---|
| Abscess | Cerebrovascular accident | Hemothorax | Peritonitis |
| Abdominal hemorrhage | Cerebellar tonsillar herniation | Hepatic failure | Pleural effusions |
| Adhesions | Chronic bedridden state | Hepatitis | Pneumonia |
| Adult respiratory distress | Cirrhosis | Hepatorenal syndrome | Pulmonary arrest |
| syndrome | Coagulopathy | Hyperglycemia | Pulmonary edema |
| Acute myocardial infarction | Compression fracture | Hyperkalemia | Pulmonary embolism |
| Altered mental status | Congestive heart failure | Hypovolemic shock | Pulmonary insufficiency |
| Anemia | Convulsions | Hyponatremia | Renal failure |
| Anoxia Anoxic encephalopathy | Decubiti | Hypotension | Respiratory arrest |
| Arrhythmia | Dehydration | Immunosuppression | Seizures |
| Ascites | Dementia (when not | Increased intra cranial | Sepsis |
| Aspiration | otherwise specified) | pressure | Septic shock |
| Atrial fibrillation | Diarrhea | Intra cranial hemorrhage | Shock |
| Bacteremia | Disseminated intra vascular | Malnutrition | Starvation |
| Bedridden | coagulopathy | Metabolic encephalopathy | Subdural hematoma |
| Biliary obstruction | Dysrhythmia | Multiorgan failure | Subarachnoid |
| Bowel obstruction | End-stage liver disease | Multisystem organ failure | hemorrhage |
| Brain injury | End-stage renal disease | Myocardial infarction | Sudden death |
| Brain stem herniation | Epidural hematoma | Necrotizing soft-tissue | Thrombocytopenia |
| Carcinogenesis | Exsanguination | infection | Uncal herniation |
| Carcinomatosis | Failure to thrive | Old age | Urinary tract infection |
| Cardiac arrest | Fracture | Open (or closed) head | Ventricular fibrillation |
| Cardiac dysrhythmia | Gangrene | injury | Ventricular tachycardia |
| Cardiomyopathy | Gastrointestinal | Pancytopenia | Volume depletion |
| Cardiopulmonary arrest | hemorrhage | Paralysis | |
| Cellulitis | Heart failure | Perforated gallbladder | |
| Cerebral edema | | | |

The CDC also published another handbook in 2003 titled "Medical Examiners' and Coroners' Handbook on Death Registration and Fetal Death Reporting"[15]. Page 61 of this handbook states the following:

**32. CAUSE OF DEATH**

Detailed instructions for this item, together with case records, are contained in the section on Medical Certification of Death in this handbook.

These items are to be completed by the attending physician or medical examiner/coroner certifying or reporting his or her opinion on the cause of death.

**Part I.** Enter the chain of events—diseases, injuries, or complications—that directly caused the death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest, or ventricular fibrillation without showing the etiology. DO NOT ABBREVIATE. Enter only one cause on a line. Add additional lines if necessary.

The cause of death means the disease, abnormality, injury, or poisoning that caused the death, not the mechanism of death, such as cardiac or respiratory arrest, shock, or heart failure.

The CDC in these books clearly confirms that Reiner Sommer did not die as a result of cardiac arrest. As these handbooks show, an individual cannot die from cardiac arrest or arrythmia. Both are mechanisms of death. The cause of death should be the underlying factor which caused these pathophysiological mechanisms. Moreover, there is no deceased human being who does not suffer cardiac arrest or arrhythmia as part of the pathophysiological cascades of death. The vital medico-legal question, therefore, is what induced Reiner Sommer' cardiac arrest.

<u>Reiner Sommer did not die from Methamphetamine toxicity</u>
Toxicologic analysis of Reiner Sommer's peripheral blood sample revealed the presence of Methamphetamine [0.18 mg/L] and Amphetamine [0.043 mg/L]. This means that Reiner Sommer had consumed Methamphetamine within hours of his death. Reiner Sommer did not consume Amphetamine separately; Amphetamine is a metabolite of Methamphetamine. Every human being who consumes Methamphetamine, even on habitual basis, does not die from

---

[15] Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics. Medical Examiners' and Coroners' Handbook on Death Registration and Fetal Death Reporting. 2003 Revision. Hyattsville, Maryland. DHHS Publication No. [PHS] 2003-1110.



Methamphetamine overdose. Majority of human beings who consume Methamphetamine as a recreational drug do not die from Methamphetamine. For example, statistical estimates indicate that about 13 million people, 12 years and older, in the United States have reported using Methamphetamine. Only about 100 thousand people [0.77%] visit the emergency department for Methamphetamine toxicity annually, and only about 3 thousand people [0.02%] die from Methamphetamine toxicity annually[16]. If not for his encounter with the police on October 18, 2021, more likely than not, Reiner Sommer would not have died, and was not expected to die on October 18, 2021.

Methamphetamine was not the underlying cause of death of Reiner Sommer. The presence of a drug in the blood of a deceased person does not equate to causation of death. The toxic effects of a drug cannot be only or fully deciphered solely based on the level of the drug in the blood. This is outside the generally accepted guidelines and standards of practice of clinical pathology and interpretative toxicologic analysis for the determination of cause of death[17]. The toxic effects of a drug are multifactorial and are determined by many independent and sometimes mutually exclusive factors. However, the level of Amphetamine in Reiner Sommer's blood was stated to be 0.043 mg/L which was significantly below the expected toxic levels of >0.20 mg/L[18,19]. The level of Methamphetamine in the blood of Reiner Sommer was 0.18 mg/L, which was minimally and negligibly higher than the expected toxic level of Methamphetamine which is 0.15 mg/L[20,21]. This is one of the reasons why a determination of the cause of death of any individual should not be based on only the level of a drug in the blood.

Chronic use of Methamphetamine results in psychologic dependence and tolerance, therefore, the effects of Methamphetamine may be modulated by the drug use history of each individual. Chronic use and exposure result in chronic drug tolerance and resistance. Reiner Sommer had a medical history of Methamphetamine use, and patients who use Methamphetamine develop drug tolerance and habituation and as time passes would use and need higher levels of drugs to achieve the same effects. Therefore, the levels of Methamphetamine and Amphetamine as documented by the autopsy of Reiner Sommer were neither unexpected nor unusual.

Moreover, following death or traumatic shock, high tissue levels of drugs migrate/diffuse into the blood, especially in chronic users of the drugs, and create artifactually and markedly elevated levels of drugs in the blood when measured. For example, Methamphetamine exhibits a post-mortem tissue redistribution of 0.9 – 2.4 heart/femoral ratios. Amphetamine exhibits a post-mortem tissue redistribution of 1.2 – 5.6 central/peripheral ratios[22]. This means that post-mortem levels of Methamphetamine and Amphetamine reported in the autopsy blood sample of Reiner Sommer may have been actually much higher than the pre-morbid levels prior to his

[16] https://drugabuse.com/library/methamphetamine-history-and-statistics/#how-dangerous-is-methamphetamine-
[17] Ferner RE. Post-mortem clinical pharmacology. British Journal of Clinical Pharmacology, 2008;66(4):430-443.
[18] Schulz M et al. Therapeutic and toxic blood concentrations of nearly 1000 drugs and other xenobiotics. Critical Care, 2012;16:R136.
[19] Regenthal R et al. Drug levels: therapeutic and toxic serum/plasma concentrations of common drugs. Journal of Clinical Monitoring and Computing, 1999, 15:529-544.
[20] Schulz M et al. Therapeutic and toxic blood concentrations of nearly 1000 drugs and other xenobiotics. Critical Care, 2012;16:R136.
[21] Regenthal R et al. Drug levels: therapeutic and toxic serum/plasma concentrations of common drugs. Journal of Clinical Monitoring and Computing, 1999, 15:529-544.
[22] Baselt RC, Disposition of Toxic Drugs and Chemicals in Man, 11th edition, Biomedical Publications, Seal Beach, California, 2017.



death especially given such a prolonged post-mortem interval of over eighteen hours before the autopsy blood sample was drawn. These ratios may be higher in chronic users who have accumulated the drug in their tissues over time.

Therefore, post-mortem levels of 0.18 mg/L of Methamphetamine and 0.043 mg/L of Amphetamine may not be of such a significant forensic consequence as it would have been for an individual who has never used Methamphetamine or who may not have attained the level of drug tolerance Reiner Sommer may have attained as a Methamphetamine user. This is exemplified by some cases reported on page 1320 of the textbook: "Disposition of Toxic Drugs and Chemicals in Man", eleventh edition, by Randall C. Baselt, PhD. This page states that "Two women found by police asleep in a car had blood Methamphetamine concentrations of 1.7 mg/L and 2.1 mg/L, as well as substantial levels of Diazepam. The same book on the same page gives two additional examples as follows: [1] Methamphetamine blood concentrations of 1.4 – 13 mg/L [average 5.1 mg/L] were found post-mortem in nine drug abusers who died of traumatic injury by violent means; [2] Blood Methamphetamine concentrations of <0.05 – 2.6 mg/L were observed in 27 persons arrested for erratic driving."

The toxic levels and effects of drugs that physicians use and apply to case management and analysis are typically related to therapeutic drug levels and toxicities. However, the National Highway Traffic Safety Administration reports a non-toxic range of 0.01 to 2.5 mg/L[23] in individuals who use Methamphetamine for recreational purposes. This further confirms that the level of Methamphetamine detected in the blood of Reiner Sommer was of no significant forensic consequence, was not expected to kill him and did not kill him. He used Methamphetamine recreationally and chronically.

In 2020, Strommer EMF et al[24] stated that in the assessment of the cause of death of a forcefully restrained individual with illicit stimulants in the blood, the per-dose risk of death from such drugs is exceedingly low. There were 42 tons of crystal Methamphetamine consumed by around 1.2 million people in the United States in 2010. In the same year there were ~2700 deaths attributed, at least in part, to Methamphetamine exposure. Given the typical dose of the drug (10–40 mg), the risk of death from use of the drug was no more than 1 per 353,000 doses. Therefore, the presence of these stimulant drugs should not be preferentially promoted over aggressive restraint as a more probable cause of death in cases like Mr. Sommer's case.

<u>Reiner Sommer did not suffer Excited Delirium, and did not die from Excited Delirium</u>
Just like cardiac arrest, excited delirium is not a disease but a symptom that can be manifested by patients, caused by many factors. In 2009, a panel of medical and mental health experts appointed by the Departments of Justice and Health in Nova Scotia; Canada published a position report that concluded that there is no disease entity called Excited Delirium[25]. Excited delirium is a clinical sign like fever that cannot be recognized as a disease. It is akin to an autonomic hyperactivity state, which is not a disease. In 2022 Physicians for Human Rights

---

[23] National Highway Traffic Safety Administration. Drugs and Human Performance Fact Sheets. U.S. Department of Transportation- Methamphetamine [and Amphetamine] www.nhtsa.dot.gov
[24] Strömmer EMF, Leith W, Zeegers MP, Freeman MD. The Role of Restraint in Fatal Excited Delirium: A Research Synthesis and Pooled Analysis. Forensic Sci Med Pathol. 2020 Dec;16(4):680-692. doi: 10.1007/s12024-020-00291-8. Epub 2020 Aug 22. PMID: 32827300; PMCID: PMC7669776.
[25] Report of the Panel of Mental Health and Medical Experts Review of Excited Delirium. https://novascotia.ca/just/public_safety/_docs/Excited%20Delirium%20Report.pdf



published a report that stated that excited delirium is an invalid diagnosis that has become a go-to diagnosis for medical examiners and coroners to use in explaining deaths in police custody, many of which involve restraint asphyxia[26].

The American Psychiatric Association [APA] has not recognized excited delirium as a mental disorder and it is not included in the Diagnostic and Statistical Manual of Mental Disorders [DSM-5]. In their position report in 2020[27], the APA stated the following about excited delirium:

> "The concept of "excited delirium" (also referred to as "excited delirium syndrome (ExDs)") has been invoked in a number of cases to explain or justify injury or death to individuals in police custody, and the term excited delirium is disproportionately applied to Black men in police custody. Although the American College of Emergency Physicians has explicitly recognized excited delirium as a medical condition, the criteria are unclear and to date there have been no rigorous studies validating excited delirium as a medical diagnosis. APA has not recognized excited delirium as a mental disorder, and it is not included in the *Diagnostic and Statistical Manual of Mental Disorders (DSM-5)."*

In 1998, Pollanen, MS et al published a paper that shows that in the so-called cases of excited delirium, 100% of their cohort had violent restraint as a significant underlying or contributory factor to death[28]. In 2020 Strommer, EMF et al published a literature review paper that concluded that "When death has occurred in an aggressively restrained individual who fits the profile of either ExDS or AgDS, restraint-related asphyxia must be considered a likely cause of the death"[29].

California Assembly Bill 360 was signed into law on October 8, 2023. This bill, which is now law, prohibits "excited delirium," from being recognized as a valid medical entity or diagnosis, or cause of death in the State of California. The Law prohibits a coroner, medical examiner, physician, or physician assistant from stating on the certificate of death or in any report that the cause of death was excited delirium.

Mr. Sommer manifested transient substance induced acute psychosis and did not suffer from any disease called excited delirium. Delirium is a symptom that can be associated with a broad variety of diseases including psychiatric illnesses and acute psychosis, and as a symptom it cannot be the cause of death.

---

[26] "Excited Delirium" and Deaths in Police Custody: The Deadly Impact of a Baseless Diagnosis. https://phr.org/our-work/resources/excited-delirium/
[27] Position Statement on Concerns About Use of the Term "Excited Delirium" and Appropriate Medical Management in Out-of-Hospital Contexts. https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-Use-of-Term-Excited-Delirium.pdf
[28] Pollanen MS, Chiasson DA, Cairns JT, Young JG. Unexpected death related to restraint for excited delirium: a retrospective study of deaths in police custody and in the community. CMAJ. 1998 Jun 16;158(12):1603-7. PMID: 9645173; PMCID: PMC1229410.
[29] Strömmer EMF, Leith W, Zeegers MP, Freeman MD. The role of restraint in fatal excited delirium: a research synthesis and pooled analysis. Forensic Sci Med Pathol. 2020 Dec;16(4):680-692. doi: 10.1007/s12024-020-00291-8. Epub 2020 Aug 22. PMID: 32827300; PMCID: PMC7669776.



<u>Reiner Sommer died as a result of Restraint Asphyxiation [Mechanical-Positional Asphyxiation]</u>
When Reiner Sommer first encountered the police on October 18, 2021, he was not in any form
of lethal distress and was not dying. A novel factor or event occurred unexpectedly and suddenly
in his life after 1:44 p.m. on October 18, 2021. He progressively lost consciousness following
multimodal restraint asphyxiation and blunt force trauma when police officers restrained him
while he was prone on the ground and compressed his body on the unyielding floor.

As has been stated above, Sergeant Blum directed officers to move in and take Mr. Sommer into
custody, who by then, was on the floor at a corner of the stall, lying face down with his head in
the corner. His arms were underneath his body. Officers conducted a segmenting tactic on him.
Sergeant Blum grabbed Mr. Sommer's feet while two other officers restrained his trunk,
applying and pressing him down prone on the ground with their extremities and body weight.
Two officers climbed on top of him, on his back, kneeling on him, applying their body weight on
him, and pressing him down and prone on the ground. Mr. Sommer made grunting and
growling noises.

The officers removed Mr. Sommer's arms from underneath his body and placed him in
handcuffs, while pressing his body and head down on the floor. At this point Mr. Sommer was
noted to become unresponsive and flaccid after about 2-3 minutes of pressing him down prone
on the ground. They pulled him out from the bathroom into the main portion of the bathroom
where he was rolled onto his side in the recovery position. An officer stated that Mr. Sommer
was turning purple. Officers informed the medical team that Mr. Sommer was unresponsive,
and they were asked to bring him out into the hallway where they would have more room to
work on him. He was eventually pulled into the open portion of the store as they performed life-
saving measures. Mr. Sommer was emergently transported to Southern Hills Hospital where he
was pronounced deceased by Dr. Aronstein at 01:42 p.m.

The global evidentiary clinical and autopsy findings in this case confirm that Reiner Sommer
suffered restraint asphyxiation/ asphyxial brain injury [hypoxic-ischemic brain injury]. The
human brain is a post-mitotic organ and can only survive on oxygen and glucose, which are
supplied by blood that come from the heart, primarily in the internal carotid arteries and the
vertebral arteries. While the brain is only about 2-3% of the body weight, it receives
approximately 15% of the cardiac output at a rate of 750-900 ml/min of blood. The normal
range of perfusion of the brain is about 50 to 65 ml/100 g/min [80-100 ml/100g/min for the
gray matter and 20—25 ml/100g/min for the white matter, at a rate of oxygen consumption of
3.5 ml/100 g/min. The normal brain tissue partial pressure of oxygen is 35 to 40 mmHg. Brain
tissue oxygen levels below 30 mmHg may cause brain tissue injury, and at 20 mmHg, the risk of
brain damage becomes exponentially elevated. The threshold for brain infarction is 10-12
ml/100g/min of blood supply with neuronal injury and death beginning in 60 to 180 seconds.

Being a post-mitotic organ, the human brain does not have any reasonable capacity to
regenerate itself. This means that when the human brain suffers any type of irreversible injury,
that injury is permanent and cannot be reversed or cured by the brain or by medical therapy.
There are so many types of brain injuries. Asphyxial brain injury [hypoxic-ischemic brain injury]
is only one type of brain injury. For the human brain to suffer irreversible hypoxic-ischemic
brain injury, there has to be impaired supply of oxygen and blood to the brain. The established
and generally accepted median or mean reference threshold time for irreversible hypoxic-
ischemic brain damage to occur is 3 to 5 minutes in cumulative time. According to the central
limit theorem, this means that irreversible brain damage can occur in less than 3 minutes or in
more than 5 minutes, but with a mean or median time of close to 3 to 5 minutes.



It is pertinent to note that Reiner Sommer suffered multimodal restraint asphyxiation and blunt force trauma for approximately 2 to 3 minutes before cardiopulmonary resuscitation was instituted. The multimodal restraint asphyxiation comprised a continuum of asphyxial factors, which included mechanical-positional asphyxiation and a terminal type 2 myocardial infarction.

The brain is about the only organ in the human body that exhibits the concept of cumulative injury, cumulative risk exposure to injury, or repetitive cumulative injury. Being a post-mitotic organ, if the brain suffers an injury, and within a relatively short time, suffers a repeat injury, the eventual outcome is an exponential and multiplicative combined effect of the two injuries, which increase the risk of sudden death. In traumatic brain injury, some refer to this concept as the second impact syndrome. This concept does not only apply to injuries suffered within a short time. For example, in football players who suffer Chronic Traumatic Encephalopathy [CTE] their risk of developing CTE is primarily based on their cumulative exposure to mild and seemingly innocuous sub-concussive and concussive blows to the head across time [years]. The risk of permanent and irreversible brain injury and death was exponentially increased in a cumulative manner when Reiner Sommer suffered contiguous and multimodal restraint asphyxiation.

Any factor that impairs the entire respiratory functioning of the human being can result in the deprivation of oxygen to the brain. Absolute deprivation [complete absence of oxygen- anoxia] is not necessary for the brain to suffer brain injury. Any factor that impairs the body's ability to inspire oxygen and expire carbon dioxide, impairs the body's ability to bind oxygen to hemoglobin, impairs the body's ability to transmit oxygenated blood to the brain, impairs the brain's ability to absorb oxygen from oxygenated blood, impairs the brain's ability to utilize oxygen, and to transmit carbon dioxide to the blood and transport it out of the brain tissues can result in hypoxic-ischemic injury to the brain. Diminishing levels of oxygen and increasing levels of carbon dioxide in brain tissue impairs the cerebral vascular autoregulation, which results in impaired vascular perfusion of the brain, which causes combined hypoxic-ischemic injury of the brain. This means that the brain does not have to suffer complete lack of oxygen or blood to suffer brain damage. There are multiple metabolic factors that can ameliorate or aggravate the risk of brain damage at varying levels of oxygen, glucose, and blood supply to the brain.

Compression and blunt force trauma of the head, face, neck, trunk, and extremities also cause neurological compression and blunt force injury to vital nerves and plexuses in the trunk, head, and neck, which decreases respiration and systemic blood pressure, which in turn decreases cerebral perfusion pressure, which accentuates the hypoxic-ischemic injury of the brain. When the motor, sympathetic and parasympathetic innervations, and systems of the nerves in the trunk and neck, including but not limited to the vagus nerve, phrenic nerve, glossopharyngeal nerve, hypoglossal nerve, cervical sympathetic trunks, and cervical parasympathetic ganglia, undergo sustained compression and blunt force trauma, there is a combined effect of bradycardia, systemic hypotension, cardiac arrest, and respiratory arrest. The higher the scale of the compression, the more sustained the compression is and the longer the compression lasts the greater the risk of attaining irreversible neurological injury and the greater the risk of suffering permanent and irreversible end-organ consequences, like we have in the case of Reiner Sommer.

For normal and optimal respiratory activity to occur the thoracic pressure remains at negative atmospheric pressure to support intricate homeostatic undulations of intrathoracic pressure that allow normal and effortless respiratory movements of the diaphragm, chest, and lungs.



Compression of the trunk and body as we have in this case undermines this homeostatic balance and increases the risk of respiratory failure, asphyxial injury of the brain and sudden death.

It is pertinent to note that it takes only 4.4 pounds of pressure to compress the jugular veins and only 11 pounds of pressure to compress the carotid arteries of the neck. Compression of the jugular veins only is sufficient to cause asphyxial brain injury during compression of the neck. In order to compress the trachea or larynx, we need greater than 33 pounds of pressure, which is about 8 times the amount of pressure needed to compress the internal jugular veins. The underlying pathophysiological mechanism of asphyxial brain injury by mechanical-positional asphyxiation is vasogenic with decreased cerebral blood perfusion and consequent ischemic cerebral injury by occlusion of the arteries and veins that transmit blood to and from the brain. Compression of the airways is not the underlying mechanism of injury for asphyxial brain injury.

It is also pertinent to note that human beings who are suffering all forms of asphyxial injuries can perform phonation functions unless there is a direct early or preceding damage to the vocal cords and glottis. Some degrees of phonation may be expected, although impaired, but complete loss of phonation is not expected until there is paralysis of the glottis, directly or neurologically.

A fundamental cellular injury of the brain cell is the excitotoxic neuronal injury. Excitotoxic neuronal injury is the endpoint and outcome of different types of brain injuries including but not limited to prolonged or untreated seizures, status epilepticus, heat stroke and hyperthermic brain injury, hypoglycemic brain injury, hypoxic-ischemic brain injury [asphyxial brain injury], electroshock, and electrical injuries of the brain, blunt force trauma of the head and face etc. Excitotoxic brain injury can be initiated by many types of cellular and membrane injuries of the brain cell.

Brain injury depresses adenosine triphosphate synthesis, with failure of ion pumps and irreversible membrane failure, rapid efflux of potassium ions and influx of sodium, calcium, and chloride ions, along with water [cytotoxic or cellular edema]. The energy-dependent excitotoxic amino-acid [glutamate and aspartate] uptake mechanisms in presynaptic nerve terminals and astrocytes result in extracellular accumulation of glutamate and/ or aspartate, and prolongation of the stimulation of the N-methyl-D-aspartate [NMDA], kainate and alpha-amino-3-hydroxy-5-methyl-4-isoxazole [AMPA] membrane receptors. Additional calcium and sodium ions then enter the neuron through open NMDA, kainate and AMPA receptor channels [mechanoporation]. Further disruption of cellular organelles and function ensues when proteases, calpains, endonucleases, phospholipases and other catabolic enzymes are released. These changes in concert cause rapid cell death, which manifests as pyknosis, amphophilia and eosinophilia of neurons [red dead neurons].

As part of the continuum of his restraint asphyxiation, Reiner Sommer suffered a terminal acute myocardial infarction as part of his cascade of restraint injury exposure, pain infliction and distress. Acute myocardial infarction causes cardiac arrhythmia and cardiac arrest, which causes hypoperfusion of the brain, which causes hypoxic-ischemic cerebral injury. The myocardial infarction he suffered as a direct result of his cumulative injury exposure aggravated and accentuated asphyxial brain injury and made death more imminent.



According to the international classification of myocardial infarctions[30], there are five types of myocardial infarctions, viz: Types 1, 2, 3, 4 and 5.

Type 1 myocardial infarction is precipitated by an atherosclerotic plaque disruption, rupture, or erosion. The thrombotic component may lead to distal coronary embolization. Plaque rupture is complicated by intraluminal thrombosis and by hemorrhage into the plaque through the disrupted surface. Reiner Sommer did not suffer a Type 1 myocardial infarction.

Type 3 myocardial infarction occurs when a patient presents with myocardial injury or ischemia including presumed new ischemic EKG changes or ventricular fibrillation and dies suddenly and unexpectedly before it is possible to obtain blood or cardiac biomarker determination. Or the patient dies after the onset of symptoms before elevation of biomarker values has occurred. Autopsy does not show any ruptured or disrupted plaque and no intraluminal thrombosis. Reiner Sommer did not suffer a Type 3 myocardial infarction. Type 3 myocardial infarction allows the separation of fatal myocardial infarction events from the much larger group of sudden death episodes that may be cardiac [non-ischemic] or non-cardiac in origin.

Type 4 myocardial infarction occurs as a result of cardiac procedural myocardial injury related to percutaneous coronary intervention and revascularization procedures. It may be related to the procedure itself, which may reflect periprocedural issues or complications of a device such as early or late stent thrombosis or in-stent restenosis. Reiner Sommer did not suffer a Type 4 myocardial infarction.

Type 5 myocardial infarction occurs as a result of cardiac procedural myocardial injury related to coronary artery bypass grafting procedures. It may be related to the procedure itself, which may reflect periprocedural issues or complications, graft occlusion or stenosis. Reiner Sommer did not suffer a Type 5 myocardial infarction.

Reiner Sommer suffered a Type 2 myocardial infarction. As the article states[31]:
"The pathophysiological mechanism leading to ischemic myocardial injury in the context of a mismatch between oxygen supply and demand has been classified as type 2 myocardial infarction. By definition, acute atherothrombotic plaque disruption is not a feature of type 2 myocardial infarction. In patients with stable known or presumed Coronary Atherosclerotic Disease, an acute stressor such as an acute gastrointestinal bleed with a precipitous drop in hemoglobin, or a sustained tachyarrhythmia with clinical manifestations of myocardial ischemia, may result in myocardial injury and a type 2 myocardial infarction. These effects are due to insufficient blood flow to the ischemic myocardium to meet the increased myocardial oxygen demand of the stressor. Ischemic thresholds may vary substantially in individual patients depending on the magnitude of the stressor, the presence of non-cardiac comorbidities, and the extent of underlying Coronary Atherosclerotic Disease and cardiac structural abnormalities."

"The short- and long-term mortality rates for patients with type 2 myocardial infarction are generally higher than for type 1 myocardial infarction patients in most but not all studies due to

---

[30] Thygesen K et al. Fourth universal definition of myocardial infarction [2018]. European Heart Journal, 2019;40:237-269.
[31] Thygesen K et al. Fourth universal definition of myocardial infarction [2018]. European Heart Journal, 2019;40:237-269.



an increased prevalence of comorbid conditions. Coronary atherosclerosis is a common finding in type 2 myocardial infarction patients selected for coronary angiography."

"The context and mechanisms of type 2 myocardial infarction should be considered when establishing this diagnosis. The myocardial oxygen supply/demand imbalance attributable to acute myocardial ischemia may be multifactorial, related either to: reduced myocardial perfusion due to fixed coronary atherosclerosis without plaque rupture, coronary artery spasm, coronary microvascular dysfunction [which includes endothelial dysfunction, smooth muscle cell dysfunction, and the dysregulation of sympathetic innervation], coronary embolism, coronary artery dissection with or without intramural hematoma, or other mechanisms that reduce oxygen supply such as severe bradyarrhythmia, respiratory failure with severe hypoxemia, severe anemia, hypotension/shock; or to increased myocardial oxygen demand due to sustained tachyarrhythmia or severe hypertension with or without left ventricular hypertrophy".

Reiner Sommer suffered from a terminal Type 2 myocardial infarction given the global prevailing forensic scenario in this case. A type 2 myocardial infarction does not require coronary atherosclerotic disease to be present to occur. The fundamental principle and criterion for a type 2 myocardial infarction is the presence of a stressor or stressors, which place the heart at an increased demand for oxygen, and when there is a mismatch between the supply of oxygen and the metabolic rate of the heart cells, myocardial injury and infarction occurs. If coronary atherosclerotic disease is present, the blood vessels supplying the heart may not dilate sufficiently or have luminae that can open wide enough for larger amounts of blood to pass per unit time and per unit mass of the heart. Restraint asphyxiation and blunt force trauma as we have in this case are independent high-scale stressors, that vividly increased the risk and contributed to the patho-etiology and pathogenesis of a terminal type 2 myocardial infarction, cardiac arrhythmia, cardiac arrest, and death.

So, the presence of coronary atherosclerotic disease is not the underlying cause of a type 2 myocardial infarction but a comorbidity that can contribute to the mechanism of injury of myocardial ischemia and infarction. The terminal type 2 myocardial infarction he suffered was more likely than not responsible for the terminal cardiac arrest he eventually suffered. Myocardial infarction synergized with, aggravated, and accentuated other asphyxial and traumatic injuries and made death more likely and imminent.

In summary therefore, if not for the restraint suffered by Reiner Sommer in the hands of the police on October 18, 2021, he would not have died on October 18, 2021.

It is pertinent to revisit the concept of co-morbidities as have been described above. In June 1995, the National Law Enforcement Center of the United States Department of Justice, Office of Justice Programs, National Institute of Justice published a position bulletin titled "Positional Asphyxia- Sudden Death". In this bulletin, the Department of Justice stated that the bulletin "...identifies factors found to precipitate positional asphyxia and provides recommendations for ensuring a subject's safety and advisory guidelines for care of subjects."

The bulletin further stated the following:

> "It is important to understand how
> preexisting risk factors, combined with
> the subject's body position when subdued



or in transit, can compound the risk of
sudden death. Information contained in
this bulletin may help to alert officers to
those factors found frequently in deaths
involving positional asphyxia."

"Certain factors may render some individuals more susceptible to positional asphyxia following
a violent struggle, particularly when prone in a face-down position:
1.    Obesity
2.    Alcohol and high drug use
3.    An enlarged heart (renders an individual more susceptible to a cardiac arrhythmia under
      conditions of low blood oxygen and stress).

The risk of positional asphyxia is compounded when an individual with predisposing factors
becomes involved in a violent struggle with an officer or officers, particularly when physical
restraint includes use of behind-the-back handcuffing combined with placing the subject in a
stomach-down position."

In this case of Reiner Sommer, therefore, the contemporaneous occurrence of substance use
disorder, which is a psychiatric behavioral disorder, morbid obesity, coronary atherosclerotic
disease, and an enlarged heart from hypertensive cardiovascular disease should be considered
as co-morbidities and not as underlying causes of his death. However, co-morbidities may have
increased or decreased the lethal risk of his restraint asphyxiation, but did not cause these
injuries.

As has been stated above, for every disease or cause of death, there are extenuating and
aggravating factors, which can either decrease or increase the risk of suffering from or dying
from a disease. A contemporaneous or co-morbid disease or factor that increases the risk of a
second disease or factor does not denote causation, rather it denotes co-morbidity. Disease or
event "A" that is co-morbid with disease or event "B" does not mean disease "A" causes disease
"B" and vice versa. In this case of Reiner Sommer, his co-morbidities did not cause restraint
asphyxiation. These co-morbidities at most, may be classified as contributory factors to death
and not the underlying cause of death.

If acute Methamphetamine intoxication was the cause of death, then the manner of death could
not have been classified as a homicide. If coronary atherosclerotic disease, hypertensive
cardiovascular disease, and/ or morbid obesity were the cause of death, then the manner of
death could not have been classified as a homicide. Reiner Sommer died from restraint
asphyxiation which was an injury induced or caused by another person or other persons.

Restraint asphyxiation was an independent and mutually exclusive significant or substantial
factor that resulted or contributed to the sudden and unexpected death of Reiner Sommer. With
or without acute Methamphetamine intoxication, hypertensive cardiovascular disease, coronary
atherosclerotic disease and/or morbid obesity, Mr. Sommer, more likely than not, would still
have died from restraint asphyxiation on October 18, 2021 as a result of his encounter with the
police.

Reiner Sommer suffered from coronary atherosclerotic disease, morbid obesity, hypertensive
cardiovascular disease, and acute Methamphetamine intoxication on October 18, 2021. He was
not in imminent death; he was not dying from any of these diseases or intoxication and was not



expected to die. However, on October 18, 2021, a novel, independent and mutually exclusive, unnatural event occurred which comprised a continuum of multimodal restraint asphyxiation. This novel chain of traumatic events successfully interrupted and breached any pre-existing chain of events and precipitated unexpected death. The underlying cause of death therefore will be restraint asphyxiation. There was a contiguous chain of events between the onset of multimodal restraint and death.

In the differential diagnosis of the cause of death of Reiner Sommer, there is no other forensic or medical evidence that may suggest or indicate that Reiner Sommer died from any other probable disease or cause of death outside restraint asphyxiation. The autopsy of Mr. Sommer did not reveal any natural disease that was killing him. There is almost no adult who does not suffer from one form of ailment or the other. An absolutely normal human being is an anomaly. We all suffer from one ailment or the other including drug abuse, which is a disease. However, most of our ailments are treatable and manageable and do not expect to kill us at the young age of 50 years old.


The manner of death of Reiner Sommer is a Homicide
The multimodal restraint asphyxiation suffered by Reiner Sommer that caused his death was directly caused by another person or persons; therefore, the manner of death will be a homicide as has been stated by Dr. Murie.

In this instance of the unexpected and violent death of Reiner Sommer the cause of death and circumstances of death are not in question and have been confirmed with a reasonable degree of medical certainty. Reiner Sommer died from restraint asphyxiation which was an injury induced or caused by another person or other persons. Restraint asphyxiation was an independent and mutually exclusive significant and substantial factor that resulted in, or contributed to the sudden and unexpected death of Reiner Sommer. The manner of death of Reiner Sommer is a homicide.


**2.    Did Reiner Sommer experience conscious pain and suffering, and for how long?**

It is a generally accepted principle and common knowledge in medicine and forensic pathology, that specific traumatic events generate predictable, reproducible, and specific patterns of traumas and injuries. The patterns of injuries generated by blunt force trauma and asphyxial trauma, and the mechanisms of sustenance of these patterns of injuries are very well-established in the medical literature and are common knowledge. Based on the prevailing forensic scenario, and on the generally accepted principles and common knowledge of medicine and science, and based on the global constellation, configurations and anatomic conformations of the multimodal and multifaceted traumas sustained by Reiner Sommer, Reiner Sommer experienced conscious pain and suffering when he sustained his fatal and non-fatal traumas on October 18, 2021.

**Pathophysiology of conscious pain and suffering**

Conscious pain and suffering are initiated by widespread free nerve endings situated in the skin, soft tissues, and organs. Pain can be elicited by multiple types of stimuli classified into three broad categories: mechanical, thermal, and chemical pain stimuli. Nerve endings for pain sensations generate electrical action potentials following all forms of tissue damage caused by all types of energies including, but not limited to, kinetic and mechanical energy from blunt and compressive force trauma, and mechanical compression of the body; and chemical energy from



asphyxiation. Action potentials are the sub-cellular physiologic basis for noxious conscious sensations and originate from voltage gated sodium and potassium electrolyte membrane pumps in the cell membranes of nerve cells, fibers, and synapses.

It takes few 10,000[th's] of a second to generate action potentials. Action potentials are transmitted through nerve fibers to the brain. They are transmitted in peripheral nerves in the Aδ and C fibers for fast and slow pain respectively at impulse rates of 5-30 meters per second and 0.5-2 meters per second, respectively. There is therefore a double pain sensation, a fast-sharp pain, and a slow pain. The sharp pain apprises the person rapidly of imminent danger and prompts the person to react immediately and remove himself from the painful stimulus or imminent danger. The slow pain becomes greater as time passes resulting in continued intolerable pain and suffering prompting the person to continue to try to relieve the cause of the pain and flee from the imminent danger.

At autopsy Reiner Sommer measured 71 inches [1.8 meters]. Reiner Sommer felt all types of blunt force trauma and asphyxiation induced pain within milliseconds of contact with the skin and body, and within milliseconds of sustenance of asphyxial injury. One millisecond is one second divided into 1000 parts. For the slowest nervous mechanisms of pain sensation and consciousness, a man like Reiner Sommer felt pain within 100 milliseconds.

Nerve pathways transmitting pain, terminate in the spinal cord. Secondary pathways transmit the pain from the spinal cord to the brainstem and thalamus, especially to the reticular activating system of the brainstem. From the thalamus tertiary pathways transmit pain to other basal ganglia, limbic cortex, and neocortex of the brain. Pain stimuli are transmitted to the reticular nuclei of the midbrain, pons, and medulla; to the tectal midbrain and the periaqueductal gray matter. These lower regions of the brain, i.e., brainstem, are vital for the appreciation of the suffering types of pain.

Animals with their brains sectioned above the midbrain, to block any impulse reaching the neocortex and cerebral hemispheres, still experience suffering from pain caused by all types of trauma. Complete removal of the somatosensory regions of the cerebral hemispheres does not preclude an animal's ability to perceive and experience pain. Pain impulses entering the brainstem and lower centers of the human brain can cause conscious perception of pain. Pain perception is principally a function of the lower centers of the brain; however, the upper centers and cerebral hemispheres are responsible for the interpretation of the quality of pain.

Blunt force and asphyxial pain elicit both the fast and slow pain types. Fast pain is felt within milliseconds while slow pain is felt within about one second. Following mechanical tissue damages and asphyxial tissue injury, biochemical tissue reactants like bradykinin, serotonin, histamine, prostaglandins, leukotrienes, potassium ions, substance P, acetylcholine, acids, and proteolytic enzymes are expressed to elicit sustained secondary chemical pain in addition to the primary fast pain directly caused by tissue damages. The chemical pain elicited by these chemical reactants is a slow type of suffering pain. The intensity of pain is closely correlated with the rate of tissue damage.

The brain is responsible for and sustains consciousness in human beings. The region of the brain responsible for consciousness is the brainstem. The center in the brainstem, which is responsible for consciousness, is the reticular activating system, which is deeply located in the central regions of the brainstem. As long as the reticular activating system remains anatomically and electrochemically intact, an individual like Reiner Sommer will remain conscious and will feel



pain and experience suffering. The sensation of pain induces conscious suffering since pain is a noxious sensation, which stimulates the neocortex, limbic cortex, and forebrain to cause mental pain and suffering. All these neural processes occur in 1000th's of a second [milliseconds]. The human nervous system is one of the most efficient, effective, and optimal operating systems ever known to mankind. After centuries of empirical research mankind has not been able to fully decipher and reproduce the operating systems of the human brain and nervous system.

**Reiner Sommer's conscious pain and suffering**
In this instance, Reiner Sommer's conscious pain and suffering sustenance began when he encountered the police on October 18, 2021, and continued until he was confirmed by the paramedics to be unresponsive and in cardiac arrest[32]. Prior to his restraint, Reiner Sommer was conscious and aware of his surroundings although he was suffering from acute psychosis. His reticular activating center was completely intact and functional. As a 50-year-old adult male he had the mental capacity to identify and classify the presence of the police officers, the noises, and the orders they were yelling as imminent dangers and threats. At this moment, the brainstem nuclei, the frontal cortex, pre-frontal cortex, basal forebrain, and limbic cortex of Reiner Sommer's brain initiated, within 10,000[th] of a second, action potentials, which initiated within milliseconds, the primitive human reflexes of fleeing from imminent danger.

Reiner Sommer had the capacity to experience noxious stimuli, pain, and suffering in spite of acute psychosis because these aspects of human functioning are primitive reflexes that are autonomic like thirst and hunger and fear. Patients who suffer neurological diseases like psychosis and dementia and all forms of cognitive impairment, congenital and acquired mental retardation and autism spectrum disorders still possess the autonomic capacity for primitive reflexes like pain and suffering, thirst and hunger and fear.

This mental awareness of imminent danger initiated the nor-adrenergic and adrenergic biochemical neural responses of fear, fright, and flight, when the locus ceruleus of the brainstem released large amounts of noradrenalin to the cerebral hemispheres. This fear, fright and flight adrenergic response caused high levels of mental fright, anguish, and suffering, which compelled him to begin to struggle and groan in response to the physical restraint.

His heart pumped faster [chronotropic effect] and stronger [ionotropic effect] due to the noradrenergic/adrenergic response. His respiratory rate and general muscle tonicity further increased due to the noradrenergic/adrenergic response. All these patho-physiologic processes culminated in high levels of conscious mental pain and suffering. Reiner Sommer suffered high levels of mental pain and suffering, fright, and fear, when he identified imminent danger and threat.

The various domains of his brain and cerebral functioning were intact and identified the imminent danger within 1000th's of a second. His limbic system instigated high levels of primitive adrenergic fear-fright-flight response, which caused high levels of mental pain and suffering. There may not be many other hyper-acute types of psychological stress that can be more severe than the fear of imminent sudden and traumatic death. This is confirmed by the high levels of adrenalin and nor-

---

[32] Human events like loss of consciousness and death involve a continuum of pathophysiological events on the cellular and gross functional levels without any identifiable rigid transitions or demarcations. Therefore, the determination of the time of occurrence of these events are guided by the time the events have been reproducibly and quantifiably confirmed. For example, the time of death of any individual is determined by the time the individual was pronounced dead by a designated medical professional who has clinically assessed the patient and confirmed the patient to be dead based on prevailing, reproducible and quantifiable clinical evidence that the patient was dead.



adrenalin in individuals who experience such deaths and who manifest the catecholamine effect at autopsy.

This mental pain and suffering continued while Reiner Sommer sustained blunt force and asphyxial trauma. Officers forcefully laid on him on the ground, compressed his body on the ground and inflicted blunt force trauma. Every blunt force injury, restraint compression, and asphyxial injury initiated multimodal kinetic and chemical energy. At this time Reiner Sommer experienced somatic and chemical pain and suffering caused by every blunt force trauma, every restraint compression trauma, and every cellular asphyxial brain trauma.

At this time, Reiner Sommer was conscious. His reticular activating center was intact and functional. As a 50-year-old male he had the mental capacity to identify the continuing imminent danger and threat of injury and death. He responded accordingly to his pain and suffering by yelling out and groaning as have been documented by the video clips.

Every kinetic and mechanical energy transferred to his body by the compression and physical restraint, and every biochemical tissue response he endured from the asphyxial injuries, caused biochemical, anatomic, and pathophysiological tissue disruptions, damages and injuries, and generated action potentials within 10,000th of a second, which were transmitted to the spinal cord and to the brain to precipitate cumulative conscious somatic, chemical, and mental pain and suffering. The multimodal nature of the noxious stimuli resulted in synergistic and cumulative conscious experience of high levels of combined somatic, chemical and mental pain and suffering. The primary injuries initiated secondary tissue injuries, systemic and tissue reactive responses, which elicited novel chemical pain and accentuated the conscious somatic and mental pain and suffering.

As his blood oxygen levels decreased and the carbon dioxide levels increased, while he was restrained, with his trunk compressed and body pressed to the ground, he began to develop bio-physiologic deficits and became more confused. His primary and secondary injuries progressed, more nerve endings in his body, soft tissues and viscerae were recruited, many more action potentials were elicited and caused increasingly higher levels of somatic, chemical, and mental pain and suffering. He gradually and slowly developed primary asphyxial brain injury, which were followed by secondary traumatic brain injury [cellular responses of the brain to primary physical injury] which elicited more action potentials from every tissue injury and damage, which resulted in more conscious somatic, mental, and chemical pain and suffering as his sensorium diminished progressively.

As Reiner Sommer sustained his injuries, many types of ions, peptides, proteins, and enzymes were expressed and activated, which enhanced his chemical pain, which synergized with his pre-existing pain to cause progressive somatic, chemical, and mental pain and suffering. Following the attainment of irreversible brain damage, he began to lose consciousness progressively passing through the varying broad stages and spectrum of consciousness from fully conscious to varying degrees of diminishing sensorium to loss of consciousness and coma. Consciousness is a continuum with varying levels of consciousness and depths of unconsciousness, which Reiner Sommer passed through before he went into deep coma and eventually died.

It is pertinent to note that the autopsy did not describe any contusion or laceration of the reticular activating system of the brainstem, therefore loss of consciousness was sustained and progressed over time. He continued to experience increasingly higher levels of somatic, chemical, and mental pain and suffering induced by all his multimodal injuries until he attained



irreversible brain injury and lost electrophysiological functioning of the brain cells and became unconscious.

After he became unconscious, be progressed into a coma, and remained in a coma until he died and was confirmed dead at about 01:42 p.m. The mechanisms of death and the pathophysiological cascades of restraint asphyxial and traumatic brain injuries do not cause instantaneous loss of consciousness. Following traumatic shock, Reiner Sommer began to lose his orientation and slowly progressed through the levels and spectrum of consciousness to eventual loss of consciousness. He progressed from full alertness to lethargy or somnolence, to obtundation, to stupor or semi-coma, and eventually to superficial or light coma to deep coma, loss of consciousness and eventually death. The distinctive anatomy of his injuries enabled him to continue to experience somatic pain and suffering, mental pain and suffering, chemical pain, and suffering over time.

The human brain has an average intrinsic survival reserve of three to five minutes before it develops irreversible injury and subsequent brain death. Unconsciousness ensues during this period following global hypoxic-ischemic cerebral injury as Reiner Sommer progressively lost his cardio-respiratory functioning. After he lost consciousness Reiner Sommer stopped experiencing conscious pain and suffering. At this time, the pathophysiological mechanisms of traumatic death were advanced. Death is a physiological process which takes time to occur.

Reiner Sommer's loss of consciousness was progressive without any distinctive juncture until he went into a deep coma. According to medical definitions and criteria, his body continued to experience debilitating pain and suffering although he was in coma. The human body continues to experience debilitating trauma-induced and physiologic chemical pain and suffering until there is a complete cessation of all bodily functions and death. Human beings who are in a coma do experience chemical bodily pain and suffering as long as the central nervous system is intact.

The unconscious patient remains in a state of high human suffering especially due to chemical pain and suffering because of the ongoing biochemical and molecular responses and systems in his body, especially in response to traumatic shock. In fact, one of the clinical tests for the evaluation of the depth or severity of unconsciousness is to intentionally inflict somatic pain to an extremity of the unconscious patient and observe the patient to see if he withdraws his extremity from the source of pain, moans, or grimaces until there is complete loss of motor functioning to respond. Again, this is one of the medical reasons why the majority of unconscious patients in the intensive care unit of hospitals are on strong pain medications and narcotic analgesics like Morphine and Fentanyl although they are in a coma. This is also why the lowest score for the Glasgow Coma Scale is 3/15 and not 0/15, and also in part why analgesics and narcotic analgesics are given to patients who are under anesthesia, and are components of drug panels used for anesthesia.

Although loss of consciousness and death are frequently immediate, they are rarely instantaneous since loss of consciousness and death are processes that involve cascades of patho-physiologic events. The adjective "immediate," within a forensic context, and within the prevailing forensic scenario in this case should be interpreted as loss of consciousness and death occurring as a result of restraint asphyxiation without the intervention of another novel or independent object, cause, or factor. It should not be forensically construed as instantaneous.

Based on the global prevailing forensic scenarios in this case and based on the generally accepted principles and common knowledge of medicine and science, Reiner Sommer experienced



conscious somatic, mental, and chemical pain and suffering for a mean, median and mode time of less than 5 minutes as a result of restraint asphyxiation[33]

### 3. Did Methamphetamine, Cannabinoids or Norbuprenorphine prevent or preclude Reiner Sommer from experiencing conscious pain and suffering?

No, Methamphetamine, Cannabinoids or Norbuprenorphine did not prevent or preclude Reiner Sommer from experiencing conscious pain and suffering. Toxicologic analysis of Reiner Sommer's autopsy blood sample revealed the presence of Methamphetamine, Methamphetamine, Cannabinoids and Norbuprenorphine.

Amphetamine is a metabolite of Methamphetamine. Methamphetamine is a sympathomimetic drug with prominent central stimulant effects, which releases biogenic amines from their storage sites in nerve terminals in the brain. It increases cardiac output and the rate and depth of respiration by stimulating the cardiopulmonary center. The mental alerting, locomotive-stimulating and anorexic effects are mediated by release of norepinephrine from central noradrenergic neurons. Some of the behavioral effects are mediated by release of central release of dopamine in the dopaminergic neurons of the neostriatum. Major side effects of Methamphetamine may include disturbances in perception, hallucinations, and overt psychotic behavior. Chronic use of Methamphetamine results in psychologic dependence and tolerance, therefore, the effects of Methamphetamine may be modulated by the drug use history of each individual.

Methamphetamine does not stimulate or inhibit naked nerve endings, which are the receptors that generate action potentials for pain sensation. Methamphetamine does not affect the conduction of action potentials in the central nervous system, to and from the spinal medulla and brain and does not modulate the experience of consciousness pain in any clinically useful manner. Methamphetamine does not have and is not used as an analgesic drug to reduce or control pain.

The receptors for pain are the free nerve endings. So, the receptors for the mechanisms of generation and sensation of pain and suffering are different from the receptors for the mechanisms of action of Methamphetamine. The generation and sensation of pain and suffering are complex mechanisms, which involve many different ions, peptides, and enzymes, including but not limited to bradykinin, histamine, potassium ions, acids, serotonin, acetylcholine, proteolytic enzymes, prostaglandins, and substance P.

Likewise, Cannabinoids, are not primarily analgesic compounds that are medically used for analgesia. Cannabinoids function by stimulating two receptors, cannabinoid receptor type 1 [CB1] and type 2 [CB2] within the endocannabinoid system. This system is a complex network of organs throughout the body, expressing the cannabinoid receptors and plays a homeostatic role. Functions of the endocannabinoid system in the cerebral hemispheres include memory, movement, appetite, metabolism, lacrimation/salivation, immunity, and even cardiopulmonary function. Endogenously, endocannabinoids serve as neuro-regulatory modulators responsible for retrograde neurotransmission. A post-synaptic neuron releases endocannabinoids that bind to predominantly CB1 receptors on the

---

[33] Medicine is not an absolute science, and these estimated ranges should not be interpreted as absolute quantitative estimations of time. Quantitative ranges of any measurable index are common practice and are the standard of practice in pathology and medicine.



Bennet Omalu
PATHOLOGY

presynaptic neuron, which results in inhibited presynaptic calcium channel activation and subsequent presynaptic neurotransmitter release. If the presynaptic neurotransmitters are predominantly inhibitory such as GABA, the net effect is excitatory and vice versa.[34] Binding to the different parts of the central nervous system mediates different psychotropic properties of cannabinoids, in particular THC. These areas and end-effects include: Hippocampus: impairment of short-term memory; Neocortex: impairment of judgment and sensation; Basal ganglia: altered reaction time and movement; Hypothalamus: increased appetite; Nucleus accumbens: euphoria; Amygdala: panic and paranoia; Cerebellum: ataxia; Brainstem: anti-emesis; Spinal cord: analgesia. Endocannabinoids, phytocannabinoids, and synthetic cannabinoid receptor agonists have antinociceptive and antihyperalgesia effects for chronic inflammatory and neuropathic pain and do not eradicate acute somatic pain induced by acute trauma[35].

Norbuprenorphine was detected in Mr. Sommer's autopsy blood sample at a level of 0.00061 mg/L. Norbuprenorphine is a major active metabolite of the opioid modulator buprenorphine. It is a μ-opioid, δ-opioid, and nociception receptor full agonist and a κ-opioid receptor partial agonist. Norbuprenorphine produces marked respiratory depression but with very little antinociceptive effect. Nociception refers to the processing of noxious stimuli like tissue injury and thermal burns by the central nervous system and peripheral nervous system. Noxious stimuli activate nociceptors and their pathways, and pain is the subjective experience one feels as a result of the activation of these pathways. However, a Norbuprenorphine level of 0.00061 mg/L in the blood is infinitesimally low and falls within the lower range of detectable levels, and is not expected to be of any significant forensic or clinical consequence in this case in terms of the experience of conscious pain and suffering.

I have provided my opinions and conclusions with a reasonable degree of medical and scientific certainty.

I have requested that the autopsy histology slides and formalin-fixed stock tissues be made available to me for examination. When they are made available to me, and I examine them, I will issue an addendum report if necessary.

I reserve the right to amend, supplement, revise and/or modify my opinions and report, up and to the time of trial, should additional information become available

Thank you.

Very truly yours,

---

[34] Cannabinoids - StatPearls - NCBI Bookshelf  https://www.ncbi.nlm.nih.gov › books › NBK556062
[35] Starowicz K, Finn DP. Cannabinoids and Pain: Sites and Mechanisms of Action. Adv Pharmacol. 2017;80:437-475. doi: 10.1016/bs.apha.2017.05.003. Epub 2017 Jun 20. PMID: 28826543.



Bennet I. Omalu, MD, MBA, MPH, CPE, DABP-AP,CP,FP,NP
Clinical Pathologist, Anatomic Pathologist, Forensic Pathologist, Neuropathologist, Epidemiologist
President and Medical Director, Bennet Omalu Pathology
Clinical Professor of Medical Pathology and Laboratory Medicine, University of California, Davis



# APPENDIX A

## ROGER P. CROTEAU & ASSOCIATES, LTD.

**A PROFESSIONAL CORPORATION**
**2810 W. Charleston Blvd, Suite 67**
**Las Vegas, Nevada 89102**

Roger P. Croteau, Esq.*
Christopher Benner, Esq.
Kenneth Harris, Esq.**

Of Counsel:
Timothy E. Rhoda, Esq.***

*Also Licensed in Massachusetts
**Also Licensed in Michigan and Maryland
*** Also Licensed in Illinois

Telephone: (702) 254-7775
Facsimile: (702) 228-7719

kristi@croteaulaw.com

*Paralegals*
Kristi Hewes
Linda D'Agostino, CP

*Legal Assistants*
Joseph Koehle
Shirin Weisman

April 22, 2024

Bennet Omalu Pathology
1621 Executive Court
Sacramento, CA 95864

RE: Reiner Sommer

Dear Dr. Omalu,

Thank you for agreeing to review this matter for our office. The following documents were sent to you on April 18, 2024 via Dropbox and are now being sent to you on the enclosed flash drive:

- Complaint
- Report of Investigation from the Clark County Coroner/Medical Examiner
- Death Certificate
- Las Vegas Review-Journal article
- Subpoenaed documents from the Office of Coroner Medical Examiner
- Subpoenaed documents from the Las Vegas Metropolitan Police Department
- Las Vegas Metropolitan Police Department Photographs

Documents disclosed in Defendants Disclosures

1. Critical Incident Review Team ("CIRT") Report – CONFIDENTIAL. This Report is an internal document protected by the Deliberate Process Privilege and will be provided open the filing of a protective order in the instant matter. All tangible items used to create the CIRT Report are identified in this disclosure.
2. Use of Force Review Board ("UFRB") Disposition – CONFIDENTIAL. The Report is an internal document protected by the Deliberate Process Privilege and will be provided open the filing of a protective order in the instant matter.
3. Tactical Review Board ("TRB") Disposition - CONFIDENTIAL. This Report is an internal document protected by the Deliberate Process Privilege and will be provided open the filing of a protective order in the instant matter.
4. Force Investigation Team ("FIT") Report [LVMPD 000001-000029]
5. CAD Incident Recall [LVMPD 000030-000047]

Bennet Omalu Pathology
Case 2:23-cv-01682
April 22, 2024

6.    CAD Incident Log by Incident Number [LVMPD 000048-000071]
7.    Coroner Inventory of Personal Effects [LVMPD 000072-000073]
8.    LVMPD Autopsy Report [LVMPD 000074
9.    Coroner Report of Investigation with Autopsy Toxicology Report [LVMPD 000075-000092]
10.   ICD Reporting Form [LVMPD 000093-000095]
11.   Crime Scene Investigation Report re Scene – Tapay [LVMPD 000096-000097]
12.   Crime Scene Investigation Report re Hospital – Felabom [LVMPD 000098]
13.   Evidence Impound Report – Smissen [LVMPD 000099]
14.   Case Report re Domestic Battery [LVMPD 000100-000110]
15.   LVMPD Public Report [LVMPD 000111-000112]
16.   Email from Iacullo to Sheriff re FIT Investigation (10/18/21) [LVMPD 000113-000115]
17.   FIT Statement SSFC Paramedic Pokorny (10/18/21) [LVMPD 000116-000123]
18.   FIT Statement of Walgreen's Manager Bever (10/18/21) [LVMPD 000124-000129]
19.   FIT Statement of Pharmacy Tech Barry (10/18/21) [LVMPD 000130-000138]
20.   FIT Statement of Ofc. Ortega (10/18/21) [LVMPD 000139-000141]
21.   FIT Statement of Ofc. Lomaglio (10/18/21) [LVMPD 000142-000147]
22.   FIT Statement of Engineer Paramedic Garwood (10/18/21) [LVMPD 000148-000158]
23.   Email re AMR Employee Information (03/17/22) [LVMPD 000159-000160]
24.   Bagaporo CIRT Notice [LVMPD 000161-000162]
25.   Blum CIRT Notice [LVMPD 000163-000164]
26.   Garcia CIRT Notice [LVMPD 000165-000166]
27.   Ortega CIRT Notice [LVMPD 000167-000168]
28.   Bagaporo CIRT Notice UOF [LVMPD 000169-000170]
29.   Blum CIRT Notice UOF [LVMPD 000171-000172]
30.   Garcia CIRT Notice UOF [LVMPD 000173-000174]
31.   Ortega CIRT Notice UOF [LVMPD 000175-000176]
32.   Garcia CIRT Statement (05/02/22) [LVMPD 000177-000185]
33.   Blum CIRT Statement (05/02/22) [LVMPD 000186-000193]
34.   Bagaporo CIRT Statement (05/04/22) [LVMPD 000194-000207]
35.   Ortega CIRT Statement (05/31/22) [LVMPD 000208-000216]
36.   Blue Team Report re CIRT [LVMPD 000217-000226]
37.   Application, Certification and Medical Clearance for Emergency Admission (11/21/11) [LVMPD 000227]
38.   Application, Certification and Medical Clearance for Emergency Admission (10/09/15) [LVMPD 000228]
39.   Application, Certification and Medical Clearance for Emergency Admission (10/16/15) [LVMPD 000229]
40.   Application, Certification and Medical Clearance for Emergency Admission (11/06/15) [LVMPD 000230]
41.   Application, Certification and Medical Clearance for Emergency Admission (05/15/16) [LVMPD 000231]
42.   Application, Certification and Medical Clearance for Emergency Admission (11/15/16) [LVMPD 0000232]

43. Application, Certification and Medical Clearance for Emergency Admission (12/27/16) [LVMPD 000233]
44. Domestic Violence Report (11/17/21) [LVMPD 000234-000237]
45. California SCOPE for R. Sommer [LVMPD 000238-000247]
46. Clark County SCOPE for R. Sommer [LVMPD 000248-000254]
47. Colorado SCOPE for R. Sommer [LVMPD 000255-000256]
48. Nevada DMV SCOPE for R. Sommer [LVMPD 000257-000261]
49. Texas SCOPE for R. Sommer [LVMPD 000262-000263]
50. Email re Tactical Workup [LVMPD 000264-000265]
51. R. Sommer Accurint [LVMPD 000266-000326]
52. R. Sommer Driver's License [LVMPD 000327-000328]
53. R. Sommer Mugshot [LVMPD 000329]
54. R. Sommer NCJIS [LVMPD 000330-000334]
55. LVMPD Policy – LVMPD Department Manual [LVMPD 000335-001261]
56. LVMPD Policy – 1/412.04 Radio Systems Bureau [LVMPD 001262]
57. LVMPD Policy – 1/412.01 Communications Bureau [LVMPD 001263-001264]
58. LVMPD Policy – 4/303.00 Accurately Recording [LVMPD 001265-001266]
59. LVMPD Policy – 4/107 Appearance [LVMPD 001267-001284]
60. LVMPD Policy – 5/209.16 Emergency Radio [LVMPD 001285-001289]
61. LVMPD Policy – 5/107.02 Request for Ambulance Service [LVMPD 001290]
62. LVMPD Policy – 5/109.09 STAR De-Escalation Protocol [LVMPD 001291-001292]
63. LVMPD Policy – 5/208.00 Firearm Procedures [LVMPD 001293-001315]
64. LVMPD Policy – 6/002.01 Use of Force Procedure [LVMPD 001316-001319]
65. LVMPD Policy – 6/002.02 Use of Force Tools and Techniques [LVMPD 001320-001329]
66. LVMPD Policy – 6/002.03 Post Use of Force Investigation [LVMPD 001330-001337]
67. LVMPD Training – 8.30 Patrol Procedures – Calls for Service [LVMPD 001338-001356]
68. LVMPD Policy – 8.34 Patrol Procedures – Armed Encounters [LVMPD 001357-001372]
69. LVMPD Policy – 10/30 Patrol Procedures – Tactical Approach to Major Crimes [LVMPD 001373-001384]
70. LVMPD Policy – Communications Bureau Manual [LVMPD 001385-001723]
71. Blue Team Report re TRB [LVMPD 001724-001730]
72. Bagaporo TRB Witness Notice [LVMPD 001731-001732]
73. Blum TRB Witness Notice [LVMPD 001733-001734]
74. Garcia TRB Witness Notice [LVMPD 001735-001736]
75. Ortega TRB Witness Notice [LVMPD 001737-001738]
76. UFRB Sign In Sheets [LVMPD 001739-001743]
77. Agreement to Protect Disclosure of CIRT [LVMPD 001744-001751]
78. Bagaporo Subject Employee UFRB Notice [LVMPD 001752-001753]
79. Garcia Subject Employee UFRB Notice [LVMPD 001754-001755]
80. Ortega Subject Employee UFRB Notice [LVMPD 001756-001757]
81. Employee Obligations and Protections [LVMPD 001758-001761]
82. Audio – Phone [LVMPD 001762]
83. Audio – Radio Condensed [LVMPD 001763]

Bennet Omalu Pathology
Case 2:23-cv-01682
April 22, 2024

84.    Audio – Radio Real Time [LVMPD 001764]
85.    Audio – Radio Time Stamped [LVMPD 001765]
86.    BWC Garcia [LVMPD 001766-001767]
87.    BWC Bagaporo [LVMPD 001768]
88.    BWC Blum [LVMPD 001769-001770]
89.    BWC Black [LVMPD 001771-001773]
90.    BWC Lomaglia [LVMPD 001774]
91.    Audio – CIRT Interviews Blum [LVMPD 001775-001776]
92.    Audio – CIRT Interviews Garcia [LVMPD 001777-001778]
93.    Audio – CIRT Interviews Ortega [LVMPD 001779-001780]
94.    Audio – CIRT Interviews Bagaporo [LVMPD 001781-001782]
95.    Audio – FIT Interview CCFD Paramedic Pokorny [LVMPD 001783]
96.    Audio – FIT Interview Pharmacy Tech Barry [LVMPD 001784]
97.    Audio – FIT Interview Witness Bever [LVMPD 001785]
98.    Audio – FIT Interview CCFD Engineer Garwood [LVMPD 001786]
99.    Audio – FIT Interview Ortega [LVMPD 001787]
100.   Audio – FIT Interview Lomaglio [LVMPD 001788]
101.   UFRB Informational Powerpoint [LVMPD 001789]
102.   BWC Ortega (post-incident) [LVMPD 001790]
103.   Photos at Hospital [LVMPD 001791-001837]
104.   Photos of Officers [LVMPD 001838-001862]
105.   Photos at Walgreens [LVMPD 001863-001948]
106.   Photos of Xrays [LVMPD 001949-001952]
107.   Photos at Coroner [LVMPD 001953-002140]
108.   Photos of Personal Effects [LVMPD 002141-002175]
109.   Blum CIRT Statement (11/02/21) [LVMPD 002176-002213]
110.   Garcia CIRT Interview (11/02/21) [LVMPD 002214-002237]
111.   Ortega CIRT Interview (11/02/21) [LVMPD 002238-002255]
112.   Bagaporo CIRT Interview (11/02/21) [LVMPD 002256-002292]
113.   Employment file of Andrew Garcia [LVMPD 002293-002304]
114.   Employment file of Geordinno Bagaporo [LVMPD 002305-002454]
115.   Employment file of Jeffrey Blum [LVMPD 002455-002581]
116.   Employment file of Joseph Ortega [LVMPD 002582-002599]
117.   2018 thru 2019 LVMPD's IAB Annual Accountability Report [LVMPD 002600-002636] and
118.   Privilege Log.

Deposition transcripts and videos

- Geordinno Bagaporo
- Andrew Garcia

Bennet Omalu Pathology
Case 2:23-cv-01682
April 22, 2024

Documents disclosed in Plaintiffs Disclosures

1.  Death Certificate, bates labeled 0001;
2.  Order Appointing Special Administrator, bates labeled 0002 – 0005;
3.  Southern Hills Hospital billing records, bates labeled 0006 – 0018;
4.  Southern Hills Hospital medical records, bates labeled 0019 – 0115;
5.  Fremont Emergency Center records, bates labeled 0116;
6.  Radiology Specialists records, bates labeled 0117;
7.  Clark County Fire Department records, bates labeled 0118 – 0121;
8.  Clark County Coroner investigative report, bates labeled 0139 – 0146;
9.  NMS Toxicology Report, bates labeled 0147 – 0158;
10. LVMPD Manual, bates labeled 0159 – 0790;
11. LVMPD Procedural Order PO-035-20 re: Use of Force, May 15, 2020, bates labeled 0791 – 0816;
12. LVMPD Use of Force Policy, rev. 11/2020, 9/2021, bates labeled 0817 – 0851;
13. USDOJ bulletin, Positional Asphyxia—Sudden Death, bates labeled 0852 – 0855;
14. Clark County District Attorney Report on Use of Force: Legal Analysis
15. Surrounding Death of Reiner Sommer on October 18, 2021, bates labeled 0856 – 0874;
16. Digital photographs received from LVMPD in response to Probate Court subpoena, 2713937-0001 through 2713937-0047; 2713953-0001 through 2713953-0111; 2715160-0001 through 2715160-0227;
17. Body camera video received from LVMPD in response to Probate Court subpoena, NPR2023-0041570#1 through NPR2023-0041570#26;
18. Intentionally Omitted, bates labeled 0875;
19. Various photographs and videos documenting the relationship between Taylor Sommer and Reiner Sommer, bates labeled 0876 – 1175.
20. Nomination of Special Administrator, bates labeled 1176;
21. Petition for Special Administration, bates labeled 1077 – 1181;
22. Letters of Special Administration, bates labeled 1182;

Once you review these documents, please contact Mr. Croteau on his cell phone at (702) 683-4518 to discuss your findings. If you need anything else, please feel free to contact me at (702) 254-7775 or by email at kristi@croteaulaw.com.  Thank you for your time reviewing this matter.

Sincerely,

ROGER P. CROTEAU & ASSOCIATES, LTD.

*Kristi Hewes*

Kristi Hewes, Paralegal to
ROGER P. CROTEAU, ESQ.