# EXHIBIT 4

# EXHIBIT 4

## On-Scene Consulting

June 5, 2024

Mr. Roger P. Croteau, Esq.
Roger P. Croteau & Associates, Ltd.
2810 West Charleston Boulevard
Suite 67
Las Vegas, Nevada 89102

<u>**Federal Rules of Civil Procedure 26 (a) (2) (B) Report**</u>

**TAYLOR SOMMER, individually; TAYLOR SOMMER, as the Administrator of
the ESTATE OF REINER SHAWN SOMMER, deceased, et al., Plaintiffs,
vs.
LAS VEGAS METROPOLITAN POLICE DEPARTMENT, et al., Defendants.
<u>Case No. 2:23-cv-01682-GMN-NJK.</u>**

Dear Mr. Croteau,

Thank you for retaining me to analyze and render opinions regarding the October 18,
2021, In-Custody Death of Mr. Reiner Sommer at 6485 S. Fort Apache, Las Vegas,
Nevada 89148, involving Las Vegas Metropolitan Police Department (<u>LVMPD</u>) Sergeant
Jeffery R. Blum, (<u>8924</u>), Sergeant Geordinno T. Bagaporo, (<u>5970</u>), Police Officer II
Andrew Garcia, (<u>17966</u>), and Police Joseph Ortega, (<u>16580</u>).  Pursuant to the
requirements of Rule 26, I have studied reports, photographs, videos, Las Vegas
Metropolitan Department documents, Transcriptions of Digitally Recorded Depositions,
and other material (<u>as listed under Materials Reviewed</u>) provided to me thus far regarding
this case.

Please be advised that if additional documents related to this matter are provided, it may
be necessary to write a supplemental report in order to refine or express additional
opinions.  It is also necessary to state at the beginning of this report that I do not make
credibility determinations in expressing my opinions.

Scott A. DeFoe
Principal
On-Scene Consulting, LLC

# On-Scene Consulting ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

## **Materials Reviewed:**

1. Critical Incident Review Team (CIRT) Report, CONFIDENTIAL.

2. Force Investigation Team (FIT) Report, [LVMPD 000001-000029].

3. CAD Incident Recall, [LVMPD 000030-000047].

4. CAD Incident Log by Incident Number, [LVMPD 000048-000071].

5. Coroner Inventory of Personal Effects, [LVMPD 000072-000073].

6. Las Vegas Metropolitan Police Department (LVMPD), Autopsy Report, [LVMPD 74].

7. Coroner Report of Investigation with Autopsy Toxicology Report, [LVMPD 000075-000092].

8. ICD Reporting Form, [LVMPD 000093-000095].

9. Crime Scene Investigation Report re: Scene – Tapay, [LVMPD 000096-000097].

10. Crime Scene Investigation Report re: Hospital – Felabom, [LVMPD 000098].

11. Evidence Impound Report – Smissen, [LVMPD 000099].

12. Case Report re: Domestic Battery, [LVMPD 000100-000110].

13. LVMPD Public Report, [LVMPD 000111-000112].

14. Email from Iacullo to Sheriff re: FIT Investigation (10/18/21), [LVMPD 000113-000115].

15. FIT Statement SSFC Paramedic Pokorny (10/18/21), [LVMPD 000116-000123].

16. FIT Statement of Walgreen's Manager Bever (10/18/21), [LVMPD 000124-000129].

17. FIT Statement of Pharmacy Tech Barry (10/18/21), [LVMPD 000130-000138].

18. FIT Statement of Officer Ortega (10/18/21), [LVMPD 000139-000141].

## On-Scene Consulting

19. FIT Statement of Ofc. Lomaglio (10/18/21), [LVMPD 000142-000147].

20. FIT Statement of Engineer Paramedic Garwood (10/18/21), [LVMPD 000148-000158].

21. Email re: AMR Employee Information (03/17/22), [LVMPD 000159-000160].

22. Bagaporo CIRT Notice, [LVMPD 000161-000162].

23. Blum CIRT Notice, [LVMPD 000163-000164].

24. Garcia CIRT Notice, [LVMPD 000165-000166].

25. Ortega CIRT Notice, [LVMPD 000167-000168].

26. Bagaporo CIRT Notice UOF, [LVMPD 000169-000170].

27. Blum CIRT Notice UOF, [LVMPD 000171-000172].

28. Garcia CIRT Notice UOF, [LVMPD 000173-000174].

29. Ortega CIRT Notice UOF, [LVMPD 000175-000176].

30. Garcia CIRT Statement (05/02/22), [LVMPD 000177-000185].

31. Blum CIRT Statement (05/02/22), [LVMPD 000186-000193].

32. Bagaporo CIRT Statement (05/04/22), [LVMPD 000194-000207].

33. Ortega CIRT Statement (05/31/22), [LVMPD 000208-000216].

34. Blue Team Report re: CIRT, [LVMPD 000217-000226].

35. Application, Certification and Medical Clearance for Emergency Admission (11/21/11), [LVMPD 000227].

36. Application, Certification and Medical Clearance for Emergency Admission (10/09/15), [LVMPD 000228]

## On-Scene Consulting ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

37.    Application, Certification and Medical Clearance for Emergency Admission (10/16/15), [LVMPD 000229].

38.    Application, Certification and Medical Clearance for Emergency Admission (11/06/15), [LVMPD 000230].

39.    Application, Certification and Medical Clearance for Emergency Admission (05/15/16), [LVMPD 000231]

40.    Application, Certification and Medical Clearance for Emergency Admission (11/15/16), [LVMPD 0000232].

41.    Application, Certification and Medical Clearance for Emergency Admission (12/27/16), [LVMPD 000233].

42.    Application, Certification and Medical Clearance for Emergency Admission (12/27/16), [LVMPD 000233].

43.    Domestic Violence Report (11/17/21), [LVMPD 000234-000237]

44.    California SCOPE for R. Sommer, [LVMPD 000238-000247].

45.    Clark County SCOPE for R. Sommer, [LVMPD 000248-000254].

46.    Colorado SCOPE for R. Sommer, [LVMPD 000255-000256].

47.    Nevada DMV SCOPE for R. Sommer, [LVMPD 000257-000261].

48.    Texas SCOPE for R. Sommer, [LVMPD 000262-000263]

49.    Email re Tactical Workup, [LVMPD 000264-000265].

50.    R. Sommer Accurint, [LVMPD 000266-000326].

51.    R. Sommer Driver's License, [LVMPD 000327-000328]

52.    R. Sommer Mugshot, [LVMPD 000329].

## On-Scene Consulting

53. R. Sommer NCJIS [LVMPD 000330-000334].

54. LVMPD Policy – LVMPD Department Manual, [LVMPD 000335-001261]

55. LVMPD Policy – 1/412.04, Radio Systems Bureau, [LVMPD 001262].

56. LVMPD Policy – 1/412.01 Communications Bureau, [LVMPD 001263-001264].

57. LVMPD Policy – 4/303.00, Accurately Recording, [LVMPD 001265-001266].

58. LVMPD Policy – 4/107, Appearance, [LVMPD 001267-001284].

59. LVMPD Policy – 5/209.16, Emergency Radio, [LVMPD 001285-001289].

60. LVMPD Policy – 5/107.02, Request for Ambulance Service, [LVMPD 001290].

61. LVMPD Policy – 5/109.09, STAR De-Escalation Protocol, [LVMPD 001291-001292].

62. LVMPD Policy – 5/208.00, Firearm Procedures, [LVMPD 001293-001315].

63. LVMPD Policy – 6/002.01, Use of Force Procedure, [LVMPD 001316-001319].

64. LVMPD Policy – 6/002.02, Use of Force Tools and Techniques, [LVMPD 001320-001329].

65. LVMPD Policy – 6/002.03, Post Use of Force Investigation, [LVMPD 001330-001337].

66. LVMPD Training – 8.30, Patrol Procedures, Calls for Service, [LVMPD 001338-001356]

67. LVMPD Policy – 8.34, Patrol Procedures, Armed Encounters, [LVMPD 001357-001372].

68. LVMPD Policy – 10/30, Patrol Procedures, Tactical Approach to Major Crimes [LVMPD 001373-001384].

## On-Scene Consulting

69. LVMPD Policy – Communications Bureau Manual, [LVMPD 001385-001723].

70. Blue Team Report re TRB, [LVMPD 001724-001730].

71. Bagaporo TRB Witness Notice, [LVMPD 001731-001732].

72. Blum TRB Witness Notice, [LVMPD 001733-001734].

73. Garcia TRB Witness Notice, [LVMPD 001735-001736].

74. Ortega TRB Witness Notice, [LVMPD 001737-001738].

75. UFRB Sign In Sheets, [LVMPD 001739-001743].

76. Agreement to Protect Disclosure of CIRT [LVMPD 001744-001751].

77. Bagaporo Subject Employee UFRB Notice, [LVMPD 001752-001753].

78. Garcia Subject Employee UFRB Notice, [LVMPD 001754-001755].

79. Ortega Subject Employee UFRB Notice, [LVMPD 001756-001757].

80. Employee Obligations and Protections, [LVMPD 001758-001761].

81. Audio – Phone, [LVMPD 001762]

82. Audio – Radio Condensed, [LVMPD 001763].

83. Audio – Radio Real Time, [LVMPD 001764]

84. Audio – Radio Time Stamped, [LVMPD 001765].

85. BWC Garcia, [LVMPD 001766-001767].

86. BWC Bagaporo, [LVMPD 001768].

87. BWC Blum, [LVMPD 001769-001770].

88. BWC Black, [LVMPD 001771-001773].

## On-Scene Consulting ─────────────

89. BWC Lomaglia, [LVMPD 001774].

90. Audio – CIRT Interviews Blum, [LVMPD 001775-001776].

91. Audio – CIRT Interviews Garcia, [LVMPD 001777-001778].

92. Audio – CIRT Interviews Ortega, [LVMPD 001779-001780].

93. Audio – CIRT Interviews Bagaporo, [LVMPD 001781-001782].

94. Audio – FIT Interview CCFD Paramedic Pokorny, [LVMPD 001783].

95. Audio – FIT Interview Pharmacy Tech Barry, [LVMPD 001784].

96. Audio – FIT Interview Witness Bever, [LVMPD 001785].

97. Audio – FIT Interview CCFD Engineer Garwood, [LVMPD 001786].

98. Audio – FIT Interview Ortega, [LVMPD 001787].

99. Audio – FIT Interview Lomaglio [LVMPD 001788].

100. UFRB Informational PowerPoint, [LVMPD 001789]

101. BWC Ortega (Post-Incident), [LVMPD 001790].

102. Photographs at Hospital, [LVMPD 001791-001837].

103. Photographs of Officers, [LVMPD 001838-001862].

104. Photos at Walgreens, [LVMPD 001863-001948].

105. Photos of Xray's, [LVMPD 001949-001952].

106. Photos at Coroner, [LVMPD 001953-002140].

107. Photos of Personal Effects, [LVMPD 002141-002175].

108. Blum CIRT Statement, (11/02/21), [LVMPD 002176-002213].

## On-Scene Consulting

109.  Garcia CIRT Interview, (11/02/21), [LVMPD 002214-002237].

110.  Ortega CIRT Interview, (11/02/21), [LVMPD 002238-002255].

111.  Bagaporo CIRT Interview, (11/02/21), [LVMPD 002256-002292].

112.  Deposition Transcript of David Barry taken on April 12, 2024.

113.  Deposition Transcript and Exhibits of Andrew Louis taken on April 11, 2024.

114.  Deposition Transcript of Joshua Bever taken on April 12, 2024.

115.  Deposition Transcript of Police Officer Joseph Ortega taken on April 15, 2024.

116.  Deposition Transcript and Exhibits of Sergeant Geordinno Bagaporo taken on March 22, 2024.

117.  Deposition Transcript and Exhibits of Police Officer Andrew Garcia taken on March 21, 2024.

118.  Deposition Transcript of Taylor Sommer taken on May 9, 2024.

119.  Deposition Transcript and Exhibits of Sergeant Jeffery Blum taken on April 23, 2024, Volume I.

120.  Deposition Transcript and Exhibits of Sergeant Jeffery Blum taken on April 29, 2024, Volume II.

**Summary**

The following statement summaries represent documents/statements that were used in part during my review but are in no way meant to be exhaustive. The documents listed in the Materials Reviewed Section of this report represent the full library of documents reviewed thus far and used as a basis for my opinions.

- On October 17, 2021, Reiner was involved in a domestic dispute at his home, as well as an assault by two unknown third parties. These events were documented by LVMPD as Event No. 21100007239.

## On-Scene Consulting

- LVMPD responded to Reiner's home and were advised that Reiner was bipolar and on various medications. At that time, Reiner was transported by ambulance to Southern Hills Hospital for medical care and treatment.

- Reiner was admitted for treatment at Southern Hills Hospital at approximately 8:55 p.m. on October 17, 2021. At that time, Reiner complained of an abrasion to his left ear; low back pain; and pain in his left knee and hip. He had no other medical complaints at the time.

- Reiner underwent CT scans of his brain, cervical spine, lumbar spine, thoracic spine and chest, as well as x-rays of his chest, left hip and knee. Other than a prior surgery, no fractures, dislocations or other remarkable findings were noted.

- At approximately 12:31 a.m. on October 18, 2021, Southern Hills Hospital determined that Reiner was in stable condition and that he could be discharged with various prescriptions for medications.

- At approximately 10:30 a.m., Reiner walked across the street from Southern Hills Hospital and presented himself at the Walgreens located at 6485 South Fort Apache Road, where he made his way to the pharmacy to fill the prescriptions he had been given at Southern Hills Hospital.

- The pharmacist advised Reiner that he would fill the prescriptions and Reiner advised that he wait on the premises while this was done. Reiner took a seat in the pharmacy area.

- As Reiner awaited his prescriptions, the pharmacist noticed that Reiner did not look well. He was visibly sweating and moaning in apparent pain. The pharmacist inquired regarding Reiner's condition whereupon Reiner advised that he was fine but needed to rest.

- Eventually, the pharmacist contacted the Walgreens store manager, who asked Reiner if he needed assistance. Reiner responded that he suffered from diabetes and high blood pressure and that he had just been released from the hospital. The store manager offered to call for medical assistance, but Reiner refused.

- Reiner continued to await his prescriptions and the store manager continued to check on his condition periodically. At approximately 1:00 p.m., the store manager discovered that Reiner had made his way to the Walgreens restroom,

## On-Scene Consulting ──────────────────

where he was lying on the floor near the toilet. The store manager called for medical assistance at approximately 1:08 p.m.

- Clark County Fire Department ("CCFD") personnel responded to the call for medical assistance relatively immediately. They spoke with Reiner, who advised that he was diabetic. Reiner's communication was otherwise confusing and non-sensical.

- Because Reiner advised that he was diabetic, CCFD personnel checked his blood sugar levels, which were found to be normal.

- CCFD contacted American Medical Response ("AMR") for ambulance service. As CCFD awaited AMR's arrival, Reiner began scooping water out of the toilet bowl and into his mouth. Reiner continued to thrash about in obvious pain and discomfort and due to his weight eventually dislodged the toilet from the floor.

- At 1:38 p.m., CCFD personnel called for police assistance due to Reiner's agitation and general demeanor.

- At no point in time did Reiner harm or threaten to harm anyone.

- At no point in time did anyone ask or demand that Reiner leave the Walgreens premises.

- It was readily apparent to all persons who came in contact with Reiner that he was suffering a medical or mental health crisis.

- Sergeant Bagaporo and Sergeant Blum responded to the Walgreens at approximately 1:44 p.m.

- As Sergeant Bagaporo and Sergeant Blum approached the entrance of the Walgreens, they discussed the potential for their involvement escalating the existing situation. Upon entering, Sergeant Blum spoke with a Walgreens employee, and asked what was going on. The Walgreens employee advised that Reiner had just been discharged from the hospital; that he was having "some kind of diabetic episode or something"; and that he didn't want an ambulance called. Sergeant Blum then asked whether Reiner had been fighting with anyone on the premises to which the employee responded, "there was no altercation here." Sergeant Bagaporo and Sergeant Blum then proceeded to the pharmacy area.

- Sergeant Bagaporo and Sergeant Blum arrived at the Walgreens restroom at approximately 1:47 p.m. Sergeant Blum spoke with the various medical personnel

## On-Scene Consulting

about their interactions with Reiner and was briefed on Reiner's condition. Sergeant Blum then went to the front of the Walgreens where he again spoke with a Walgreens employee. Sergeant Blum advised that Reiner was in the midst of a medical crisis and encouraged the Walgreens employee to trespass him. Officer Garcia arrived upon the scene as Sergeant Blum was speaking with the Walgreens employee.

- While Sergeant Blum was speaking with the Walgreens employee, Sergeant Bagaporo remained near the restroom and continued to speak with the medical personnel. Reiner was laying on his back spreadeagled, flailing about and slapping his hands on the floor and bathroom stall. He was grunting and yelling incomprehensibly and was in obvious physical and mental distress.

- At approximately 1:51 p.m., Sergeant Blum returned to the restroom area and described his plan to take Reiner into custody on the basis of either a trespass or a Legal 2000. Reiner continued to yell and grunt in pain but never threatened anyone or otherwise demonstrated himself to be a danger to himself, the officer or the public.

- At approximately 1:52 p.m., Sergeant Blum approached the open restroom stall door. Reiner was laying on his back with his head near the toilet. Sergeant Blum asked, "Hey bud, are you all, right?" "Hey, are you okay?" and "Hey, can we help you?" Reiner responded "No." Another person commented that "[Reiner] is using his best exorcist voice." At that point in time, Reiner was laying on his right side with his head resting on the side of the toilet bowl.

- Reiner rolled onto his knees and knelt over the toilet bowl with his back to the police officers and again used his hands to scoop water from the toilet bowl into his mouth. Reiner

- At approximately 2:00 p.m., Officer Ortega arrived and was directed to relieve Sergeant Blum near Reiner's left shoulder. Shortly thereafter, the officers dragged Reiner partly out of the stall in order to have more space.

- At approximately 2:00:30 p.m., Sergeant Blum stated "He's giving up." The officers utilized two sets of handcuffs to handcuff Reiner. At that point, Reiner's skin tone was noticeably purple. Upon information and belief, the actions of the police had asphyxiated Reiner by this point in time.

## On-Scene Consulting

- At approximately 2:01 p.m., the police officers dragged Reiner out of the bathroom. Sergeant Blum noted that "[Reiner was] turning purple" and directed that the handcuffs be removed to allow medical "to start working on him."

- Medical personnel attempted to resuscitate Reiner without success before he was transported across the street to Southern Hills Hospital. At approximately 2:05 p.m., Sergeant Blum stated that Reiner had no pulse.
- Subsequent to the incident, Sergeant Bagaporo, Sergeant Blum and Officer Garcia refused to provide a voluntary statement to the LVMPD Force Investigation Team. Officer Ortega participated in a recorded interview.

- Reiner had done nothing whatsoever to warrant the officers' use of deadly force.

- Reiner did not present a danger to himself, the officers or the public.

- The Defendants made no effort to peacefully handcuff or otherwise restrain Reiner before using deadly force.

- Reiner was clearly in extreme distress and in urgent need of help.

- The Police Defendants possessed actual knowledge of Reiner's medical and health conditions prior to the time that they utilized force to restrain him.

# On-Scene Consulting

## Opinions:

<u>Note</u>:  None of my opinions are intended to usurp the province of the jury and are not stated as ultimate issues.  I hold the opinions below a reasonable degree of professional certainty.  The basis and reasons for my opinions are premised upon my education, training and experience in law enforcement, my knowledge of law enforcement standards, analysis and study; my familiarity with generally accepted police practices and the professional and academic literature in the field; my review of relevant actions, policies and procedures; and my understanding of the facts of this case based on my review of the comprehensive materials listed on <u>Pages 2-8</u> of this report.  My opinions and testimony regarding police procedure are relevant topics concerning issues of which lay jurors are unaware or frequently have misconceptions.  My testimony on these topics is relevant and would assist a jury in understanding the evidence presented to them.

## Opinion Number 1

It is my opinion, based on my review of the facts, testimony and Body-Worn Camera videos in this matter, Las Vegas Metropolitan Police Department Police Sergeant Jeffery R. Blum, (<u>8924</u>), Sergeant Geordinno T. Bagaporo, (<u>5970</u>), Police Officer II Andrew Garcia, (<u>17966</u>), and Police Joseph Ortega, (<u>16580</u>), <u>failed</u> to determine that Mr. Reiner Sommer was medically ill, mentally ill, experiencing a mental crisis and/or potentially under the influence of a controlled substance.

Throughout the United States and in Nevada, law enforcement agencies have recognized and trained their officers in multiple ways to safely interact with subjects such as Mr. Reiner Sommer who are suffering from a mental illness or experiencing a mental crisis. The objective is to avoid unnecessary injury and or death.  The underlying principle is reverence for human life.  These correct and reasonable methods are recognizing cues and other indicators in order to make appropriate decisions regarding intervention strategies; time to assess the situation; calm the situation; request additional resources and equipment; provide reassurance that the Police Officers are there to help; give the person time to calm down; move slowly; eliminate emergency lights and reduce environmental distractions.  These correct and reasonable methods are well known and proven effective for the safety and welfare of both Peace Officers and the public.

Effective communication may enable a peace officer to gain cooperation and voluntary compliance in stressful situations.

## On-Scene Consulting

The vast majority of law enforcement responsibilities involve effective communication. Communication involves both command presence and words resulting in improved safety. <u>Effective communication can</u>:

- Provide skills that reduce the likelihood of physical confrontation.
- Result in a reduction of injuries.
- Render more effective public service and improves community relations.
- Decrease public complaints and internal affairs investigations.
- Decrease civil liability.
- Lessen personal and professional stress.

Gaining voluntary compliance enhances officer and public safety, helps officers to defuse a situation, mitigates unintended consequences, and establishes law enforcement legitimacy and community trust. Safety members shall use de-escalation techniques, crisis intervention tactics and other alternatives to force, as per their training, when feasible. Alternatives to force are not required by a member when the member reasonably believes that immediate action must be taken to prevent injury to themselves, another member or the public.

When time and circumstances reasonably permit, a Police Officer should consider whether a subject's lack of compliance is a deliberate attempt to resist or is the result of an inability to comply based on factors including, <u>but not limited to</u>:

- Medical conditions.
- Mental Impairment.
- Developmental Disability.
- Physical Limitation.
- Language Barrier.
- Drug Interaction.
- Behavioral Crisis.

When circumstances and time reasonably permit, a Police Officer should take reasonable and prudent actions to attempt to mitigate the immediacy of the threat. Thereby giving the Police Officer, the opportunity to call more Police Officers, utilize other tactics, or request specialty assistance, such as deputies trained in Crisis Interventions Techniques.

<u>In addition, I base my opinion on the following facts and testimony</u>:

- Mr. Reiner Sommer had a minimum of (<u>7</u>) Legal 2000's, (<u>11/21/11, 10/9/15, 10/16/15, 11/06/15, 5/15/16, 11/15/16, and 12/27/16</u>), prior to this incident, (<u>LVMPD 000227-000233</u>).

## On-Scene Consulting

- According to Mr. Joshua Bever, Mr. Reiner Sommer did not threaten him or anyone and he was under the impression that Mr. Reiner Sommer was having a medical episode, (Deposition Transcript of Joshua Bever, Pages 37, 41-42).
- According to Police Officer Joseph Ortega, he doesn't believe Mr. Reiner Sommer was in his right state of mind, (Deposition Transcript of Joseph Ortega, Page 38).
- According to Police Officer Joseph Ortega, he believes that Mr. Reiner Sommer needed a psychiatric evaluation, (Deposition Transcript of Joseph Ortega, Page 137).
- According to Sergeant Bagaporo there were no exigent circumstances happening in the bathroom and there was no reason to rush anything, (Deposition Transcript of Geordinno Bagaporo, Page 76).
- According to Sergeant Bagaporo, he believes that Mr. Reiner Sommer was a danger to himself or others, (Deposition Transcript of Geordinno Bagaporo, Page 82).
- According to Sergeant Jeffery Blum, Mr. Reiner Sommer was drinking toilet water which he doesn't believe is normal behavior, (Deposition Transcript of Jeffery Blum, Volume I, Page 138).
- According to Sergeant Jeffery Blum, he describes Mr. Reiner Sommer as a person in crisis with behavioral needs, (Deposition Transcript of Jeffery Blum, Volume II, Page 201).
- According to Sergeant Jeffery Blum, he doesn't believe that Mr. Reiner Sommer had criminal intent, (Deposition Transcript of Jeffery Blum, Volume II, Page 257).

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

In addition, I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.

Lastly, I base my opinion on my twenty-eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## On-Scene Consulting

### **Opinion Number 2**

It is my opinion, based on my review of the facts, testimony and Body-Worn Camera videos in this matter, Las Vegas Metropolitan Police Department Police Sergeant Jeffery R. Blum, (8924), Sergeant Geordinno T. Bagaporo, (5970), Police Officer II Andrew Garcia, (17966), and Police Joseph Ortega, (16580), failed to use de-escalation and defusing techniques during their interaction with Mr. Reiner Sommer. In addition, none of the aforementioned Sergeants/Police Officers or Walgreens staff requested Mr. Reiner Sommer to voluntarily exit the bathroom stall and leave the premises. In addition, none of the aforementioned Sergeants/Police Officers requested Mr. Reiner Sommer to walk over to the gurney so he could receive medical attention and or medical treatment.

In addition, law enforcement officers are taught that they should attempt to de-escalate and utilize proper defusing techniques throughout an incident. Defusing is a process of reducing the potential for violence and bringing emotional level to a manageable level to restore order. The primary objective is to calm the person so that a conversation can take place and the use of force can be avoided.

In addition, law enforcement officers should be taught the below listed De-escalation Techniques:

- Recognize the person may be overwhelmed by thoughts, beliefs, sounds (voices).
- Remember, a person's delusions or hallucinations are real to them.
- Understand that a rational discussion may not take place.
- Speak simply, move slowly.
- Announce actions before taking them.
- Attempt to gain voluntary compliance.
- Remove distractions and disruptive people.
- Be friendly, patient and encouraging but remain professional.
- Be aware that a uniform and a gun may frighten a person with mental illness.
- Reassure the person that no harm is intended.
- Get immediate emergency aid when needed.
- Understand that due to a subject experiencing a medical emergency they are unable to understand and or comply with directives.

Effective communication may enable a peace officer to gain cooperation and voluntary compliance in stressful situations.

The vast majority of law enforcement responsibilities involve effective communication. Communication involves both command presence and words resulting in improved safety. Effective communication:

## On-Scene Consulting

- Provides skills that reduce the likelihood of physical confrontation.
- Can result in a reduction of injuries.
- Renders more effective public service and improves community relations.
- Decreases public complaints and internal affairs investigations.
- Decreases civil liability.
- Lessens personal and professional stress.

In addition, it is my opinion based on my review of the facts, Body-Worn Camera videos and testimony in this matter, I base my opinion on <u>Las Vegas Metropolitan Police Department Manual, Effective 9/2021:</u>

<u>3.110 Use of Force Policy:</u>

<u>De-escalation:</u>

When reasonable, officers should gather information about the incident, assess the risks, assemble resources and equipment, attempt to slow momentum, and communicate and coordinate a response. Officers should start to develop a tactical plan prior to arriving at the scene and, when applicable, utilize intervention techniques by coordinating approaches to persons who are in crisis, are believed to be mentally ill, or have developmental disabilities. Officers will make efforts to control a confrontation and not allow it to escalate.

<u>In addition, I base my opinion on the following facts and testimony:</u>

- According to Police Officer Andrew Garcia, while he was in the restroom, he never heard anyone tell Mr. Reiner Sommer to get up and come outside and did not hear anyone telling Mr. Reiner Sommer to leave the restroom, (<u>Deposition Transcript of Andrew Garcia, Pages 158-159</u>).
- According to Sergeant Jeffery Blum, he directed the segmenting to occur without waiting on a fourth Police Officer to arrive, (<u>Deposition Transcript of Jeffery Blum, Volume I, Page 134</u>).
- According to Sergeant Jeffery Blum, he never heard Mr. Reiner Sommer being asked to leave the premises and he never asked Mr. Reiner Sommer to leave the premises, (<u>Deposition Transcript of Jeffery Blum, Volume I, Page 154</u>).
- According to Sergeant Jeffery Blum, he confirms that no one including the Walgreens staff told Mr. Reiner Sommer to leave, (<u>Deposition Transcript of Jeffery Blum, Volume II, Page 303</u>).

## On-Scene Consulting

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.


Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### **Opinion Number 3**

It is my opinion based on my review of the facts, testimony and Body-Worn Camera videos in this matter, Las Vegas Metropolitan Police Department Police Officer II Police Officer II Andrew Garcia, (<u>17966</u>), used unreasonable, inappropriate, and unnecessary force and potentially deadly force when he placed his knee on Mr. Reiner Sommer's lower back while he was on the ground and in a prone position.

Police Officer II Andrew Garcia, (<u>17966</u>), knew or should have known that when an individual in a face-down position, and breathing may become labored:

- Weight is applied to the person's back, the more weight, the more severe the degree of compression.
- The individual experiences increased difficulty breathing.
- The natural reaction to oxygen deficiency occurs-the person struggles more violently.
- The officer applies more compression to subdue the individual.

In addition, it is my opinion based on my based on my review of the facts, testimony and Body-Worn Camera videos in this matter, Mr. Reiner Sommer never threatened or resisted the involved officers and supervisors and any force in this matter would be unreasonable, inappropriate, and unnecessary force.

In addition, I base my opinion on In addition, I base my opinion on <u>Las Vegas Metropolitan Police Department Manual, (LVMPD 001318)</u>:

II. <u>LEVELS OF RESISTANCE:</u>

Officers must bear in mind that there are many reasons a subject may be non-compliant, resisting arrest or unresponsive. The person in question may not be capable of understanding the gravity of the situation. A subject may be non-compliant due to a medical condition, mental, physical, or hearing impairment, language barrier, drug

## On-Scene Consulting

interaction or emotional crisis, and have no criminal intent. These circumstances may not make the subject any less dangerous but may require a change in tactics that will be more effective while maintaining officer safety once these circumstances are known to the officer.

In addition, I base my opinion on <u>Las Vegas Metropolitan Police Department, Policy and Procedure, 3.110, Use of Force Policy, Effective 9/2021</u>:

<u>Determining the Appropriateness of Force</u>:

Officers will only use a level of force that is objectively reasonable to bring an incident or persons under control and to safely accomplish a lawful purpose. An officer's use of force must balance against the level of resistance exhibited by the subject. The level of force administered by an officer must be carefully controlled and should not be more than objectively reasonable to overcome the physical harm threatened. As stated in <u>NRS 171.1455</u>, officers will only use the amount of reasonable force necessary to effect an arrest.

<u>In addition, I base my opinion on the following facts and testimony</u>:

- According to Andrew Louis, at <u>20:33</u>, he can be seen having his hands on Mr. Reiner Sommer's legs and it looks like Officer Garcia has parts of his body on Mr. Reiner Sommer, (<u>Deposition Transcript of Andre Louis, Page 88</u>).
- According to Andrew Louis, he did see Officer Garcia place his knee on the lower back of the Mr. Sommer Reiner, (<u>Deposition Transcript of Andre Louis, Page 112</u>).
- According to Sergeant Jeffery Blum, he agrees that Police Officer Garcia was putting all of his 235 pound frame across the lower hips of Mr. Sommer, (<u>Deposition Transcript of Jeffery Blum, Volume I, Page 181</u>).

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### Opinion Number 4

It is my opinion, based on my review of the facts, testimony and Body-Worn Camera videos in this matter, Las Vegas Metropolitan Police Department Police Sergeant Jeffery R. Blum, (<u>8924</u>), Sergeant Geordinno T. Bagaporo, (<u>5970</u>), Police Officer II Andrew Garcia, (<u>17966</u>), and Police Joseph Ortega, (<u>16580</u>), should not have placed any weight on the back of Mr. Reiner Sommer. Based on my review of the Body-Worn Camera videos on this matter, the Defendants could have applied mechanical restraints without applying any weight or pressure to the lower back of Mr. Reiner Sommer. Mr. Reiner

## On-Scene Consulting

Sommer was obese and did not appear to resist. In addition, the tactical plan should have included the application of double handcuffs due to Mr. Reiner Sommer's size.

In addition, Mr. Reiner Sommer should have been immediately placed in a recumbent, seated, or standing position even when there was not weight being applied to his torso, buttocks, and legs.

In addition, it is my opinion, based on my review of the facts, testimony and Body-Worn Camera videos in this matter, Las Vegas Metropolitan Police Department Police Sergeant Jeffery R. Blum, (8924), Sergeant Geordinno T. Bagaporo, (5970), Police Officer II Andrew Garcia, (17966), and Police Joseph Ortega, (16580), were in a position to hear Mr. Reiner Sommer make grunting and groaning sounds that indicated that he was in respiratory distress.

Las Vegas Metropolitan Police Department Police Sergeant Jeffery R. Blum, (8924), Sergeant Geordinno T. Bagaporo, (5970), Police Officer II Andrew Garcia, (17966), and Police Joseph Ortega, (16580), knew or should have known that when an individual is restrained in a face-down position, and breathing may become labored:

- Weight is applied to the person's back, the more weight, the more severe the degree of compression.
- The individual experiences increased difficulty breathing.
- The natural reaction to oxygen deficiency occurs-the person struggles more violently.
- The officer applies more compression to subdue the individual.

It is my opinion that the Basic Physiology of a Struggle is applicable in this matter. A person lying on his stomach has trouble breathing when pressure is applied to the back. The remedy seems relatively simple: get the pressure off his back. In addition, it is my opinion Las Vegas Metropolitan Police Department Police Sergeant Jeffery R. Blum, (8924), Sergeant Geordinno T. Bagaporo, (5970), Police Officer II Andrew Garcia, (17966), and Police Joseph Ortega, (16580), should have recognized that there are certain factors that may render some individuals more susceptible to positional asphyxia following a struggle, particularly when prone in a face-down position even when no body weight or pressure is being applied to the individual.

Officers will not restrain subjects who are in custody and under control in a manner that compromises their ability to breathe. Proned handcuffed subjects will be immediately placed in a recovery position or a seated position once safe to do so, (i.e., the placement of a subject's body in a manner that does not restrict breathing or obstruct the airway, such as on their side or upright), (LVMPD 001316).

## On-Scene Consulting

The risk of positional asphyxia is compounded when an individual with predisposing factors become involved in a violent struggle with an officer or officers, particularly when physical restraint includes use of behind the back handcuffing combined with placing the subject in a stomach-down position.

Every day, police officers encounter situations that require them to restrain persons. Properly trained officers learn how improper restraining techniques can block the flow of air into the individual's lungs contributing to a life-threatening condition known as "positional, or restraint, asphyxia." Proper training also covers multiple effective options available such as avoiding compression of the chest, rolling the subjects over on his side, and sitting or standing the subject up.

In addition, it is my opinion based on my based on my review of the facts, testimony and Body-Worn Camera videos in this matter, Mr. Reiner Sommer never threatened or resisted the involved officers and supervisors and any force in this matter would be unreasonable, inappropriate, and unnecessary force.

In addition, I base my opinion on the following facts and testimony:

- According to Police Officer Joseph Garcia, "I walk in. Um, I see. I honestly don't know the sergeant's name. He was there segmenting the male, 516 was actually on the left shoulder. So, uh, Sergeant Blum said, "Hey you guys switch out." I switched out. I went to the left shoulder," (LVMPD 000141).
- "The incident was an in-custody death, (ICD). SAC Officers Joseph Ortega and Andrew Garcia, along with Sergeants Geordinno Bagaporo and Jeffery Blum were the involved officers who segmented Reiner Summer and placed him in handcuffs before rolling him into the recovery position, (LVMPD 001727).
- According to Police Officer Joseph Ortega, he couldn't make out if Mr. Reiner Sommer was making words, but he was grunting, (Deposition Transcript of Joseph Ortega, Page 38).
- According to Police Officer Joseph Ortega, he can hear Mr. Reiner Sommer say in the video that he can't breathe but does not recall him saying that (Deposition Transcript of Joseph Ortega, Page 51).
- According to Police Officer Joseph Ortega, he can hear Sergeant Blum say in the video, "Give me your arms and you can breathe," (Deposition Transcript of Joseph Ortega, Page 51).
- According to Police Officer Joseph Ortega, at 21:25 on the video, he can see that Mr. Reiner Sommer is turning purple, (Deposition Transcript of Joseph Ortega, Page 56).

# On-Scene Consulting

- According to Police Officer Joseph Ortega, he doesn't recall any of the officers were designated to monitor Mr. Reiner Sommer's breathing, (Deposition Transcript of Joseph Ortega, Page 80).
- According to Sergeant Bagaporo, Mr. Reiner Sommer had no weapons, and he did not threaten any of the officers or the medical staff, (Deposition Transcript of Geordinno T. Bagaporo, Page 56).
- According to Sergeant Bagaporo, Sergeant Blum grabbed Mr. Reiner Sommer's feet as Officer Garcia kneeled on the small of Mr. Sommer's back and hip area as he attempted to grab his hands, (Deposition Transcript of Geordinno Bagaporo, Page 141).
- According to Sergeant Bagaporo, he didn't hear Mr. Reiner Sommer say that he can't breathe but he heard it on video, (Deposition Transcript of Geordinno Bagaporo, Page 218).
- According to Sergeant Bagaporo, he didn't believe that Mr. Reiner Sommer intentionally tried to hit Sergeant Blum with the toilet brush, he was trying to get ride of the brush, (Deposition Transcript of Geordinno Bagaporo, Page 228).
- According to Sergeant Bagaporo, he can be heard at the 17 minute mark of the video, providing advice to Officer Garcia about going on to his lower back because he doesn't want to put any pressure on his abdomen, (Deposition Transcript of Geordinno Bagaporo, Page 233).
- According to Sergeant Bagaporo, he confirms that Mr. Reiner Sommer says he can't breathe at the 18:49 mark of the video with Sergeant Blum telling him to relax, (Deposition Transcript of Geordinno Bagaporo, Page 233).
- According to Police Officer Andrew Garcia, Mr. Reiner Sommer was not assaultive at all, (Deposition Transcript of Andrew Garcia, Page 62).
- According to Police Officer Andrew Garcia, he confirms that Sergeant Blum asked if they wanted to store to "trespass" Mr. Reiner Sommer.  The store did not want to trespass him, (Deposition Transcript of Andrew Garcia, Page 72).
- According to Police Officer Andrew Garcia, there was no mention of any alcohol or drug use by Mr. Reiner Sommer.  Sergeant Blum made a reference to a Legal 2000, which is a mental health hold, (Deposition Transcript of Andrew Garcia, Page 73).
- According to Police Officer Andrew Garcia, he placed his knees across the buttocks of Mr. Reiner Sommer, (Deposition Transcript of Andrew Garcia, Page 86).
- According to Police Officer Andrew Garcia, he confirms that at the 17:35 mark of the video, Mr. Reiner Sommer can be heard saying he can't breathe, (Deposition Transcript of Andrew Garcia, Page 99).

## On-Scene Consulting

- According to Police Officer Andrew Garcia, on the video, Officer Ortega's knee can be seen touching the buttocks area of Mr. Reiner Sommer, (<u>Deposition Transcript of Andrew Garcia, Page 102</u>).
- According to Police Officer Andrew Garcia, at the time of this incident, he weighed <u>224 pounds</u>, (<u>Deposition Transcript of Andrew Garcia, Page 126</u>).
- According to Police Officer Andrew Garcia, at the <u>18:52</u> mark of the video, someone says, "Give us your arms, you can breathe," (<u>Deposition Transcript of Andrew Garcia, Page 126</u>).
- According to Police Officer Andrew Garcia, there was no indication Mr. Reiner Sommer was in a life or death situation in the bathroom other than the moment that he said that he couldn't breathe, (<u>Deposition Transcript of Andrew Garcia, Page 168</u>).
- According to Sergeant Jeffery Blum, when the BWC video was played back, he could hear Mr. Reiner Sommer say that he couldn't breathe, (<u>Deposition Transcript of Jeffery Blum, Volume I, Page 176</u>).
- According to Sergeant Jeffery Blum, he definitely heard Mr. Reiner Sommer say he couldn't breathe, (<u>Deposition Transcript of Jeffery Blum, Volume I, Page 191</u>).
- According to Sergeant Jeffery Blum, he couldn't see and didn't know if Mr. Reiner Sommer was breathing, (<u>Deposition Transcript of Jeffery Blum, Volume II, Pages 315-316</u>).
- According to Sergeant Jeffery Blum, it was difficult to understand what Mr. Sommer Reiner was saying as he was grunting and groaning, (<u>Deposition Transcript of Jeffery Blum, Volume II, Page 319</u>).
- According to Sergeant Jeffery Blum, even lay persons know when people are having distressed breathing, (<u>Deposition Transcript of Jeffery Blum, Volume II, Page 356</u>).

In addition, I base my opinion on my twenty-eight- year law enforcement career as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### **Opinion Number 5**

It is my opinion, based on my review of the facts, testimony and Body-Worn Camera videos in this matter, Las Vegas Metropolitan Police Department Police Sergeant Jeffery R. Blum, (<u>8924</u>), Sergeant Geordinno T. Bagaporo, (<u>5970</u>), Police Officer II Andrew Garcia, (<u>17966</u>), and Police Joseph Ortega, (<u>16580</u>), failed to take <u>Command and Control</u> of the scene and <u>immediately</u> intervene/intercede and ensure that there wasn't any weight on the back of Mr. Reiner Sommer during the handcuffing process. In addition, due to

# On-Scene Consulting

Mr. Reiner Sommer's size, Sergeant Jeffery Blum should have utilized (3) plastic cuffs and simply secured his wrists without putting any weight and or pressure on the lower back and or back of Mr. Reiner Sommer.

The community expects that its Police Officers will use reasonable force, and Police Officers will intervene if reasonable force is exceeded.  For the community and Police Officers protection, Police Officers must know the laws pertaining to intervention. This intervention may take the form of one or more of the following actions:

- Strongly caution the other Police Officer.
- Physically restrain the other Police Officer.
- Immediately report the incident.

**Intervention:** is the act of attempting to prevent or attempting to stop the inappropriate or unlawful behavior of another.

A Police Officer may face both criminal or civil liability and disciplinary action if they fail to intervene and prevent other officers from violating anyone's constitutional rights if they had reason to know and an opportunity to act.

**Necessity for Intervention:**

Intervention is necessary because:

- It is required by law.
- It is morally and ethically correct.
- Personal integrity demands it.
- It enhances officer safety.
- It preserves professionalism and supports the law enforcement mission.
- It strengthens public confidence in the law enforcement profession and the individual agency involved.

It reduces personal and agency liability because it results in fewer:

- Physical injuries arising from unreasonable force.
- Disciplinary actions and personal complaints.
- Criminal complaints filed against officers.
- Civil liability suits, including fewer punitive financial judgments against individual officers.

## On-Scene Consulting ────────────────

**Factors Affecting Intervention:**

Although law enforcement officers are legally and ethically required to intervene when they observe inappropriate behavior by a fellow Police Officer, personal and psychological reasons may prevent them from intervening.

Law Enforcement Officers may fail to act when a fellow Police Officer is behaving inappropriate because of several factors.

**Law Enforcement Officers may not intervene because of:**

I.  <u>Transfer of Responsibility</u>: "Somebody else will step in any minute now."

II.  <u>Rationalization</u>: "Nobody else is doing anything so maybe I am just misunderstanding the situation, and nothing is really wrong."

III.  <u>Self-Doubt</u>: "What if I'm wrong?  What will everyone think of me if I step in and do something."

**Personal and Psychological Factors:**

**Personal Factors:**

- Unfamiliar with fellow Police Officer.
- Inexperience with proper action to remedy the situation.
- Feeling the intervention is someone else's responsibility.
- Peer pressure.
- Personal problems.
- Fearing consequences, such as being ostracized.
- Fear of reaction from senior Police Officers, Field Training Officers, or supervisors.
- Lack of training and the understanding of directives, bulletins, policies, and procedures of the Department.

**Psychological Factors:**

- Erroneous notion of how law enforcement officers should behave.
- Fear may play a significant part in the behavior of the observing law enforcement officer.

In addition, I base my opinion on In addition, I base my opinion on <u>Las Vegas Metropolitan Police Department Manual, 9/2021</u>:

<u>3.110 Use of Force Policy</u>:

## On-Scene Consulting

<u>DUTY TO INTERVENE</u>:

Any officer present, regardless of rank, and observing another officer using force that is clearly beyond what is justified or objectively reasonable under the circumstances will, when in a safe position to do so, intercede to prevent the use of unreasonable force. The officer will promptly report these observations and the efforts made to intervene to a supervisor. If the supervisor is using unjustified force, the officer will report it to the next level of supervision. If the observing officer is a supervisor, they will issue a direct order to stop the violation.

Lastly, I base my opinion on my twenty-eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### **Opinion Number 6**

It is my opinion there was a gross lack of situational awareness and fundamental tactical errors in this incident. It is also my opinion that there was a failure by the Las Vegas Metropolitan Police Department to provide proper training to Las Vegas Metropolitan Police Department Police Sergeant Jeffery R. Blum, (<u>8924</u>), Sergeant Geordinno T. Bagaporo, (<u>5970</u>), Police Officer II Andrew Garcia, (<u>17966</u>), and Police Joseph Ortega, (<u>16580</u>), on the following subject matters: Tactical Plan, Working as a Team, Verbal Strategies, Active Listening Skills, Defusing and De-Escalation Techniques, Duty to Intervene and Intercede, Professional Behavior/Ethical Responsibility, Agonal Breathing and Positional/Restraint/Compressional Asphyxia.

In addition, training associated with positional/restraint/compressional asphyxiation is not new to the law enforcement community based on my review, training, and understanding of <u>U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, National Law Enforcement Technology Center, Positional Asphyxiation, Sudden Death, June 1995</u>. In addition, there have been numerous high-profile matters throughout the United States involving positional/restraint/compressional asphyxiation, which should have put the LVMPD to ensure that their officers were properly trained.

In addition, it is my opinion that ratification of the use of deadly force and the aforementioned LVMPD Police Officers conduct prior to the use of unreasonable, inappropriate, and unnecessary force can be seen as endorsing and perpetuating inadequate training and failure to enforce written polices and established standards.

<u>In addition, I base my opinion on the following facts and testimony</u>:

## On-Scene Consulting

- According to Police Officer Joseph Ortega, he is not trained in recognizing people that are having breathing difficulties, (Deposition Transcript of Joseph Ortega, Page 210).

Lastly, I base my opinion on my twenty-eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### Opinion Number 7

It is my opinion Las Vegas Metropolitan Police Department Sergeant Jeffery R. Blum, (8924), Sergeant Geordinno T. Bagaporo, (5970), Police Officer II Andrew Garcia, (17966), and Police Joseph Ortega, (16580), failed to recognize that Mr. Reiner Sommer was in medical distress and having a difficulty breathing and take appropriate action.

It is my opinion based on my training and experience that Agonal Respirations or what is commonly referred to as Agonal Breathing looks or sounds like: snoring, heavy breathing; labored or exaggerated breathing; gurgling; guttural sounds; groaning; snorting; and or gasping. Agonal Respirations are often heard by those people who are near a person prior to death.

In addition, Police Officers are trained or should be trained that if a person subjectively says, "I can't breathe" or uses similar words, do not dismiss the person's claim. In addition, talking does not equal breathing. An individual who speaks in one-word sentences is in medical trouble and needs medical treatment. Police Officers must demonstrate concern and remain professional at all times.

Lastly, I base my opinion on my twenty-eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### My Qualifications for Reviewing this Case:

My opinions are based on my education, training, and experience. Upon my graduation in June 1988 from Northeastern University in Boston with a Bachelor's Degree in Criminal Justice, I was hired as Criminal Investigator/Special Agent GS-1811. Upon completion of Criminal Investigator/Basic Agent School at the Federal Law Enforcement Training Center (FLETC)-6-month academy, I was assigned to the Organized Crime Drug Task Force where I functioned as an agent and undercover operative. The investigations focused on targeting criminal organizations that were involved in large scale narcotic smuggling and money laundering operations.

## On-Scene Consulting ─────────────

I was assigned to the Office of the Special Agent In-Charge, in San Francisco from August 1988 until I joined the Los Angeles Police Department in November of 1989. While in the academy, I was selected by the staff to be my Recruit Class Leader.  Upon my graduation from the LAPD Academy, I was assigned to 77th Division.  In addition to being assigned to 77th Division, I was assigned to Northeast Division (Patrol), Northeast Division (Special Projects Unit-SPU), Northeast Division C.R.A.S.H (Gang Detail).  I was selected to be transferred to Operations Central Bureau C.R.A.S.H., where I worked a plain clothes detail targeting specific gangs throughout Operations Central Bureau.

I applied and was selected to be a Police Officer III at Wilshire Area Vice where I functioned as an undercover operative targeting prostitution, gambling, bookmaking, and other Vice related offenses. While working Wilshire Vice, I was ambushed and received two gunshot wounds.  I received the Purple Heart in 2010.  Upon return from my injuries, I attended mandated Field Training Officer School and was assigned as a Field Training Officer at Wilshire Division.  I trained recruits upon their graduation from the Los Angeles Police Academy in tactics, use of force, report writing, vehicle stops, calls for service, court testimony, emergency procedures, pursuit policy, accident investigations, perimeters, Department policies and procedures, and effective communication skills. While assigned as a Field Training Officer, I was involved in an In-Policy Lethal Use of Force incident, while working with a Probationary Police Officer who had recently graduated from the Los Angeles Police Academy.

I was promoted to the rank of Detective and attended Basis Detective School.  Upon completion of Basic Detective School, I was assigned to Wilshire Area Narcotics, Field Enforcement Section, where I functioned in an undercover capacity.

I was promoted to the rank of Sergeant I and assigned to Hollenbeck Division.  Prior to my assignment, I attended mandated Basic Supervisor School.  In conjunction with Supervisor School, I was selected to attend the West Point Leadership Academy Supervisor Training.  The training focused on team building, leadership, and decision making.  While assigned to Hollenbeck Division, I conducted roll call training on a daily basis on numerous subject matters to include Use of Force Options (Non-Lethal and Lethal), Tactics, Calls for Service, Calls for Service involving the Mentally Ill, Vehicle Pursuit Policy, LAPD Policies and Procedures, Use of Force Policy, Updated Legal Bulletins, Training Directives, and other Standardized Roll Call Training.  I directly supervised a Watch of Officers and provided supervisory oversight during calls for service, tactical situations, perimeter tactics, containment and control issues and use of force incidents.  I conducted audits, personnel investigations, Standard Based

## On-Scene Consulting

Assessments (<u>Ratings</u>), Use of Force Investigations, Administrative Projects, and prepared commendations for officer's field performance. While assigned to Hollenbeck Division, I was selected as the Officer-In-Charge of Hollenbeck Division's Special Enforcement Group. I directly supervised (<u>14</u>) Police Officers and Detectives assigned to the Unit. Our unit worked in conjunction with Hollenbeck Detectives and specifically targeted career criminals in the Division. I provided ongoing mandated Department Training as well tactical, firearms, less than lethal and search warrant tactics training to the Officers and Detectives. As a Unit, we prepared and served numerous search warrants. I provided search warrant tactical briefing and de-briefing of each warrant at the conclusion of the service. I completed audits, administrative projects, Use of Force Investigations, personnel complaints, and other administrative duties as deemed necessary by the Area Commanding Officer.

During this time, I was selected to be loaned to Internal Affairs, Headquarters Section. I investigated personnel complaints that were too large in scope for a geographical Division. At the conclusion of my loan, I was selected to Management Services Division, Special Projects, and Office of the Chief of Police. I completed numerous in-depth staff projects for review by the Chief of Police. In addition, I was assigned with conducting research and editing the 2000 LAPD Department Manual.

Also, during this time, I earned my Master's Degree in Public Administration from California State University, Long Beach.

I applied and was selected as a Sergeant II at 77th Division Vice. I directly supervised ten undercover officers and four uniformed officers. I provided all facets of training to the officers assigned to Vice at that time to include Use of Force Policy, Legal Updates, Department Directives, Training Bulletins, Standardized Roll Call Training, Tactics Training, Undercover Operations training, Surveillance training, and any other training deemed necessary by my Area Commanding Officer. I conducted audits, personnel investigations, administrative projects, Use of Force Investigations, and special projects.

During this time, I was selected by the Chief of Police to be loaned to the Rampart Corruption Task Force. I conducted Use of Force audits on Specialized Units in Central and South Bureaus. I reported it directly to the Office of the Chief of Police.

In 2000, I applied and was selected to Metropolitan Division K9 Platoon as a Sergeant II+1. I directly supervised (<u>18</u>) K9 Handlers. Metro K9 conducted K9 Operations for the entire Department covering all Patrol Divisions and Specialized Units. I provided all facets of training to the K9 Officers to include: K9 Operations, tactics, search warrant

## On-Scene Consulting

services, Mobile Field Force Options, Less than Lethal Force Options, Lethal Force Options, Department Directives, Training Bulletins, and other training dictated by the Officer-in-Charge and Commanding Officer.  In addition, I taught K9 Operations at in-service training, Watch Commander School, Field Training Officer (FTO) School, and Basic Detective School.   While at K9, I investigated and completed K9 contacts, personnel complaints, and Use of Force Investigations.  In addition, I directed and was directly involved in Use of Force incidents.  I received the LAPD Medal of Valor and LAPD Police Star for two lethal use of force incidents while assigned to K9.

In 2005, I was selected as a Sergeant II+1 in Special Weapons and Tactics (SWAT). I directly supervised sixty SWAT Officers.  I conducted and facilitated all facets of SWAT training to include Weapons Training (.45 caliber, MP-5, M-4, Benelli Shotgun, Remington 870 Bean Bag Shotgun, .40mm, SAGE, X-26 Taser) on a monthly basis.  In addition, I facilitated and conducted training in the following training Cadres: Breacher (Explosive), Crisis Negotiation-Mental Health, MEU, SMART, Suicide Prevention, Counter-Terrorism Cadre, Climbing, Hostage Rescue, Sniper Training, Air Support Training (Fast Rope, Aerial Platform Shooting).  I directly supervised SWAT missions and High-Risk Search Warrant Services to include all facets (preparation, briefing, deployment, de-briefing).  I was the Supervisor-in-Charge of the Crisis Negotiation Team.  I provided on-going crisis negotiation training, mental health training, de-briefs, 40-hour POST Certified CNT School, and suicide prevention training.  I worked in conjunction with the mental health community to provide and facilitate training with LAPD SMART, LAPD Mental Evaluation Unit (MEU), Behavioral Science Services Section (BSS), and the Didi Hirsch Suicide Prevention Training.  In addition, I assisted the West Point Military Academy with the development of their crisis negotiation curriculum.

During this time, I was selected as the sole LAPD SWAT representative to respond to Mumbai India with Counterterrorism following the terrorist attack in November 2008.  I taught use of force, tactics, and SWAT deployment to 250 Mumbai Special Tactical Police Officers.  Upon my return, I assisted with the development of multiple venue/multiple attacker tactics.

In June 2010, I retired from the Los Angeles Police Department with 20 years in service to pursue an opportunity in the private sector. I held supervisory positions for the last 14 years of my career.  During my tenure with the LAPD, I received over 100 Commendations including: The Medal of Valor, Purple Heart, and the Police Star.

## On-Scene Consulting

From June 2010 through April 2013, I was the Vice President of Security Operations at Caruso Affiliated in Los Angeles, CA. My responsibilities included: Identified and conducted Risk and Vulnerability Assessments for all Caruso Affiliated Developments, projected developments/investments, and residences. Utilized strategic-level analysis from the intelligence community, law enforcement and the private sector. Ensured a coordinated ability to identify and monitor potential or actual incidents among critical infrastructure domains and all personal and professional interests of Caruso Affiliated. Mitigated expected threats. Utilized preplanned, coordinated actions in response to infrastructure warnings or incidents. Responded to hostilities. Identified and eliminated the cause, or source, of an infrastructure event by the utilization of emergency response measures to include on-site security personnel, local law enforcement, medical and fire rescue, and relevant investigative agencies. Conducted all facets of security training for the company and employees. Formulated Business Continuity and CEO Succession Plans for the company and all affiliated business interests. Conducted ongoing audits and internal investigations.

From June 2013 to June 2014, I was hired as a Deputy Sheriff at the Riverside Sheriff's Department where I conducted all facets of patrol service to include calls for service, self-initiated field activity, arrests, citations, and court testimony. In addition, during my tenure with the Riverside County Sheriff's Department, I was assigned to Robert Presley Detention Center (RPDC). Processed and monitored inmate population from initial intake, housing, court, transportation, and release. Conducted searches of inmate population as well as the facility on an ongoing basis. I was a member of the Cell Extraction Team while assigned to Robert Presley Detention Center and was directly involved in over 20 cell extractions as a Team Leader and Team Member to include video-taping the cell extraction. Utilized experience as a gang officer, Detective and Sergeant with LAPD to conduct interviews and interrogations of prisoners regarding a myriad of investigations. Provided information to gang detail. Functioned as a mentor to newly appointed Deputy Sheriffs as well as Supervisors. Attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. Attended on-going training to include Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents, and Proper Protocols and Procedures when responding to a medical incident or suicide.

From June 2014 to March 2016, I was the Director of Security at Universal Protection Service where I supervised 84 Security Professionals at the City National Plaza. Conducted and facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals. Ensured all Security Professionals were compliant with

## On-Scene Consulting

BSIS security training and licensing.  Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft.  Conducted ongoing Risk and Vulnerability Assessments of the City National Plaza to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. Coordinated all security efforts to ensure safety at Special Events.  Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis.


From March 2016 to September 5, 2017, I was the Director of Security at L&R Group of Companies.  Identified and conducted Risk and Vulnerability Assessments for all L&R Group of Companies developments and projected developments throughout the United States. Conducted and/or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals. Ensured all Security Professionals were compliant with BSIS security training and licensing.  Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft.  Conducted ongoing Risk and Vulnerability Assessments to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. Coordinated all security efforts to ensure safety at Special Events.  Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis as well as respective law enforcement agencies throughout the United States on security matters.

Attached are my curriculum vitae, listing of testimony and fee schedule.

Scott A. DeFoe