# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| TAYLOR SOMMER, *et al.*, | |
| Plaintiffs, | Case No.: 2:23-cv-01682-GMN-NJK |
| vs. | **ORDER GRANTING IN PART MOTION FOR SUMMARY JUDGMENT** |
| LAS VEGAS METROPOLITAN POLICE DEPARTMENT, *et al.*, | |
| Defendants. | |

Pending before the Court is the Motion for Summary Judgment ("MSJ"), (ECF No. 32), filed by Defendants Joe Lombardo, Las Vegas Metropolitan Police Department, Gerald Bagaporo, Jeffrey Blum, Andrew Garcia, and Joseph Ortega. Plaintiff Taylor Sommer, in her capacities individually and as the Administrator of the Estate of Reiner Shawn Sommer, filed a Response, (ECF No. 42), to which Defendants filed a Reply, (ECF No. 43). For the reasons discussed below, the Court **GRANTS, in part, and DENIES, in part,** Defendants' Motion for Summary Judgment.

## I.      BACKGROUND

Plaintiff brings this case against Defendants following the death of her father, Reiner Shawn Sommer ("Mr. Sommer"). (*See generally* First Am. Compl. ("FAC"), ECF No. 30). On October 17, 2021, Mr. Sommer was injured in a domestic dispute at his daughter's home. (Pl.'s Dep. 56:14–62:4, Ex. A to MSJ, ECF No. 32-2); (Domestic Violence Report, Ex. B to MSJ, ECF No. 32-3). Mr. Sommer complained of an abrasion to his left ear, and pain in his back, left hip, and knee. (DeFoe Report at 9, Ex. 4 to Resp., ECF No. 42-4). He was transported to Southern Hills Hospital and received CT scans of his brain, spine, and chest, as well as x-rays to his chest, left hip, and knee. (*Id.*). Other than a prior surgery, the results noted no fractures or other remarkable findings. (*Id.*). The hospital discharged him shortly after midnight. (*Id.*).

Around 10:30 a.m., Mr. Sommer entered a Walgreens store across the street from the hospital to fill his prescriptions. (*Id.*). While sitting and waiting for his prescriptions, he began breathing heavily and sweating. (Bever Dep. 21:3–6, Ex. C to MSJ, ECF No. 32-4). The store manager checked on him and asked if he needed an ambulance, but Mr. Sommer said he was okay and just needed to rest. (*Id.* 21:7–9). Around 1:00 p.m., the manager checked the bathroom and found Mr. Sommer in a stall with the door closed, where he was sitting or laying on the floor and making a lot of noise. (*Id.* 21:17–22). The manager told Mr. Sommer that he was going to call 911 because he felt like Mr. Sommer needed help. (*Id.* 21:23–25). Clark County Fire Department ("CCFD") responded, and they contacted American Medical Response for an ambulance. (*Id.* 39:19–40:2). Mr. Sommer told CCFD that he was diabetic, but his communication was otherwise confusing. (DeFoe Report at 10, Ex. 4 to Resp.). CCFD checked Mr. Sommer's blood sugar levels, which were normal. (*Id.*).

Mr. Sommer began scooping water from the toilet into his mouth or splashing it on his face and thrashing around in the stall. (FAC ¶¶ 41–42); (Pokorny Dep. 13:8–21, Ex. D to MSJ, ECF No. 32-5). He also dislodged the toilet, at least partially, from the floor. (DeFoe Report at 10, Ex. 4 to Resp.). Mr. Pokorny, a fire department employee, noted that Mr. Sommer was acting erratically and was spastic with his movements, so CCFD contacted the Las Vegas Metropolitan Police Department, ("LVMPD"), around 1:38 p.m. (Pokorny Dep. 13:17–23, Ex. D to MSJ). Shortly thereafter, two LVMPD Sergeants, Bagaporo and Blum, arrived at the Walgreens. (Blum Body Worn Camera ("BWC") at T20:45:15Z, Ex. E to MSJ, ECF No. 32-6). Sergeant Blum spoke with a Walgreens employee who told him that Mr. Sommer had just been discharged from the hospital, that he was having "some kind of diabetic episode or something," and that Mr. Sommer didn't want an ambulance called. (*Id.* at T20:46:16Z). The employee also informed Sergeant Blum that Mr. Sommer had not been in any altercations. (*Id.* at T20:45:34Z).

When Sergeant Blum went into the bathroom, he noted that Mr. Sommer was suffering from a medical emergency. (Blum Dep. 124:1–25, Ex. F to MSJ, ECF No. 32-7).  The medical personnel on scene briefed Sergeant Blum on Mr. Sommer's condition, including that he was uncooperative and drinking toilet water. (Blum BWC at T20:47:29Z–59Z, Ex. E to MSJ). Sergeant Blum also spoke to a Walgreens employee to confirm whether they wanted Mr. Sommer trespassed from the store. (*Id.* at T20:48:54Z).  Officer Garcia arrived on the scene during his conversation and Sergeant Blum told him that he intended to either detain Mr. Sommer for trespassing or initiate a "Legal 2000" mental health hold. (*Id.* at T20:49:22Z–50:23Z).

Sergeant Blum returned to the restroom and informed Sergeant Bagaporo and medical personnel of his plan to take Mr. Sommer into custody. (*Id.* at T20:51:50Z).  The Sergeants approached the open stall door and saw Mr. Sommer laying on his back with his head near the toilet. (*Id.* at T20:52:20Z).  Sergeant Blum asked, "Hey bud, are you all right?" "Hey, are you okay?" and "Hey, can we help you?" (*Id.* at T20:52:25Z).  Mr. Sommer responded, "No, I said no." (*Id.* at T20:52:31Z).  He rolled onto his knees and knelt over the toilet bowl, using his hands to scoop water into his mouth or onto his face. (*Id.* at T20:52:40Z).  Sergeant Blum again asked if Mr. Sommer was okay and told him to "Come on out here for us." (*Id.* at T20:52:41–45Z).  Mr. Sommer ignored him. (*Id.*).  Sergeant Blum called dispatch and requested another unit, stating that "[Mr. Sommer] is definitely in a medical crisis right now," and "We are definitely going to have to go hands on here – he's a large male." (*Id.* at T20:53:02Z–20Z). Mr. Sommer continued to kneel over the toilet bowl and moan. (*Id.* at T20:53:16Z).  Sergeant Blum told the other officers to wait for an opportunity to use low-level force, remove Mr. Sommer from the stall, and "segment" him, which is a tactic allowing officers to handcuff a non-compliant suspect on the ground by controlling the limbs and head. (*Id.* at T20:53:45–58Z); (Reyes Dep. 35:4–9, Ex. K to MSJ, ECF No. 32-12).  The goal of segmenting is to a

create a plan and have at least three to four officers involved. (Reyes Dep. 35:22–36:19, Ex. K to MSJ).

Sergeant Blum continued to evaluate the situation for the next three minutes, during which time Mr. Sommer threw a toilet brush that hit Sergeant Blum's shoulder. (Blum BWC at T30:54:00Z–57:55Z, Ex. E to MSJ); (Blum Dep. II 223:2–21, Ex. G to MSJ, ECF No. 32-8). Sergeant Blum testified that it didn't appear Mr. Sommer was intending to hit him. (Blum Dep. II 223:2–21, Ex. G to MSJ). Sergeant Blum again asked Mr. Sommer to come out of the stall to talk to the officers, to which he responded "No." (Blum BWC at T20:54:41Z, Ex. E to MSJ).

When Mr. Sommer moved away from the toilet and laid on his stomach at the back of the stall, Sergeant Blum instructed Sergeant Bagaporo and Officer Garcia to enter the stall and handcuff him. (*Id.* at T20:57:55Z–59Z). Sergeant Bagaporo moved to Mr. Sommer's left shoulder, Officer Garcia went to his hip area and placed a knee across his buttocks or lower back, and Sergeant Blum held his ankles. (*Id.* at T20:58:04Z); (Bagaporo Dep. 206:22–207:17, Ex. I to MSJ, ECF No. 32-10). Sergeant Blum told Officer Garcia to make sure his weight was only resting on Mr. Sommer's buttocks or lower back. (Blum BWC at T20:58:15–24Z, Ex. E to MSJ). Mr. Sommer resisted the officers' attempts to handcuff him by tucking his arms underneath his torso. (*Id.* at T20:58:21–59:53Z). At one point, Mr. Sommer stated, "I can't breathe," to which Sergeant Blum replied, "Relax, relax, give us your arms and you can breathe." (*Id.*).

Officer Ortega then entered the stall and relieved Sergeant Bagaporo from near Mr. Sommer's shoulder. (*Id.* at T21:00:02Z). He noted that Mr. Sommer's hand was tucked underneath him, so he tried to pull it out, but Mr. Sommer "was a very strong individual." (Ortega Dep. 38:18–21, Ex. L to MSJ, ECF No. 32-13). After a few seconds, Sergeant Blum decided to drag Mr. Sommer partly out of the stall to have more space to place him in handcuffs. (Blum BWC at T21:00:05–17Z, Ex. E to MSJ). This allowed the officers to free

Mr. Sommer's right hand. (Ortega Dep. 38:18–25, Ex. L to MSJ). The officers removed their weight from Mr. Sommer's body and Sergeant Blum told the officers to "slow down" because Mr. Sommer was giving up. (Blum BWC at T21:00:30Z, Ex. E to MSJ). The officers double handcuffed Mr. Sommer. (*Id.* at T21:00:40Z). The struggle lasted just under three minutes. (MSJ 6:19–22).

When Mr. Sommer was handcuffed, the officers rolled him onto his side in a recovery position. (*Id.* at T21:00:51Z). This position allows a handcuffed person to be able to support themselves and breathe freely. (Ortega Dep. 29:22–29:4, Ex. L to MSJ). The officers noticed that Mr. Sommer was "turning purple," and Sergeant Blum directed the handcuffs to be removed so that Mr. Sommer could receive medical care. (Blum BWC at T21:01:19Z, Ex. E to MSJ); (Ortega Dep. 29:19–22, Ex. L to MSJ). Medical personnel performed CPR and transported Mr. Sommer to Southern Hills Hospital where he was pronounced deceased. (Blum BWC at T21:01:45Z–09:38Z, Ex. E to MSJ); (Coroner Investigation Report at 000076, Ex. H to MSJ, ECF No. 32-9).

The coroner determined the cause of death to be "toxic effects of methamphetamine in the setting of police restraint." (Coroner Report of Investigation at 000088, Ex. H to MSJ). Mr. Sommer had 180 ng/ml of methamphetamine in his system. (*Id.* at 000099). The coroner also noted Mr. Sommer's additional significant conditions to be cardiovascular disease and obesity. (*Id.*). The medical examiner explained that the effects of the methamphetamine would increase blood pressure and heart rate, which would cause additional stress on the heart. (Murie Dep. 46:14–23, Ex. 1 to Resp., ECF No. 42-1). He also testified that in the setting of police restraint, a physical altercation could exacerbate the effects of the methamphetamine. (*Id.* 46:25–47:3).

After Mr. Sommer's death, his daughter brought a civil rights action against LVMPD, Sheriff Joe Lombardo, Sergeants Baraporo and Blum, and Officers Garcia and Ortega. (*See generally* FAC).

## II.          **LEGAL STANDARD**

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is a sufficient evidentiary basis on which a reasonable fact-finder could rely to find for the nonmoving party. *See id.* "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)). "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quotation marks and citation omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the

nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied, and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). However, the nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts," *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252. In other words, the nonmoving party cannot avoid summary judgment by "relying solely on conclusory allegations unsupported by factual data." *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn

in his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

### III.    DISCUSSION

Plaintiff asserts five claims brought under § 1983 of Title 42 of the United States Code: (1) excessive force against the Defendant Officers (first cause of action), (2) Fourteenth Amendment deprivation of familial relationship against the Defendant Officers (third cause of action), and (3) three *Monell* claims against LVMPD and Sheriff Lombardo (second, fourth, and fifth causes of action). (FAC ¶¶ 90–133).[1]  Plaintiff also brings five claims under Nevada law against all Defendants: (1) negligence, (2) intentional/negligent infliction of emotional distress, (3) wrongful death, (4) common law battery, and (5) violation of the Nevada Constitution Article 1. (*Id.* ¶¶ 143–79).  Lastly, Plaintiff asserts a state negligent supervision and training claim against LVMPD and Sheriff Lombardo. (*Id.* ¶¶ 151–65).  The Court begins by addressing Defendants' argument that all claims asserted against Sheriff Lombardo, in both his individual and official capacities, must fail. (MSJ 26:13–28, ECF No. 32).

### A.    Claims Against Sheriff Lombardo

Beginning with the § 1983 claims brought against Sheriff Lombardo in his official capacity, the Court GRANTS summary judgment because the claims are equivalent to a suit against the government entity, LVMPD. *See Kentucky v. Graham*, 473 U.S. 159, 165–66, (1985).  Official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690 n.55 (1978).  "As long as the government entity receives notice and

---

[1] It is unclear whether Plaintiff's claims for excessive force and familial deprivation are brought against the Defendant Officers or all "Defendants" broadly.  But both claims appears to only refer to the Defendant Officers because it asserts that the "misconduct of the Police Defendants described herein was conducted in an objectively unreasonable manner . . . ." and that  "Defendants, acting under color of law, deprived Plaintiffs of their right to a familiar relationship . . . by seizing Reiner . . . . (FAC ¶¶ 94, 115).  These claims make no mention as to liability for LVMPD, and Plaintiff asserts three related *Monell* claims against LVMPD.  The Court will thus evaluate these claims as brought against the Defendant Officers.

an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky*, 473 U.S. at 166. Thus, the real party in interest is the entity and "a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself." *Id.*

Plaintiff also asserts the § 1983 claims against Sheriff Lombardo in his individual capacity. To adequately demonstrate a local government official's personal liability, a plaintiff must show (1) that the official was personally involved in the alleged constitutional deprivation, or (2) the existence of a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *Hansen v. Black*, 885 F.2d 642, 645–46 (9th Cir. 1989). Regardless, "each [g]overnment official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677. In this case, Plaintiff does not assert that Sheriff Lombardo was involved in the Walgreens incident. Rather, she alleges that Mr. Sommer's rights were violated due to the Sheriff and LVMPD's failure to supervise and train the officers. (FAC ¶¶ 122, 137, 153–57). However, the FAC consistently mentions both LVMPD and Sheriff Lombardo together and fails to allege any distinct misconduct or actions taken by Sheriff Lombardo that caused injury to Mr. Sommer. The Court therefore GRANTS summary judgment for Defendants on the § 1983 claims brought against Sheriff Lombardo in his individual capacity.

Third, Plaintiff asserts state law claims against all Defendants, presumably including Sheriff Lombardo, for (1) negligence, (2) intentional/negligent infliction of emotional distress, (3) wrongful death, (4) common law battery, and (5) violation of the Nevada Constitution for excessive force, and (6) negligent supervision and training. (*Id.* ¶¶ 143–79). However, Sheriff Lombardo is not mentioned in the claims relating to intentional/negligent infliction of emotional distress, wrongful death, common law battery, or the violation of the Nevada Constitution. And the negligence claim against Sheriff Lombardo appears to be the same claim

that Plaintiff brings for negligent supervision and training. (*See id.* ¶ 137). While unclear, to the extent that the first five claims seek to hold Sheriff Lombardo liable for the officers' acts in Walgreens, they are barred by Nevada law. *See* NRS 41.0335(1)(a)–(b) ("[n]o action may be brought against: (a) a sheriff or county assessor which is based solely upon any act or omission of a deputy; (b) a chief of a police department which is based solely upon any act or omission of an officer of the department"). And for the reasons discussed below in Section E pertaining to LVMPD, Sheriff Lombardo is immune from Plaintiff's negligent supervision and training claim. The Court therefore GRANTS summary judgment for Defendants on all claims brought against Sheriff Lombardo.

## B.    Excessive Force *(First Cause of Action)*

Plaintiff asserts three claims relating to excessive force: a § 1983 claim, a state law battery claim, and a state law excessive force claim brought pursuant to Article 1 of the Nevada Constitution. (FAC ¶¶ 90–98, 166–79). The Court begins by addressing Plaintiff's federal excessive force claim.

### 1.    Genuine Issue of Material Fact

Excessive force allegations are examined under the Fourth Amendment's prohibition on unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394 (1989). When judging the reasonableness of the force used, courts consider the following illustrative but non-exhaustive factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. This inquiry must be viewed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* Courts also consider the government's interest in the use of force, as well as the balance between "the gravity of the intrusion on the individual" and "the government's need for that intrusion." *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003). Summary judgment is appropriate "if the . . . court

concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

### i.    *Defendants' Initial Burden*

Weighing the *Graham* factors, the Court finds that Defendants meet their initial burden of presenting evidence to negate Plaintiff's claim that their use of force was excessive. Beginning with the type and amount of force used, Defendants put forth evidence that they used only low-level force techniques.  Prior to restraining Mr. Sommer and applying handcuffs, the Defendants took their time to speak with Walgreens employees and medical personnel on site. (*See* Blum BWC at T20:46:16Z–48:54Z, Ex. E to MSJ).  They evaluated the situation, made a plan to take Mr. Sommer into custody for a Legal 2000 hold, and requested additional help from dispatch. (*Id.* at T20:49:22Z–53:20Z, Ex. E to MSJ).  Before any officer physically touched Mr. Sommer, Sergeant Blum spoke calmly to him for two to three minutes and asked if he was all right and if the officers could help him. (*Id.* at T20:52:25Z–31Z).  Mr. Sommer said "no," and refused to come out of the bathroom stall. (*Id.* at T20:52:41–54:41Z).

Sergeant Blum also waited until Mr. Sommer moved away from the toilet and was lying on his stomach at the back of the stall before instructing the other officers to remove Mr. Sommer from the stall by "segmenting" him. (*Id.* at T20:53:45–57:59Z); (Ortega Dep. 43:6–45:3, Ex. L to MSJ).  Sergeant Blum monitored Officer Garcia's bodyweight placement to ensure that no weight was placed on Mr. Sommer's neck or upper torso. (Blum BWC at T20:58:15–24Z, Ex. E to MSJ).  Mr. Sommer resisted being handcuffed throughout the encounter. (*Id.* at T20:59:30Z–53Z); (Ortega Dep. 38:18–21, Ex. L to MSJ).  Once the handcuffs were applied, the officers rolled him onto his side in a "recovery" position and removed all bodyweight. (Blum BWC at T21:00:51Z, Ex. E to MSJ).  And when Sergeant

Blum noticed Mr. Sommer "turning purple," he directed the handcuffs to be removed. (*Id.* at T21:01:19Z).

LVMPD guidelines characterize segmenting as a "low" level of force. (*See* Guidelines at LVMPD 001317–19, Ex. M to MSJ, ECF No. 32-14); (Ryan Report ¶¶ 156–57, Ex. R to MSJ, ECF No. 32-19). Officer Garcia explained that segmenting is a process involving multiple officers controlling someone who is prone. (Garcia Dep. 83:1–85:23, Ex. J to MSJ, ECF No. 32-11). One officer controls the head, another controls the body by placing a knee across the buttocks, and a third officer controls the feet to prevent kicking. (*Id.*). Because of the way Mr. Sommer was situated in the corner, one of the officers was positioned at his shoulder instead of his head. (Garcia Dep. 86:2–11, Ex. J to MSJ). The officers are trained to put a knee on the buttocks or below the waist so that the prone person has the ability to breathe, and Officer Garcia testified that he followed the training by keeping his weight at Mr. Sommer's buttocks. (*Id.* 85:2–11). Officer Garcia believed that the officers did everything according to the way they had been trained by waiting about fifteen minutes to come up with a plan and attempt to communicate with Mr. Sommer in advance. (*Id.* 147:2–9). He stated that the officers did not restrict Mr. Sommer's breathing in any way. (*Id.* 168:2–13, 182:2–3).

Defendants' expert report states that segmenting is a best practice when dealing with someone in a mental health crisis because it keeps pressure off the torso to avoid compression asphyxia. (Ryan Report ¶ 155, Ex. R to MSJ). In the expert's opinion, it was clear from the video that the officers were aware of the need to keep pressure off the torso by using their bodyweight towards the buttocks and below the waistline. (*Id.*). He further opined that based on the video discussions, the officers were aware of the dangers associated with asphyxia and in-custody death, and "took proper steps to minimize the potential that such a death would occur." (*Id.* ¶ 159). Additionally, the officers testified as to their regular training on both lethal

force and mental health. (Garcia Dep. 43:9–22, 81:15–25, 232:11–25, Ex. J to MSJ); (Blum Dep. 22:3–11, Ex. F to MSJ); (Bagaporo Dep. 27:2–23, 41:4–20, Ex. I to MSJ).

The Court must next balance this level of force against the need for such force to determine whether the force used was "greater than is reasonable under the circumstances." *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (quoting *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002) (overruled on other grounds)). Courts consider non-exclusive factors such as "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Miller*, 340 F.3d at 964. These factors are "non-exhaustive, and we examine the totality of the circumstances, including the availability of less intrusive alternatives to the force employed and whether proper warnings were given." *Rice v. Morehouse*, 989 F.3d 1112, 1122 (9th Cir. 2021) (internal citations omitted).

Defendants present evidence that the force applied was not greater than what was reasonable under the circumstances. There was no underlying crime at issue in this case, but the officers had a reasonable belief that Mr. Sommer posed a threat to his own safety. Mr. Sommer was exhibiting erratic and odd behavior by dislodging a toilet from the floor and scooping water into his mouth, while flailing and pounding his arms and making loud and guttural moans and screams. Sergeant Blum determined that Mr. Sommer was having some kind of medical emergency and was possibly in an excited delirium state. (Blum Dep. 124:16–25, Ex. F to MSJ). He noted that the toilet was loose, but he couldn't tell if Mr. Sommer would be able to pick it up. (*Id.* at 138:14–22). Mr. Sommer was also resisting the attempted handcuffing and refused to comply with requests to leave the stall. (Garcia Dep. 63:13–25, Ex. J to MSJ) (noting Mr. Sommer's uncompliant and obstructive behavior); (Ryan Report ¶ 152, Ex. R to MSJ); (Ortega Dep. 124:4–8, Ex. L to MSJ).

Defendants' expert Mr. Ryan wrote in a report that based on his training and experience, the officers acted consistently with generally accepted practices. (Ryan Report ¶ 143, Ex. R to MSJ). Specifically, he clarified that the officers followed CIT training by gathering information, determining that a Legal 2000 was appropriate, developing and communicating a plan, waiting for an additional officer to arrive, and not attempting to restrain Mr. Sommer until be moved away from the toilet. (*Id.* ¶ 147). He opined that "the handling of this event could be used as a training guide for how officers should approach a subject who is in an irrational and agitated state due to a mental or medical crisis." (*Id.* ¶ 133).

*ii.*        *Plaintiff's Evidence Establishing Dispute of Material Fact*

The burden now shifts to Plaintiff to establish that a genuine issue of material fact exists, such that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc.*, 809 F.2d at 631. The Court finds that Plaintiff sufficiently established a genuine issue of material fact. Primarily, although the coroner determined Mr. Sommer's cause of death to be "toxic effects of methamphetamine in the setting of police restraint," Plaintiff's medical expert opined that, "[i]f not for his encounter with the police on October 18, 2021, more likely than not, Reiner Sommer would not have died, and was not expected to die on October 18, 2021." (Omalu MD Expert Report at 13, Ex. 2 to Resp., ECF No. 42-2). He stated that methamphetamine was not the underlying cause of death, partially due to Mr. Sommer's tolerance to the drug as a methamphetamine user. (*Id.* at 13–14). Importantly, his report concludes that Mr. Sommer died due to restraint asphyxiation. (*Id.* at 16).

Additionally, another one of Plaintiff's experts opined that Mr. Sommer did not present a danger to himself, and that the officers failed to make an effort to "peacefully handcuff or otherwise restrain [Mr. Sommer] before using deadly force." (DeFoe Report at 12, Ex. 4 to Resp.). He stated that the officers could have applied mechanical restraints without using any

weight or pressure on Mr. Sommer's lower back, made sure there was no weight applied to Mr. Sommer's back, and failed to recognize that Mr. Sommer was having difficulty breathing. (*Id.* at 19, 23–24, 27). Plaintiff's expert Mr. DeFoe opined that Officer Garcia "used unreasonable, inappropriate, and unnecessary force and potentially deadly force" by placing his knee on Mr. Sommer's back while Mr. Sommer was prone on the floor. (*Id.* at 18). Because it appears from the footage that Mr. Sommer was resisting the officers by keeping his arms tucked underneath his torso, but was not attempting to stand up or threaten the officers, a reasonable juror could conclude that Officer's Garcia's force was unnecessary under the circumstances.

The court must be "mindful that cases in which the victim of alleged excessive force has died pose a particularly difficult problem in assessing whether the police acted reasonably, because 'the witness most likely to contradict [the officers'] story . . . is unable to testify.'" *Gregory v. Cnty. of Maui*, 523 F.3d 1103, 1107 (9th Cir. 2008). Plaintiff's expert opined that Mr. Sommer died from restraint asphyxiation and would not have died if not for his encounter with the police, which leads to a dispute of material fact regarding to what extent the officers' force caused Plaintiff's death. There is also a genuine issue of material fact as to whether the force used by the officers was truly reasonable under the circumstances. *See Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) (explaining that reasonableness is traditionally a question of fact for the jury). Drawing all justifiable inferences in favor of Plaintiff, the Court finds that she has set forth specific facts showing a genuine issue for trial as to whether the officers used excessive force. *See Scott v. Smith*, 109 F.4th 1215, 1226 (9th Cir. 2024) (finding that two officers used excessive force by applying bodyweight to a prone, unarmed person who was not suspected of a crime).

### 2. Qualified Immunity

Having found a material dispute of fact, the Court must now address the officers' qualified immunity claim. "Qualified immunity gives government officials breathing room to

make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). To overcome a claim of immunity, plaintiffs must plead "facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *al-Kidd*, 563 U.S. at 735.

As noted above, whether the officers violated Mr. Sommer's constitutional rights involves disputes of material fact. So, turning to the second prong, a right is "clearly established" when "the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *al-Kidd*, 563 U.S. at 741 (cleaned up). The Supreme Court has "'repeatedly told courts . . . not to define clearly established law at a high level of generality,' since doing so avoids the crucial question [of] whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (quoting *al-Kidd*, 563 U.S. at 742) (internal citation omitted). Although defeating a qualified immunity claim on summary judgment does not require a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate" for a right to be clearly established. *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). For purposes of qualified immunity, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Courts should ask "whether the state of the law" at the time of Defendants' conduct provided "fair warning" that their actions were unconstitutional. *Id.* Once the defense of qualified immunity is raised by the defendant, the plaintiff bears the burden of showing that the rights allegedly violated were "clearly established." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000).

To demonstrate that Mr. Sommer's rights were clearly established, Plaintiff points to a 2024 Ninth Circuit decision, *Scott v. Smith*, 109 F.4th 1215 (9th Cir. 2024). (Resp. 25:23–27:2). The *Scott* court held that two officers collectively used deadly force while applying handcuffs when one of them put bodyweight on the plaintiff's back and neck for one to two minutes and the other put his weight on the plaintiff's lower body. 109 F.4th at 1226. Although the *Scott* decision was handed down three years after Mr. Sommer's death, Plaintiff directs the Court to the quote in *Scott* that "Long before Scott's death, we clearly established that it is unconstitutional to use bodyweight force on the back and neck of a prone and unarmed individual." *Id.* "The law is especially clear where, as here, the officers know the prone individual is suffering from a mental illness and is not suspected of a crime." *Id.* The *Scott* court cited *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003), to support its conclusion that bodyweight force on the back and neck is unconstitutional. Because *Scott v. Smith* was published three years after this incident occurred, it cannot serve as notice for the Defendant Officers. But because *Scott* relied heavily on the Ninth Circuit's previous *Drummond* decision, the Court will analyze whether *Drummond* and its progeny provided "fair warning" that the officers' conduct here was unconstitutional.

The *Drummond* court reversed a grant of summary judgment to officers in an excessive force case involving a schizophrenic man who was "hallucinating and in an agitated state." 343 F.3d at 1054, 1063. Drummond was unarmed, had not committed a crime, was not a danger to himself or others, and did not offer resistance. *Id.* at 1054. Even so, the officers knocked Drummond to the ground and leaned their bodyweight on Drummond's neck and upper torso. *Id.* One officer weighed substantially more than Drummond, and he repeatedly told the officers that he could not breathe and that they were choking him. *Id.* The officers left their weight on his back and neck after applying handcuffs, and after about 20 minutes, Drummond went unconscious. *Id.* at 1055. The court explained that "some force was surely justified in

restraining Drummond so that he could not injure either himself or the arresting officers." *Id.* at 1059. But "after he was handcuffed and lying on the ground," the force was clearly unconstitutional when compared to the minimal amount of force that was warranted. *Id.* Therefore, the officers "should have known that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable." *Id.*

In another case, *Gregory v. County of Maui*, the Ninth Circuit differentiated the facts of *Drummond* to find that officers in *Gregory* did not use excessive force. 523 F.3d 1103, 1109 (9th Cir. 2008). The officers in that case pinned the plaintiff to the ground and tried to hold down his back and neck. *Id.* at 1105. The plaintiff had committed a crime of trespassing, refused to put down a pen that he was pointing at the officers, and resisted the officers. *Id.* The plaintiff shouted that he couldn't breathe, and one officer continued to hold his head and neck. *Id.* When the handcuffs were applied, the officers sat him up and discovered he was not breathing. *Id.* The *Gregory* court noted that unlike *Drummond*, the plaintiff had committed the crime of trespass, the officers first attempted to verbally coax the plaintiff, and the officers had reason to believe the plaintiff posed a threat to them. *Id.* at 1108–09. "Finally, unlike *Drummond*, Gregory resisted the officers throughout the encounter, and the officers in this case ceased using force once Gregory was handcuffed." *Id.* (citing *Drummond*, 343 F.3d at 1057–58) ("After he was knock [ed] . . . to the ground where the officers cuffed his arms behind his back as [he] lay on his stomach, a jury could reasonably find that he posed only a minimal threat to anyone's safety.")). So, the court reasoned that even though the officers were confronted with a mentally ill individual, the officers used "the minimal force necessary to disarm and to restrain Gregory, and that they ceased such force once the threat was neutralized." *Id.* at 1109.

Although Plaintiff need not identify a "case directly on point" for a right to be clearly established, the facts in this case are more similar to *Gregory* and can also be differentiated from *Drummond*. "*Drummond* articulated the parameters of reasonableness that the officers' conduct breached: 'The officers allegedly crushed *Drummond* against the ground by pressing their weight on his neck and torso, and continuing to do so despite his repeated cries for air, and despite the fact that his hands were cuffed behind his back and he was offering no resistance.'" *Arce v. Blackwell*, 294 F. App'x 259, 261 (9th Cir. 2008) (quoting *Drummond*, 343 F.3d at 1061).

First, although Officer Garcia had a knee across Plaintiff's buttocks or lower back before Mr. Sommer was handcuffed, no officer had bodyweight on Mr. Sommer's neck or upper back at any time. And while some courts have applied *Drummond* to deny immunity when officers used pre-handcuffing bodyweight, the facts can be differentiated because bodyweight in those cases was placed on the plaintiff's neck and/or upper back. *See, e.g.*, *Dominguez v. Cnty. of Los Angeles*, No. CV 21-6369 FMO (KSX), 2024 WL 3914873, at *3 (C.D. Cal. Aug. 15, 2024); *Wallisa v. City of Hesparia*, 369 F. Supp. 3d 990, 999 (C.D. Cal. 2019). Second, unlike in *Drummond* but similar to the plaintiff in *Gregory*, Mr. Sommer was resisting the officers' attempt to handcuff him, and the officers attempted to verbally coax him to comply before applying force.

And third, as Defendants point out, multiple Ninth Circuit and district court cases characterize *Drummond* as pertaining to the application of *post-handcuffing* bodyweight. *See, e.g.*, *Slater v. Deasey*, 789 Fed. App'x 17, 21 (9th Cir. 2019) (*Drummond* placed officers "on notice" that "plac[ing their] bodyweight on the arrestee's back and neck while he was handcuffed and lying on his stomach" violated the Fourth Amendment); *Abston v. City of Merced*, 506 Fed. App'x 650, 652–53 (9th Cir. 2013) ("A reasonable fact-finder could conclude that defendants' use of body compression as a means of restraint was unreasonable and

unjustified by any threat of harm or escape when [the plaintiff] was handcuffed and shackled, in a prone position, and surrounded by numerous officers."); *Garlick v. Cnty. of Kern*, 167 F. Supp. 3d 1117, 1158 (E.D. Cal. 2016) ("Drummond is sufficiently similar to the specific context of this case that it clearly warned officers that when a suspect is handcuffed and prone on the ground, further restraint measures, if applied as alleged here, would be unconstitutional.").

Here, the officers removed all bodyweight once the handcuffs were applied.  The Ninth Circuit has found this to be a "significant" differentiating factor. *See Arce*, 294 F. App'x at 262 ("Significantly, unlike in *Drummond*, or here, the police officers in Gregory 'ceased using force once Gregory was handcuffed,' even though Gregory continued to resist throughout the encounter.)  The *Drummond* court's explanation that "some force was surely justified in restraining Drummond so that he could not injure either himself or the arresting officers," applies equally to the facts here. *Drummond*, 343 F.3d at 1059.  The court noted that "*after* he was handcuffed and lying on the ground," the force was clearly unconstitutional. *Id.*

Plaintiff disputes Defendants' argument that *Drummond* applies to *post*-handcuffing force because the *Scott* court held otherwise.  The *Scott* court explained that the officers' restraint of Scott with his hands behind his back was the functional equivalent of being handcuffed, and the court found that *Drummond* opined more generally about the use of bodyweight force on a prone individual. *Scott*, 109 F.4th at 1227.  Here, however, the officers were struggling to get Mr. Sommer's hands behind his back.  They did not get both arms out from underneath him until they moved him out of the stall, so he was never in the position of being functionally handcuffed.  And more importantly, the *Scott* court's conclusion that *Drummond* applied more broadly to bodyweight force on a prone individual, whether or not they were handcuffed, was not available to Defendants at the time of this incident in 2021.

Plaintiff did not cite a case, other than *Scott v. Smith*, for her argument that the violation was clearly established.

When, as here, a plaintiff fails to identify "direct case law" recognizing the unconstitutionality of the challenged conduct at the time it occurred, and when the facts of the plaintiff's cited cases "are distinguishable," qualified immunity must be granted. *See Manriquez v. Ensley*, 46 F.4th 1124, 1131–32 (9th Cir. 2022); *see also City of Tahlequah, Okla. v. Bond*, 595 U.S. 9, 12–13 (2021) ("It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted . . . . [T]he decisions relied upon by the Court of Appeals . . . [involved] facts . . . dramatically different from the facts here."). Plaintiff's proffered case, *Scott v. Smith*, was decided three years after Mr. Sommer's death. And the Ninth Circuit cases that the *Scott* court relied on, such as *Drummond*, have distinguishable facts.  The Court therefore GRANTS qualified immunity on Plaintiff's § 1983 excessive force claim, (first cause of action), and GRANTS summary judgment for Defendants.

## C.    Fourteenth Amendment Familial Relationship *(Third Cause of Action)*

Plaintiff also brings a Fourteenth Amendment Familial Relationship claim pursuant to 42 U.S.C. § 1983 based on Defendants' alleged deprivation of her right to a relationship with her father. (FAC ¶¶ 114–17).  "Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct." *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013).  In the Ninth Circuit, the standard of culpability for a due process right to familial association claim is whether the conduct at issue "shocks the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008); *see also Gonzalez v. City of Anaheim*, 747 F.3d 789, 797 (9th Cir. 2014).

To show that a defendant's conduct shocks the conscience, a plaintiff must demonstrate that the defendant either "acted with deliberate indifference" or with a "purpose to harm . . . that was unrelated to legitimate law enforcement objectives," the latter requiring a "more demanding showing." *Porter*, 546 F.3d at 1137. The deliberate indifference standard applies "only when actual deliberation is practical." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998). "On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010).

The Court finds that given the time the officers had to talk to Walgreens employees, discuss the situation with each other, and come up with a plan, the deliberate indifference standard applies. But even if the officers were deliberately indifferent to the risk that their segmenting technique and bodyweight could harm Mr. Sommer, the Plaintiff's Fourteenth Amendment rights were not clearly established at the time of the incident. Plaintiff cites *Scott v. Smith* for her argument that the officers should not be entitled to qualified immunity on this claim, but the *Scott* court found *no* clearly established law finding a Fourteenth Amendment violation for facts similar to this case. *See Scott*, 109 F.4th at 1229 ("Plaintiff identifies no authority for finding a Fourteenth Amendment violation here, instead citing only a general statement of the rule. We have not identified any such authority either."). The same is true here, and thus Defendants are entitled to qualified immunity on Plaintiff's third cause of action, her Fourteenth Amendment familial relationship claim.

### D.    *Monell* **Claims** *(Second, Fourth, and Fifth Causes of Action)*

The Court will next determine whether LVMPD should be granted summary judgment on Plaintiff's *Monell* claims. Plaintiff argues that LVMPD has failed to adopt appropriate policies and training to protect the rights of people experiencing a mental health crises. (FAC

¶¶ 68–86).  She cites examples involving other persons suffering from mental health crises in which they suffered death or injury and relies on these examples for her argument that the LVMPD has been deliberately indifferent to its training related to such encounters. (*Id.* ¶¶ 87–89).  LVMPD moves for summary judgment, arguing that it has robust training on use of force and responding to individuals in mental health crisis. (MSJ 7:9–26).

To impose *Monell* liability on a municipality under § 1983, a plaintiff must demonstrate that (1) they were deprived of a constitutional right; "(2) the municipality had a policy; (3) the policy amounts to deliberate indifference to [the plaintiff's] constitutional right; and (4) the policy is the moving force behind the constitutional violation." *Gordon v. Cnty. of Orange*, 6 F.4th 961, 973 (9th Cir. 2021) (internal quotation marks and citation omitted).  A plaintiff can satisfy the policy requirement by demonstrating that either (1) the action was taken pursuant to an expressly adopted official policy, (2) the public entity followed a longstanding practice or custom, such as by failing to implement procedural safeguards or failing to train adequately, or (3) the individual who committed the tort was an official with final policy-making authority of such an official ratified a subordinate's unconstitutional decision. *Id.* at 973–74.

To establish *Monell* liability for a failure to train, a plaintiff must show not only that the training was inadequate, but also that the local governmental entity was deliberately indifferent to its constituents' constitutional rights. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).  Simply that more or better training might have avoided the constitutional violation is insufficient to assign liability; instead, the choice not to train must be deliberate. *See id.* at 392. Failure to train may amount to a policy of "deliberate indifference" if the need to train was obvious and the failure to do so made a violation of constitutional rights likely. *Id.* at 390. Similarly, a failure to supervise that is "sufficiently inadequate" may amount to "deliberate indifference." *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989).  Mere negligence in training or supervision, however, does not give rise to a *Monell* claim. *Id.*

LVMPD's evidence demonstrates that it has not been deliberately indifferent to its officers receiving sufficient training on use of force or responding to an individual in a mental health crisis.  Its officers receive 1,040 hours of police academy training and an additional six months of field training. (Reyes Dep. 193:12–194:3, Ex. K to MSJ, ECF No. 32-12).  Officers further receive continued yearly training on use of force, including positional asphyxiation. (*Id.* 43:16–23, 45:8–47:19, 71:10–72:1); (Bagaporo Dep. 118:18–126:1, Ex. I to MSJ).  LVMPD also trains its officers on performing a Legal 2000 in situations involving a mental health crisis. (Reyes Dep. 162:6–163:3, Ex. K to MSJ).  Plaintiff's expert Mr. DeFoe testified that he didn't think the LVMPD policies themselves were deficient, and in fact found them to be "very detailed." (DeFoe Dep. 61:19–62:18, Ex. Q to MSJ, ECF No. 32-18).  His criticism was instead centered around whether the officers received the training, and if they did, whether they forgot it or departed from it. (*Id.* 62:2–9).  Additionally, LVMPD's expert opined that based on his training and experience, LVMPD "has adopted the best practices for dealing with persons in medical or mental health crisis." (Ryan Report ¶ 161, Ex. R to MSJ).  He further wrote that LVMPD had adopted the "premier" Crisis Intervention Training ("CIT"), and that based on the videos, the officers acted consistently with those principles by slowing the event down, insuring Mr. Sommer was isolated, having EMS nearby to take action, developing a plan, communicating it, and attempting to communicate with Mr. Sommer. (*Id.* ¶ 164).  And he believes it was clear that the officers were familiar with the dangers of compression asphyxia and need to move them into a rescue position to facilitate breathing after handcuffing. (*Id.* ¶ 165).

Plaintiff fails to raise a genuine issue of material fact in response.  First, Plaintiff fails to provide evidence, or even allegations, that the current LVMPD training program is deficient.  Even if the officers in this case either were not trained properly or failed to follow the training, a particular officer's unsatisfactory training "will not alone suffice to fasten liability on the city,

for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton*, 489 U.S. at 390; *see also Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407–08 (1997) (explaining that a "one-time negligent administration" of a training program does not "tend to show . . . the lack of proper training").

Second, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). Of Plaintiff's six examples of individuals harmed or killed by LVMPD officers, however, only one other instance involved pre-handcuffing bodyweight force leading to asphyxiation: the case of Roy Scott, discussed above. (*See* FAC ¶¶ 81–86). The other five examples involve a chokehold neck restraint, attack by K9 unit dog and gunshot in the back, application of handcuffs in a restraint chair, bodyweight kneeling after handcuffs were applied, and restraint on a gurney. (*Id.*). The variety of force applied in these previous cases does not create an obvious lack of training such that it demonstrates LVMPD's deliberate indifference to the rights of individuals with mental illness. And the *Scott* case alone is not enough to demonstrate a widespread pattern or custom of bodyweight asphyxiation while handcuffs are being applied. Lastly, a plaintiff may prove deliberate indifference through "evidence of a 'failure to investigate and discipline employees in the face of widespread constitutional violations.'" *Rodriguez v. Cty. of L.A.*, 891 F.3d 776, 803 (9th Cir. 2018). But here, Plaintiff has not submitted evidence that LVMPD has allowed its officers to repeatedly commit constitutional violations without disciplinary action. Accordingly, the Court GRANTS Defendants' Motion for Summary Judgment as to Plaintiff's *Monell* claims asserted in its second, fourth, and fifth causes of action.

### E.    State Law Claims Remaining *(Sixth thru Eleventh Causes of Action)*

In light of the Court's order thus far, the claims remaining for adjudication are Plaintiff's state law claims for (1) negligence, (2) intentional/negligent infliction of emotional distress, (3)

wrongful death, (4) common law battery, and (5) violations of the Nevada Constitution. (FAC ¶¶ 143–79).  Lastly, Plaintiff asserts a state negligent supervision and training claim against LVMPD and Sheriff Lombardo. (*Id.* ¶¶ 151–65).

### 1. Negligence and Negligent Infliction of Emotional Distress *(Sixth and Seventh Causes of Action)*

Plaintiff alleges that the Defendant Officers had a duty to comply with LVMPD training regarding use of force, including a duty not to utilize careless or reckless police tactics and respond appropriately to those suffering from a mental health episode, and that as a result of their "negligence, carelessness, and unskillfulness," their breaches led to excessive force and Mr. Sommer's death. (FAC ¶¶ 136–39).  She also alleges that Sheriff Lombardo and LVMPD were negligent in their hiring, training, and supervising, which is discussed below in Section E. (*See id.* ¶ 137).  To establish negligence under Nevada law, a party must establish, (1) the existence of a duty of care, (2) breach of that duty, (3) legal causation, and (4) damages. *Clark County Sch. Dist. v. Payo*, 403 P.3d 1270, 1279 (Nev. 2017).

Defendants assert that the officers' pre-force tactical decisions, such as how to accomplish the arrest, were discretionary acts.  Discretionary-function immunity is codified in NRS 41.032(2) and states that no action can be brought against an officer or employee of the state or any of its agencies or political subdivisions "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty . . . whether or not the discretion involved is abused."  A state actor raising this defense must show that (1) the questioned decision involved personal judgment, choice, or deliberation, and (2) the decision was based on considerations of social, economic, or political policy. *Martinez v. Maruszczak*, 168 P.3d 720, 722, 728–29 (Nev. 2007).

However, there are two limitations on discretionary-act immunity.  First, immunity does not attach for actions taken in bad faith. *Falline v. GNLV Corp.*, 823 P.2d 888, 891 (Nev. 1991); *Davis v. City of Las Vegas*, 478 F.3d 1048, 1059 (9th Cir. 2007).  Second, acts taken in

violation of the Constitution cannot be considered discretionary. *Mirmehdi v. United States*, 689 F.3d 975, 984 (9th Cir. 2011); *Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir. 2000). "[I]n general, governmental conduct cannot be discretionary if it violates a legal mandate." *Nurse*, 226 F.3d at 1002.

Defendants are correct that generally, a police officer's decision on how to effectuate an arrest is protected by discretionary immunity. *See Davis*, 478 F.3d at 1059 ("An officer's decision as to how to accomplish a particular seizure or search is generally considered a discretionary determination under Nevada law, and officers are therefore immune from suit as to state law claims arising therefrom in most cases."). Plaintiff responds that the officers' actions in this case should not be covered by discretionary immunity because they "negligently creating a dangerous situation" by "pil[ing] onto" Mr. Sommer with knowledge of his medical conditions, even though he had not demonstrated that he was a danger to them. (Resp. 31:23–26).[2]

Acts in violation of the Constitution are not discretionary, and the Court has found a dispute of material fact as to whether the officers complied with their use of force training or violated Mr. Sommer's Fourth Amendment rights through their use of force. The Court thus DENIES summary judgment on the negligence claim as applied to the Defendant Officers. *See Jackson v. Cnty. of San Bernardino*, 191 F. Supp. 3d 1100, 1116 (C.D. Cal. 2016) (denying

---

[2] Defendants make an additional argument that as a matter of law, there can be no negligence cause of action based on an officer's *intentional* use of physical force. (Reply 16:12–24) (citing *DeCastro v. Las Vegas Metro Police Dep't*, No. 2:23-cv-00580-APG-EJY, 2024 WL 4189939, at *22 (D. Nev. Sept. 12, 2024)). The Court agrees that to the extent Plaintiff's negligence claim is based on an intentional use of force, it cannot form the basis of her negligence claim. *See DeCastro*, 2024 WL 4189939, at *22; *see also Wells v. City of Las Vegas*, No. 2:21-cv-1346 JCM, 2024 WL 2028007, at *16 (D. Nev. May 7, 2024) (predicting that the Supreme Court of Nevada would hold that police officers cannot be held liable under a negligence theory for alleged use of excessive force). However, the Court finds that Plaintiff's negligence claim is based, at least primarily, on an alternative theory of liability that the officers acted carelessly in the amount and type of force used. And a plaintiff "may plead a negligence claim for conduct that is independent of the intentional use of force or plead negligence and battery as alternate theories if the evidence supports each theory." *Ryan v. Napier*, 425 P.3d 230, 238 (Ariz. 2018). The Court thus finds this argument to be unpersuasive.

summary judgment on negligence claim where "a disputed issue of fact remains as to whether [the officer]'s use of force was reasonable"). And because Defendants' Motion does not address Plaintiff's NIED claim, the Court also DENIES summary judgment as to that claim.

### 2. Intentional Infliction of Emotional Distress ("IIED") *(Seventh Cause of Action)*

Next, Defendants argue that Plaintiff lacks evidence that the officers intended to cause emotional distress or acted with reckless disregard for causing emotional distress. (MSJ 26:8–11). They assert that the parties agree the officers intended to take Mr. Sommer in for a Legal 2000 hold for his own protection and medical care. (*Id.*). Plaintiff does not respond to Defendants' argument. To establish a prima facie claim of IIED in Nevada, a plaintiff must prove: "(1) extreme and outrageous conduct on the part of the defendant; (2) intent to cause emotional distress or reckless disregard for causing emotional distress; (3) that the plaintiff actually suffered extreme or severe emotional distress; and (4) causation." *Blige v. Terry*, 540 P.3d 421, 432 (Nev. 2023). Extreme and outrageous conduct is that which is "outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community." *Maduike v. Agency Rent–A–Car*, 953 P.2d 24, 26 (Nev. 1998) (internal quotation marks and citation omitted).

Defendants' argument consists of only three sentences stating in a conclusory manner that the officers' intent was to help Mr. Sommer and take him in for medical treatment. Other than the black-letter law describing the elements of an IIED claim, they offer no case law to defend their assertions with. Per the Court's local rules, "[t]he failure of a moving party to file points and authorities in support of the motion constitutes a consent to the denial of the motion." LR 7-2. But even more importantly, Defendants do not cite to the record of evidence to bolster their assertions. Although there does not appear to be a dispute that the officers' intention was to handcuff Mr. Sommer for a Legal 2000 hold, Plaintiff's expert opined that the officers should have monitored Mr. Sommer's breathing and changed their positions when Mr.

Sommer told them that he couldn't breathe. (DeFoe Report at 19, 23–24, 27, Ex. 4 to Resp.). Further, a dispute of material fact exists as to whether Defendants used excessive force. Defendants fail to meet their burden on summary judgment due to their lack of legal citations, argument, or cites to the record.  The Court DENIES summary judgment on this claim.

### 3.  Wrongful Death, Battery, and State Constitutional Excessive Force *(Eighth, Tenth, and Eleventh Causes of Action)*

The Court moves next to Plaintiff's claims for wrongful death, battery, and excessive force in violation of the Nevada Constitution.  Nevada's wrongful death statute, NRS 41.085, provides that "[w]hen the death of any person . . . is caused by the wrongful act or neglect of another, the heirs of the decedent and the personal representatives of the decedent" may maintain a wrongful death claim for "damages against the person who caused the death." NRS 41.085(2).  Plaintiff alleges that Defendants "intentionally, wantonly, willfully, maliciously, oppressively and without just provocation or cause" brought about the death of Mr. Sommer through asphyxiating him, and that the LVMPD ratified this conduct. (FAC ¶ 148).  Because genuine issues of material fact exist surrounding the impact of the officers' actions on Mr. Sommer's death, the Court DENIES Defendant' Motion for Summary Judgment on Plaintiff's wrongful death claim.

Additionally, Plaintiff's claims for battery and excessive force under the Nevada Constitution are based on the same facts as her federal claim for excessive force brought under § 1983.  The Court evaluates these claims under the same standard, but the officers' qualified immunity defense applies only to the § 1983 claim. *See Williams v. City of Sparks*, 112 F.4th 635, 647 (9th Cir. 2024) (explaining that under Nevada law, common-law battery by a police officer mirrors the federal civil rights law standard); *Mack v. Williams*, 522 P.3d 434, 451 (Nev. 2022) (en banc) ("[Q]ualified immunity, as that doctrine is understood under federal law, is not a defense available to state actors sued for violations of the individual rights enumerated in Nevada's Constitution.").

The Court found that a genuine dispute of material fact exists as to whether the officers used excessive force, and only granted summary judgment on qualified immunity grounds. Because qualified immunity is not a defense to these state law claims, and Defendant makes no other argument for summary judgment on these claims, the Court DENIES Defendants' Motion for Summary Judgment on Plaintiff's battery and state constitutional excessive force claims. *See Nelson v. City of Davis*, 709 F. Supp. 2d 978, 992 (E.D. Cal. 2010) ("Because the same standards apply to both state law assault and battery and § 1983 claims premised on constitutionally prohibited excessive force, the fact that Plaintiff's § 1983 claims under the Fourth Amendment survive summary judgment also mandates that the assault and battery claims similarly survive.").

### 4.  Negligent Supervision and Training *(Ninth Cause of Action)*

Moving to Plaintiff's negligent supervision and training claim, Defendants argue that LVMPD is immune. (MSJ 25:19–23).  Plaintiff does not address this claim or argument in her Response.  Her FAC alleges that although LVMPD had certain policies in place to deal with persons suffering from a mental health crisis, LVMPD failed to properly train and supervise its employees to ensure they were followed. (FAC ¶ 153).

Here, the specific government actions being challenged are LVMPD's training decisions surrounding de-escalation, excited delirium, the monitoring of breathing, and Legal 2000 criteria. (*Id.* ¶¶ 151–59).  The training and supervision of employees typically falls within the discretionary-function immunity. *Doe v. Holy See*, 557 F.3d 1066, 1084 (9th Cir. 2009); *Nurse v. United States*, 226 F.3d 996, 1001 (9th Cir. 2000) (holding that plaintiff's claim of negligent supervision and training "fall[s] squarely within the discretionary function exception"). The Ninth Circuit has held that "decisions relating to the hiring, training, and supervision of employees usually involve policy judgments of the type Congress intended the discretionary function exception to shield." *Vickers v. United States*, 228 F.3d 944, 950 (9th Cir. 2000);

1  *Bryan v. Las Vegas Metro. Police Dep't*, 349 F. App'x 132, 134 (9th Cir. 2009). The Nevada

2  Supreme Court affirmed this view in *Paulos v. FCH1*, 456 P.3d 589, 595–96 (Nev. 2020)

3  (citing *Vickers* and noting that NRS 41.032 bars a claim against LVMPD based on LVMPD's

4  negligent hiring, training, and supervision).

5     The Court finds that LVMPD's training and supervision decisions are covered by

6  discretionary immunity. In *Paulos*, the Nevada Supreme Court held that LVMPD's decision to

7  hire and train an officer involved a sufficient element of choice, and their training process

8  decisions were reasonably subject to a policy analysis. *Paulos*, 456 P.3d at 596. The Court

9  applies that reasoning here. As to the first prong of the test, whether the questioned decision

10  involved personal judgment, choice, or deliberation, it has already been established that

11  LVMPD's decision to adopt particular policies and train officers to follow that policy, involves

12  an element of choice. *See Neal-Lomax v. Las Vegas Metro. Police Dep't*, 574 F. Supp. 2d 1170,

13  1192 (D. Nev. 2008), aff'd, 371 F. App'x 752 (9th Cir. 2010) (finding acts relating to hiring

14  and training of employees involve elements of judgment and choice).

15     Turning to the second prong of the test, whether the decision was based on

16  considerations of social, economic, or political policy, the Court finds that LVMPD's

17  supervision and training involves "the exercise of political, social, or economic judgment,

18  involving 'consideration of fiscal constraints, public safety, the complexity of the task involved,

19  the degree of harm a wayward employee might cause, and the extent to which employees have

20  deviated from accepted norms in the past.'" *Futi v. United States*, No. 08-00403JMS/LEK,

21  2010 WL 2900328, at *16 (D. Haw. July 22, 2010) (citing *Burkhart v. Wash. Metro. Area*

22  *Transit Auth.*, 112 F.3d 1207, 1217 (D.C. Cir. 1997)). Plaintiff did not respond to Defendants'

23  argument, nor assert that either exception to discretionary immunity applies in this case. The

24  Court therefore GRANTS Defendants' Motion for Summary Judgment as to this claim.

25

**IV.**  **CONCLUSION**

In conclusion, the Court first grants summary judgment for Defendants on all claims brought against Sheriff Lombardo. Second, the Court finds a genuine dispute of material fact as to whether the Defendant Officers used excessive force, but grants summary judgment on Plaintiff's § 1983 excessive force claim due to their qualified immunity defense. Third, the Court grants summary judgment for Defendants on Plaintiff's § 1983 familial relationship claim based on qualified immunity. Fourth, the Court grants summary judgment for Defendants on Plaintiff's *Monell* claims. As for Plaintiff's state law claims, the Court denies summary judgment on Plaintiff's claims for negligence as against the Defendant Officers, negligent or intentional infliction of emotional distress, wrongful death, battery, and violation of the Nevada Constitution.[3] But the Court grants summary judgment to LVMPD on Plaintiff's negligent supervision and training claim.

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment, (ECF No. 32), is **GRANTED, in part, and DENIED, in part. All counts against Defendant Lombardo are dismissed, and causes of action 1-5 and 9 are dismissed.** Proceeding to trial will be Plaintiff's claim for negligence, (sixth cause of action), but only against the Defendant Officers. Additionally, proceeding to trial against LVMPD and Defendant Officers will be Plaintiff's claims for negligent or intentional infliction of emotional distress (seventh cause of action), wrongful death (eighth cause of action), battery (tenth cause of action), and violation of the Nevada Constitution (eleventh cause of action).

---

[3] Claims 7, 9, 10, and 11 will proceed to trial against the Defendant Officers as well as against LVMPD. Plaintiff asserted these claims against all Defendants, and the Defendants' Motion for Summary Judgment did not address whether the claims were properly brought against LVMPD or should be dismissed. Additionally, slthough there are only state law claims remaining for trial and this Court has the discretion to remand to state court, the parties did not address remand in their briefing. Further, because the events underlying these claims occurred in 2021, remand could lead to statute of limitation issues.

**IT IS FURTHER ORDERED** that the parties will have thirty days from the date of this Order to file a jointly proposed pretrial order pursuant to LR 16-3(b) using the form provided in LR 16-4.

**DATED** this __22__ day of April, 2025.

_____
Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT